IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BLACK & VEATCH CORPORATION, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 12-cv-2350 SAC/KGS ) |
| ASPEN INSURANCE (UK) LTD., CATLIN LLOYD'S SYNDICATE 2003, and LIBERTY MUTUAL INSURANCE EUROPE (UK) LTD, | ) JURY TRIAL DEMANDED ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

Plaintiff, Black & Veatch Corporation ("Black & Veatch"), by its undersigned counsel, hereby complains against Defendants Aspen Insurance (UK) Ltd. ("Aspen"), Catlin Lloyd's Syndicate 2003 ("Catlin"), and Liberty Mutual Insurance Europe (UK) Ltd. ("Liberty Mutual") as follows:

### PARTIES AND JURISDICTION

1.  This is an action for declaratory judgment and breach of contract, seeking an adjudication of the rights, duties and obligations of Plaintiff Black & Veatch and Defendants Aspen and Catlin (collectively, "Aspen/Catlin"), under an umbrella liability insurance policy, Policy No. LB0710352, issued by Aspen/Catlin in equal shares, under which Black & Veatch is the named insured (the "Aspen/Catlin Policy"). The Aspen/Catlin Policy is attached as **Exhibit 1**.

2.  Plaintiff Black & Veatch also seeks declaratory relief concerning its rights, duties and obligations under an excess umbrella liability policy, Policy No. LB0710335, issued by

3128955.1

Liberty Mutual, under which Black & Veatch is the named insured (the "Liberty Mutual Policy"). The Liberty Mutual Slip Policy is attached as **Exhibit 2**.

3. The amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of all attorneys' fees, interest and costs.

4. Plaintiff Black & Veatch is incorporated pursuant to the laws of Delaware and its principal place of business is now in Overland Park, Kansas.

5. Upon information and belief, Defendant Aspen is incorporated pursuant to the laws of the United Kingdom, with its principal place of business in London, England.

6. Upon information and belief, Defendant Catlin is incorporated pursuant to the laws of the United Kingdom, with its principal place of business in London, England.

7. Upon information and belief, Defendant Liberty Mutual is incorporated pursuant to the laws of the United Kingdom, with its principal place of business in London, England.

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 2201 and 1332.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), (c) and (d), and under the insurance policies at issue.

**BACKGROUND**

10. Black & Veatch entered into a series of agreements with American Electric Power Service Corporation ("AEP"), in its own capacity and/or as agent for other power companies (collectively, the "Owners"), to engineer, procure and construct wet flue gas desulfurization systems (aka, jet bubbling reactors ("JBRs")) for various power plants.

11. For eight of those JBRs, Black & Veatch subcontracted the engineering, procurement and construction of the internal components to Midwest Towers, Inc. ("MTI"). MTI in turn subcontracted much of the work, including the fabrication and erection of individual

components of the JBR, to lower-tier subcontractors. Damages arising in connection with seven of those JBRs, located at four different power plants in the States of Ohio and Indiana, are the subject of this coverage dispute.

12.     The seven JBRs at issue are:

| Plant Name | Plant Location | Owners | JBR No. | JBR Cap. (MW) | JBR Diameter/ Height |
|---|---|---|---|---|---|
| Cardinal | Brilliant, OH | AEP & Cardinal Operating Co. | 1 | 620 | 89.0 ft x 76.0 ft |
| Cardinal | Brilliant, OH | AEP & Cardinal Operating Co. | 2 | 620 | 89.0 ft x 76.0 ft |
| Cardinal | Brilliant, OH | AEP & Cardinal Operating Co. | 3 | 650 | 95.5 ft x 76.5 ft |
| Conesville | Conesville, OH | AEP & Columbus Southern Power Co. | 4 | 850 | 101.0 ft x 73.5 ft |
| Kyger Creek | Cheshire, OH | AEP & Ohio Valley Elec. Corp. | 12 | 450 | 77.0 ft x 68.5 ft |
| Kyger Creek | Cheshire, OH | AEP & Ohio Valley Elec. Corp. | 35 | 675 | 92.5 ft x 77.0 ft |
| Clifty Creek | Madison, IN | AEP & Indiana-Kentucky Elec. Corp. | 13 | 675 | 95.5 ft x 69.5 ft |

13.     Although the design and construction of each JBR varies, they share common characteristics. In general terms, a JBR is a large steel tank structure (approximately ten stories tall) with three principal internal spaces (plenums) created by two horizontal decks. Renderings of the internal components of the JBRs are attached as **Exhibit 3 and Exhibit 4**.

14.     As indicated on Exhibit 3, the bottom level of an operating JBR contains limestone slurry. Exhaust gas from the coal-fired power plant enters the JBR and proceeds to the JBR's inlet plenum, where it is cooled and moisturized in the process, beginning the removal of sulfur and other contaminants. The gas then moves from the inlet plenum to the middle section between the upper and lower decks.

3128955.1

15. From the middle section, the exhaust gas is forced down through PVC pipes known as sparger tubes (colored red on Exhibit 3) and into the limestone slurry in the lower section of the JBR. There, a chemical reaction occurs between the exhaust gas and the slurry that removes sulfur dioxide and other constituents from the exhaust gas.

16. The cleaned gas that bubbles up out of the slurry is forced upward through fiberglass reinforced plastic ("FRP") tubes (known as gas risers, colored yellow on Exhibit 3) into the exhaust plenum (the upper level) of the JBR, from which it is forced out of the JBR through the plant exhaust stacks and released into the atmosphere.

## INSURANCE COVERAGE FOR THE JBRs

17. Black & Veatch procured commercial general liability insurance covering construction of the seven JBRs at the four plants.

18. Zurich provided the primary layer of general liability coverage underlying the Aspen/Catlin Policy, with per occurrence limits of $2,000,000, general aggregate limits of $4,000,000, and products-completed operations aggregate limits of $4,000,000, all subject to a $250,000 per occurrence deductible.

19. Defendants Aspen/Catlin provided first layer excess/umbrella liability coverage, with per occurrence limits of $25,000,000, general aggregate limits of $25,000,000, and products-completed operations aggregate limits of $25,000,000.

20. Coverage under the Aspen/Catlin Policy for thirteen projects defined as "Large Works" was written on a project specific basis. In particular, pursuant to Endorsement No. 36 to the Aspen/Catlin Policy, there are separate and distinct per occurrence, General Aggregate and Products/Completed Operations Aggregate limits of $25,000,000 for each "Large Works" project. Pursuant to Endorsement No. 36, the coverage runs for the duration of each Large Works project, plus an additional five years after project completion. This per-project coverage applies

to Kyger Creek, Clifty Creek and Conesville, three of the four projects at issue. *See* Aspen/Catlin Policy, Endorsement No. 35.

21. Coverage for Cardinal under the Aspen/Catlin Policy is included in the global program, with limits shared among other projects. To Black & Veatch's knowledge, no portion of the shared aggregate limit has been impaired.

22. Coverage under the Aspen/Catlin Policy is triggered when Black & Veatch faces legal liability in excess of that covered by underlying insurance. *See* Aspen/Catlin Policy, Insuring Agreements, Section I. Coverage, Section IV.L and Conditions, Section G.

23. The Aspen/Catlin Policy provides coverage for, among other things, physical injury to, or loss of use of, tangible property of a third party caused by an "occurrence," which is defined to include "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," including "any continuation, change or resumption of that . . . 'Property Damage' . . . after the end of the Policy Period." *See* Aspen/Catlin Policy, Section I, Section IV and Endorsement No. 2. Coverage exists for "liability imposed by law, or assumed by [Black & Veatch] under contract prior to the 'Occurrence.'" Aspen/Catlin Policy, Insuring Agreement, Section I.

24. The coverage provided includes, but is not limited to, property damage to Black & Veatch's completed work, where "the damaged work or the work out of which the damage arises was performed on [its] behalf by a subcontractor." Aspen/Catlin Policy, Exclusion F. For ongoing operations, coverage is provided for damage to property other than "that particular part" of the work out of which the damages arises. Aspen/Catlin Policy, Endorsement No. 4.

25. In addition, under Endorsement No. 27, the Aspen/Catlin Policy, provides $8,000,000 of coverage for property damage that results directly from "any act, negligence,

error or omission, malpractice or mistake arising, out of 'Professional Services,' committed or alleged to have been committed by or on [Black & Veatch's] behalf…." Under Endorsement Nos. 35 and 36, this coverage for property damage caused by design errors or other "Professional Services" is provided for each of the four plants described above. To the extent that professional errors contributed to the property damages at issue, then the additional coverage provided by Endorsement No. 27 is implicated.

26. Aspen/Catlin knew that Black & Veatch commonly acts as what is known as an "EPC Contractor" (Engineer, Procure and Construct), and the Aspen/Catlin Policy was issued with Black & Veatch's frequent role as an EPC Contractor in mind, among others. The intent of the Aspen/Catlin Policy was to cover, among other things, property damage arising from Black & Veatch's activities as an EPC Contractor, including damage to Black & Veatch's "Work" in various circumstances.

27. Defendant Liberty Mutual provided second layer excess liability coverage, with per occurrence limits of $50,000,000, general aggregate limits of $50,000,000, and products-completed operations aggregate limits of $50,000,000.

28. The Liberty Mutual Policy follows form to the Aspen/Catlin Policy except as otherwise noted therein. There are no relevant exclusions or limitations in the Liberty Mutual Policy which are not in the Aspen/Catlin Policy. To the extent Black & Veatch's damages exceed the limits of liability provided under the Aspen/Catlin Policy, coverage is provided under the Liberty Mutual Policy.

**PROPERTY DAMAGE INCURRED AT THE JBRs**

29. After completion of some of the JBRs, and during construction of others, significant deficiencies were discovered in the internal components installed by MTI and its subcontractors at each of the JBRs, including deficiencies in the procurement, fabrication and

6

erection of the components installed. Although the deficiencies vary in nature and magnitude from one JBR to another, in every instance they have resulted in significant damage, including physical damage to otherwise non-defective property.

30. The Cardinal 2 JBR began operating during December 2007. The Cardinal 1 JBR began operating during March 2008. Shortly after operations began at Cardinal 1 and 2, latent deficiencies in the components procured by MTI and erected by MTI's subcontractors contributed to, among other things, excessive mineral deposits accumulating on the decks and other internal components of the JBRs, the weight of which in turn contributed to those components deforming, cracking and in some cases collapsing entirely.

31. The Owners alleged that a variety of errors by MTI's subcontractors contributed to the build-up of excessive deposits and other problems damaging the internal components at Cardinal 1 and 2. The damages grew progressively worse over time, as the components faced repeated exposure to substantially the same general harmful conditions.

32. From November 2008 through September 2009, Cardinal 1 experienced four outages, two of which were unscheduled, to repair physical damages resulting from deficiencies by MTI and its subcontractors in the procurement and erection of the JBR's internal components. The cost of repairs undertaken by the Owners during these outages totaled $4,482,050, of which more than $2 million was incurred to repair resulting damage to otherwise non-defective property.

33. Cardinal 2 experienced six outages between December 2008 and August 2009, four of which were unscheduled, to repair physical damages resulting from deficiencies by MTI and its subcontractors in the procurement and erection of the JBR's internal components. The cost of repairs undertaken by the Owners during these six outages totaled $8,162,007, of which

7

more than $5 million was incurred to repair resulting damage to otherwise non-defective property.

34. Notwithstanding numerous shut downs and extensive repair efforts at Cardinal 1 and 2, by the Summer of 2009, the internal components of the Cardinal 1 and 2 JBRs were deteriorating and so badly damaged that the Owners demanded their complete replacement.

35. With respect to the other five JBRs (Conesville, Kyger Creek 12, Kyger Creek 35, Clifty Creek 13 and Cardinal 3), the incorporation of defective internal components, including gas risers, among others, resulted in widespread property damage to otherwise non-defective property.

36. Among other things, MTI procured Composolite® from Strongwell Corporation, and gas risers from Beetle Plastics that were defective. A detailed survey of the gas risers provided by Beetle Plastics revealed that they were too thin.

37. In the fall of 2009, it was discovered that some of the installed gas risers at Conesville, which was completed and put into operation in June 2009, were beginning to oval in the center (they should be cylindrical from top to bottom). Representatives of the Owners and B&V examined the risers and shared information to determine the cause. This information was also shared with the Defendant Insurers. Ultimately, there could be little disagreement that the wall thickness of the risers was significantly less than specified, or that the problem derived from errors by Beetle Plastics in manufacturing gas risers for these JBRs. Eventually, given the pervasiveness and seriousness of the problem, the Owners demanded that all installed gas risers in each of the JBRs be removed and replaced.

38. The gas risers are FRP tubes that extend between the upper and lower decks of the JBRs. The process function of the gas risers is to provide an outlet for the cleaned exhaust gas

that bubbles up out of the limestone slurry in the lower plenum to escape to the upper plenum and ultimately into the atmosphere.

39.     The gas risers are also critical to the structural integrity of the JBRs. As originally constructed, the lower deck, and thus the sparger tubes, are held in place structurally by the gas risers (as opposed to being bottom or side supported).

40.     Given this structure, and the overall configuration of the JBRs, removal of the risers requires them to be lowered to the floor of the vessel, and taken out through a hole cut in the steel tank. As part of that process, many non-defective components must be removed and are unavoidably damaged.

## BLACK & VEATCH'S LIABILITY

41.     By the summer of 2009, the Owners of the Cardinal plant were demanding the complete replacement of the Cardinal 1 and 2 JBR internal components, by reason of physical damage to the internal components, among other problems. By late 2009, Owners of the other plants and JBRs (Conseville, Kyger Creek, Clifty Creek and Cardinal 3), were making similar demands, by reason of deficiencies in certain of the internal components, which had been incorporated into the JBRs, and could not be removed without causing damage to other components.

42.     The potential liabilities faced by Black & Veatch from the claims brought by the Owners were enormous, and far exceeded the amounts of the settlements ultimately negotiated by Black & Veatch with the owners of the JBRs.

43.     Black & Veatch provided timely notice to its insurers, including Defendants Aspen/Catlin and Liberty Mutual, of the claims being made by the Owners.

9

44. Black & Veatch retained attorneys and experts to respond to the Owners' claims. There were in-depth investigations of existing conditions at each individual location and of the underlying engineering, as well as considerations of different possible fixes. Negotiations with the Owners lasted over many months. Black & Veatch incurred millions of dollars in legal and expert fees defending and responding to the Owners' claims.

45. To avoid litigation with the Owners, Black & Veatch obtained permission from its insurers, including Defendant Aspen/Catlin, to settle the Owners' claims without prejudicing any of its rights to coverage. In consenting to Black & Veatch settling with the Owners, the insurers reserved all rights to assert coverage defenses, and to deny coverage altogether, except for any defense based upon violation of consent to settle provisions.

46. During the summer of 2010, Black & Veatch and the Owners of each of the four projects referenced above, entered into settlement agreements resolving their disputes over the damages incurred to the seven JBRs at issue. These settlements were the culmination of extensive negotiations.

47. As part of the settlement with the Owners of the Cardinal plant, Black & Veatch agreed to pay $10.03 million for repairs conducted at Cardinal 1 and Cardinal 2 during 2008 through 2009. In addition, Black & Veatch agreed to replace most internal components of the Cardinal JBRs.

48. Similarly, as part of the settlements with the Owners of the Kyger Creek, Clifty Creek and Conesville plants, Black & Veatch agreed to replace most internal components of the JBRs at the various plants.

49. Replacement work began immediately thereafter and is scheduled to continue through the summer of 2013, when the replacement work at the last of the plants is scheduled to be completed.

50. Specifically, replacement work at the Cardinal Plant and at the Kyger Creek Plant has been completed. The repair process at Clifty Creek is ongoing, with an anticipated completion date of August 2012. The repair process at Conesville is scheduled to commence during the fall of 2012, with an anticipated completion date of July 2013.

51. Black & Veatch's liability arose from the negligence of MTI and its subcontractors in the procurement, fabrication and erection of the JBRs' internal components that resulted in physical injury to tangible property, causing unexpected shut downs to repair and replace otherwise non-defective property, among other things.

52. Black & Veatch's covered damages are in excess of the limits of the Aspen/Catlin Policy, and trigger the coverage of the Liberty Mutual Policy.

53. Zurich, Black & Veatch's primary general liability carrier, has issued payment to Black & Veatch in the amount of $4 million for the damages incurred at the JBRs, thereby exhausting a full products-completed operations aggregate under the Zurich Policy.

54. The liability for damages incurred by Black & Veatch by reason of, among other things, physical injury to otherwise non-defective property of the Owners, arising from the negligent work of MTI and its subcontractors, includes, but is not limited to:

    A. Amounts paid to reimburse the Owners of the Cardinal plant for the cost of repairing physical damage to internal components of Cardinal 1 and 2 after those JBRs began operations;

B.    Liability for physical damage to non-defective property of the Owners of the Cardinal Plant, which required the near complete replacement of the internal components of the Cardinal JBRs;

C.    Liability for damage to or destruction of non-defective property of the Owners of the other plants (Kyger Creek, Clifty Creek and Conesville), which must be removed to access and replace defective components supplied by lower-tier subcontractors of MTI; and

D.    Costs and expenses incurred to pursue this action, including award of fees under KAN. STAT. ANN. § 40-256.

### DEFENDANTS HAVE FAILED TO PROVIDE COVERAGE

55.    On or about July 9, 2009, after receiving a letter from AEP alleging that defective work in the construction of Cardinal 1 and 2 was causing widespread physical damage to the internal components of those units, Black & Veatch informed its general liability carriers, including Defendants Aspen/Catlin and Liberty Mutual, of the Owners' claim and sought coverage.

56.    The Defendants were further informed by Black & Veatch of the Owners' claims regarding damages at the other three plants.

57.    Defendant Aspen/Catlin responded to Black & Veatch's request for coverage by reserving rights under the Aspen/Catlin Policy and requesting additional information.

58.    Black & Veatch provided Aspen/Catlin with extensive documentation and information regarding the nature of the damages at each of the seven JBRs and Black & Veatch's potential liability. Black & Veatch also provided Aspen/Catlin with detailed costs analyses regarding the damages at issue, as well as access to the project sites themselves. The same information has been available to Defendant Liberty Mutual. The insurers were also offered the

12

opportunity to participate in negotiations with the Claimant/Owners.  Black & Veatch has continued to make information available to the insurers subsequent to its settlements with the four ownership groups.

59. Black & Veatch has made repeated demands for indemnification from Aspen/Catlin for covered damages incurred at all seven JBRs located at the four plants.  Aspen/Catlin has refused to provide any indemnification.

60. Liberty Mutual provides second layer umbrella coverage above the Aspen/Catlin Policy.  To the extent that Black & Veatch's covered losses exceed Aspen/Catlin's limits of liability, Liberty Mutual's coverage is triggered.

61. Black & Veatch has paid all premiums due on the Aspen/Catlin Policy and the Liberty Mutual Policy.

62. Black & Veatch has complied with all applicable conditions of the Aspen/Catlin Policy and the Liberty Mutual Policy, or they have been waived, released or are the subject of an estoppel.

63. Black & Veatch has satisfied all underlying payment obligations at the individual plants under the Aspen/Catlin Policy and the Liberty Mutual Policy.

## COUNT I
## DECLARATORY JUDGMENT
## (ASPEN/CATLIN)

64. Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

65. Upon information and belief, Defendants Aspen/Catlin dispute one or more of the allegations herein, including, without limitation, the assertion of Black & Veatch that the Aspen/Catlin Policy covers the damages outlined above.

66. By reason of the foregoing, an actual and justiciable controversy exists between Black & Veatch and Aspen/Catlin regarding their respective rights and obligations under the Aspen/Catlin Policy, including, but not limited to Aspen/Catlin's obligation to indemnify Black & Veatch in connection with its liability for property damage incurred at the seven JBRs.

67. An Order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

68. Black & Veatch is entitled to a declaratory judgment, <u>inter</u> <u>alia</u>, that:

(i) Aspen/Catlin are obligated to indemnify Black & Veatch for its liability to the Owners for property damage arising out of the negligence of MTI and its subcontractors at the Cardinal 1, Cardinal 2, Cardinal 3, Conesville, Kyger Creek 12, Kyger Creek 35 and Clifty Creek 13 JBRs;

(ii) The exclusions cited by Aspen/Catlin do not bar the recovery of the liability for property damages incurred by Black & Veatch;

(iii) Black & Veatch is entitled to recover from Aspen/Catlin all fees and costs incurred in pursuing this action. *See* KAN. STAT. ANN. § 40-256.

## COUNT II
## **BREACH OF CONTRACT**
## (ASPEN/CATLIN)

69. Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

70. The Owners made claims against Black & Veatch for property damage, including physical injury to tangible property of the Owners due to defects in the procurement, manufacturing and erection of internal components at the above referenced JBRs by subcontractors.

71. Black & Veatch incurred liability for, among other things, the costs of repairing damage to otherwise non-defective property of the Owners.

72. The Aspen/Catlin Policy is a valid and binding agreement.  Pursuant to the terms of the Aspen/Catlin Policy, Aspen/Catlin have an obligation to indemnify Black & Veatch against its liability for, among other things, accidental physical damage to property of the Owners, including all damage to otherwise non-defective components of the JBRs.

73. Black & Veatch has incurred liability by reason of claims for damages because of "property damage," including claims for damages for the repair and replacement of internal JBR components damaged by the negligence of MTI and its subcontractors.

74. Aspen/Catlin are obligated to indemnify Black & Veatch, but have breached that obligation.

75. Black & Veatch has satisfied all of its obligations under the Aspen/Catlin Policy, including the payment of premiums and provision of timely notice of claims.

76. Aspen/Catlin have refused to honor their coverage obligations.

77. As a direct, proximate and foreseeable result of Aspen/Catlin's refusal to fulfill their coverage obligations to Black & Veatch, and other breaches, Black & Veatch has incurred, and will continue to incur substantial costs, expenses and other damages, as more fully set forth above.

78. As a result of the aforementioned breaches, Aspen/Catlin are liable to Black & Veatch for money damages under the Aspen/Catlin Policy, including attorneys' fees, costs and interest.

3128955.1

## COUNT III
## DECLARATORY JUDGMENT
## (LIBERTY MUTUAL)

79. Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

80. Upon information and belief, Defendant Liberty Mutual disputes one or more of the allegations herein, including, without limitation, the assertion of Black & Veatch that the Liberty Mutual Policy covers the property damages outlined above in excess of underlying limits.

81. By reason of the foregoing, an actual and justiciable controversy exists between Black & Veatch and Liberty Mutual regarding their respective rights and obligations under the Liberty Mutual Policy, including, but not limited to, Liberty Mutual's obligation to indemnify Black & Veatch for damages incurred at the seven JBRs.

82. An Order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

83. Black & Veatch is entitled to a declaratory judgment, inter alia, that:

(i) Liberty Mutual is obligated to indemnify Black & Veatch for property damages in excess of the Aspen/Catlin Policy limits of liability in connection with the JBRs described above; and

(ii) The exclusions contained in the Liberty Mutual Policy do not bar the recovery of damages incurred by Black & Veatch.

**WHEREFORE,** Black & Veatch demands judgment against Aspen/Catlin and Liberty Mutual as follows:

(a) Entering declaratory relief, in accordance with paragraphs 68 and 83 above, and as otherwise appropriate based upon the claims and defenses of the parties;

(b) Awarding money damages, in an amount to be proven at trial;

(c) For attorneys' fees and costs incurred pursuing this action;

(d) For pre-judgment and post-judgment interest; and

(e) For such other and further relief that this Court deems just and equitable.

## JURY DEMAND

Black & Veatch demands a trial by jury on all issues so triable.

Respectfully submitted,

POLSINELLI SHUGHART PC

By: */s/ Christopher P. Sobba*
Roy Bash (MO 25769)
rbash@polsinelli.com
Christopher P. Sobba (KS 20708)
csobba@polsinelli.com
Twelve Wyandotte Plaza
120 W. 12th Street, Suite 1600
Kansas City, MO 64105
(816) 421-3355
Fax No.: (816) 374-0509

OF COUNSEL:

David T. Dekker
David L. Beck
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N. Street, N.W.
Washington, DC 20037-1122
Phone (202) 663-8000
Fax: (202) 663-8007
david.dekker@pillsburylaw.com
david.beck@pillsburylaw.com

17