## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BLACK & VEATCH CORPORATION,

        Plaintiff,

  v.                                    Case No.: 12-CV-2350 SAC/KGS

ASPEN INSURANCE (UK) LTD.,               JURY TRIAL DEMANDED
CATLIN LLOYD'S SYNDICATE 2003,
LIBERTY MUTUAL INSURANCE EUROPE
(UK) LTD., FACTORY MUTUAL INSURANCE CO.,
ASSOCIATED ELECTRIC & GAS INSURANCE
SERVICES LTD., and ENERGY INSURANCE
SERVICES, INC.

        Defendants.

### FIRST AMENDED COMPLAINT

      Plaintiff, Black & Veatch Corporation ("Black & Veatch"), by its undersigned counsel, hereby complains against Defendants Aspen Insurance (UK) Ltd. ("Aspen"), Catlin Lloyd's Syndicate 2003 ("Catlin"), Liberty Mutual Insurance Europe (UK) Ltd. ("Liberty Mutual"), Factory Mutual Insurance Co. ("FM Global"), Associated Electric & Gas Insurance Co. Services Ltd. ("AEGIS"), and Energy Insurance Services, Inc. ("EIS"), as follows:

### PARTIES AND JURISDICTION

      1.     This is an action for breach of contract and declaratory judgment, seeking damages and an adjudication of the rights, duties and obligations of Plaintiff Black & Veatch and Defendants Aspen, Catlin and Liberty Mutual under certain general liability policies, including an umbrella liability policy, Policy No. LB0710352, issued by Defendants Aspen and Catlin (collectively, "Aspen/Catlin") in equal shares, under which Black & Veatch is the named insured (the "Aspen/Catlin Policy") (attached as Exhibit 1), and an excess umbrella policy, Policy No.

LB0710335, issued by Defendant Liberty Mutual, under which Black & Veatch is the named insured (the "Liberty Mutual Policy") (attached as Exhibit 2).

2.      Plaintiff Black & Veatch also seeks breach of contract damages and declaratory relief concerning its rights, duties and obligations under property policies issued by Defendants FM Global, AEGIS and EIS, under which Black & Veatch is an additional insured or has the right to pursue coverage.  The property policies issued by Defendants are in their possession and are hereby incorporated by reference.

3.      The amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of all attorneys' fees, interest and costs.

4.      Plaintiff Black & Veatch is incorporated pursuant to the laws of Delaware and its principal place of business is now in Overland Park, Kansas.

5.      Upon information and belief, Defendant Aspen is incorporated pursuant to the laws of the United Kingdom, with its principal place of business in London, England.

6.      Upon information and belief, Defendant Catlin is incorporated pursuant to the laws of the United Kingdom, with its principal place of business in London, England.

7.      Upon information and belief, Defendant Liberty Mutual is incorporated pursuant to the laws of the United Kingdom, with its principal place of business in London, England.

8.      Upon information and belief, Defendant FM Global is incorporated pursuant to the laws of Rhode Island, with its principal place of business in Johnston, Rhode Island.

9.      Upon information and belief, Defendant AEGIS is incorporated pursuant to the laws of Bermuda, with its principal place of business in Hamilton, Bermuda.

10.     Upon information and belief, Defendant EIS is incorporated pursuant to the laws of South Carolina, with its principal place of business in Greenville, South Carolina.

403455426

11.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 2201 and 1332.

12.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), (c) and (d).

## BACKGROUND

13.   Black & Veatch entered into a series of agreements with American Electric Power Service Corporation ("AEP"), in its own capacity and/or as agent for other power companies (collectively, the "Owners"), to engineer, procure and construct wet flue gas desulfurization systems (aka, jet bubbling reactors ("JBRs")) for various power plants.

14.   For at least seven of those JBRs, Black & Veatch subcontracted the engineering, procurement and construction of the internal components to Midwest Towers, Inc. ("MTI"). MTI in turn subcontracted much of the work, including the fabrication and erection of individual components of the JBR, to lower-tier subcontractors.  Damages arising in connection with these seven JBRs, located at four different power plants in the States of Ohio and Indiana, are the subject of this coverage dispute.

15.   The seven JBRs at issue are:

| Plant Name | Plant Location | Owners | JBR No. | JBR Cap. (MW) | JBR Diameter/ Height |
|---|---|---|---|---|---|
| Cardinal | Brilliant, OH | AEP & Cardinal Operating Co. | 1 | 620 | 89.0 ft x 76.0 ft |
| Cardinal | Brilliant, OH | AEP & Cardinal Operating Co. | 2 | 620 | 89.0 ft x 76.0 ft |
| Cardinal | Brilliant, OH | AEP & Cardinal Operatign Co. | 3 | 650 | 95.5 ft x 76.5 ft |
| Conesville | Conesville, OH | AEP & Columbus Southern Power Co. | 4 | 850 | 101.0 ft x 73.5 ft |
| Kyger Creek | Cheshire, OH | AEP & Ohio Valley Elec. Corp. | 12 | 450 | 77.0 ft x 68.5 ft |
| Kyger Creek | Cheshire, OH | AEP & Ohio Valley Elec. Corp. | 35 | 675 | 92.5 ft x 77.0 ft |
| Clifty Creek | Madison, IN | AEP & Indiana- Kentucky Elec. Corp. | 13 | 675 | 95.5 ft x 69.5 ft |

403455426

16.     Although the design and construction of each JBR varies, they share common characteristics.  In general terms, a JBR is a large steel tank structure (approximately ten stories tall) with three principal internal spaces (plenums) created by two horizontal decks. Renderings of the internal components of the JBRs are attached as Exhibit 3 and Exhibit 4.

17.     As indicated on Exhibit 3, the bottom level of an operating JBR contains limestone slurry.  Exhaust gas from the coal-fired power plant enters the JBR and proceeds to the JBR's inlet plenum, where it is cooled and moisturized in the process, beginning the removal of sulfur and other contaminants.  The gas then moves from the inlet plenum to the middle section between the upper and lower decks.

18.     From the middle section, the exhaust gas is forced down through PVC pipes known as sparger tubes (colored red on Exhibit 3) and into the limestone slurry in the lower section of the JBR. There, a chemical reaction occurs between the exhaust gas and the slurry that removes sulfur dioxide and other constituents from the exhaust gas.

19.     The cleaned gas that bubbles up out of the slurry is forced upward through fiberglass reinforced plastic ("FRP") tubes (known as gas risers, colored yellow on Exhibit 3) into the exhaust plenum (the upper level) of the JBR, from which it is forced out of the JBR through the plant exhaust stacks and released into the atmosphere.

**GENERAL LIABILITY**
**INSURANCE COVERAGE FOR THE JBRs**

20.     Black & Veatch procured commercial general liability insurance covering construction of the seven JBRs at the four plants.

21.     Zurich provided the primary layer of general liability coverage underlying the Aspen/Catlin Policy, with per occurrence limits of $2,000,000, general aggregate limits of

$4,000,000, and products-completed operations aggregate limits of $4,000,000, all subject to a $250,000 per occurrence deductible.

22.     Defendants Aspen/Catlin provided first layer excess/umbrella liability coverage, with per occurrence limits of $25,000,000, general aggregate limits of $25,000,000, and products-completed operations aggregate limits of $25,000,000.

23.     Coverage under the Aspen/Catlin Policy for thirteen projects defined as "Large Works" was written on a project specific basis.  In particular, pursuant to Endorsement No. 36 to the Aspen/Catlin Policy, there are separate and distinct per occurrence, General Aggregate and Products/Completed Operations Aggregate limits of $25,000,000 for each "Large Works" project. Pursuant to Endorsement No. 36, the coverage runs for the duration of each Large Works project, plus an additional five years after project completion.  This per-project coverage applies to Kyger Creek, Clifty Creek and Conesville, three of the four projects at issue.  *See* Aspen/Catlin Policy, Endorsement No. 35.

24.     Coverage for Cardinal under the Aspen/Catlin Policy is included in the global program, with limits shared among other projects.  To Black & Veatch's knowledge, no portion of the shared aggregate limit has been impaired.

25.     Coverage under the Aspen/Catlin Policy is triggered when Black & Veatch faces legal liability in excess of that covered by underlying insurance.  *See* Aspen/Catlin Policy, Insuring Agreements, Section I. Coverage, Section IV.L and Conditions, Section G.

26.     The Aspen/Catlin Policy provides coverage for, among other things, physical injury to, or loss of use of, tangible property of a third party caused by an "occurrence," which is defined to include "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," including "any continuation, change or resumption of

that . . . 'Property Damage' . . . after the end of the Policy Period." *See* Aspen/Catlin Policy, Section I, Section IV and Endorsement No. 2. Coverage exists for "liability imposed by law, or assumed by [Black & Veatch] under contract prior to the 'Occurrence.'" Aspen/Catlin Policy, Insuring Agreement, Section I.

27. The coverage provided includes, but is not limited to, property damage to Black & Veatch's completed work, where "the damaged work or the work out of which the damage arises was performed on [its] behalf by a subcontractor." Aspen/Catlin Policy, Exclusion F. For ongoing operations, coverage is provided for damage to property other than "that particular part" of the work out of which the damages arises. Aspen/Catlin Policy, Endorsement No. 4.

28. In addition, under Endorsement No. 27, the Aspen/Catlin Policy, provides $8,000,000 of coverage for property damage that results directly from "any act, negligence, error or omission, malpractice or mistake arising, out of 'Professional Services,' committed or alleged to have been committed by or on [Black & Veatch's] behalf...." Under Endorsement Nos. 35 and 36, this coverage for property damage caused by design errors or other "Professional Services" is provided for each of the four plants described above. To the extent that professional errors contributed to the property damages at issue, then the additional coverage provided by Endorsement No. 27 is implicated.

29. Aspen/Catlin knew that Black & Veatch commonly acts as what is known as an "EPC Contractor" (Engineer, Procure and Construct), and the Aspen/Catlin Policy was issued with Black & Veatch's frequent role as an EPC Contractor in mind, among others. The intent of the Aspen/Catlin Policy was to cover, among other things, property damage arising from Black & Veatch's activities as an EPC Contractor, including damage to Black & Veatch's "Work" in various circumstances.

30.     Defendant Liberty Mutual provided second layer excess liability coverage, with per occurrence limits of $50,000,000, general aggregate limits of $50,000,000, and products-completed operations aggregate limits of $50,000,000.

31.     The Liberty Mutual Policy follows form to the Aspen/Catlin Policy except as otherwise noted therein.  There are no relevant exclusions or limitations in the Liberty Mutual Policy which are not in the Aspen/Catlin Policy.  To the extent Black & Veatch's damages exceed the limits of liability provided under the Aspen/Catlin Policy, coverage is provided under the Liberty Mutual Policy.

## PROPERTY INSURANCE COVERAGE FOR THE JBRs

32.     AEP and the various Owners of the Power Plants procured property insurance covering the seven JBRs at the four plants.

33.     Buckeye Power, Inc. ("Buckeye Power"), the principal owner of the Cardinal Power Plant, procured all-risk property insurance from Defendant FM Global for the Cardinal Power Plant (the "FM Global Policy").  The FM Global Policy provides coverage for Insured Property "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy."    Insured Property is defined as "Real Property, including new buildings and additions under construction at an Insured Location." The Insured Locations include the Cardinal 1, 2 and 3 JBRs.

34.     Black & Veatch is an additional insured under the FM Global Policy for ongoing operations and, pursuant to an agreement with the Owners, has the right to pursue coverage for completed operations.

35.     Ohio Valley Electric Corporation ("OVEC"), one of the owners of the Clifty Creek and Kyger Creek Power Plants, procured all-risk property insurance from Defendant

403455426

AEGIS for the Clifty Creek and Kyger Creek Power Plants (the "AEGIS-OVEC Policy").  The AEGIS Policy covering these plants provides coverage for all risks of physical loss or damage to Insured Property, unless expressly excluded.  Insured Property is defined to include "[r]eal property, including buildings, stock … signs and glass, and additions under construction, renovation, installation, erection or assembly, property at an Insured Location or away from an Insured Location where the Insured has a requirement to Insure, or in which the Insured has an insurable interest."   The Insured Locations include the Clifty Creek and Kyger Creek JBRs.

36.   Black & Veatch is an additional insured under the AEGIS-OVEC Policy for ongoing operations.

37.   AEP procured all-risk property insurance from Defendant EIS for the Conesville JBR at the Conesville Power Plant (the "EIS Policy").  The EIS Policy provides $5 million of primary property insurance for "Real and Personal property of every kind and description" against "all risks, unless otherwise excluded, of direct physical loss or damage to insured property." The Conesville JBR constitutes insured property.

38.   Black & Veatch is an additional insured under the EIS Policy for ongoing operations and, pursuant to an agreement with the Owners, has the right to pursue coverage for completed operations.

39.   AEP also procured all-risk property insurance coverage from AEGIS for the Conesville JBR (the "AEGIS-AEP Policy") to apply as excess coverage to the EIS Policy referenced above. The AEGIS-AEP Policy insuring Conesville similarly provides coverage for all risks of damage to insured property in excess of $5 million.  Insured Property is defined to include real and personal property of every kind and description, including but not limited to

property while in the course of construction, installation, erection or assembly.  Insured Property includes the Conesville JBR.

40.    Black & Veatch is an additional insured under the AEGIS-AEP Policy for ongoing operations and, pursuant to an agreement with the Owners, has the right to pursue coverage for completed operations.

## PROPERTY DAMAGE INCURRED AT THE JBRs

41.    After Black & Veatch completed construction of the Cardinal 1 and 2 JBRs, the Owners alleged significant deficiencies in the installation work performed by certain of Black & Veatch's subcontractors.  These alleged installation deficiencies at Cardinal 1 and 2 allegedly contributed to damage to otherwise non-defective property.

42.    The Cardinal 2 JBR began operating during December 2007.  The Cardinal 1 JBR began operating during March 2008.  Shortly after operations began at Cardinal 1 and 2, the Owners alleged latent deficiencies in the components procured by MTI and erected by MTI's subcontractors contributed to, among other things, excessive mineral deposits accumulating on the decks and other internal components of the JBRs, the weight of which in turn contributed to those components deforming, cracking and, in some cases, collapsing entirely.

43.    The Owners alleged that a variety of errors by MTI's subcontractors contributed to the build-up of excessive deposits and other problems damaging the internal components at Cardinal 1 and 2.  The damages grew progressively worse over time, as the components faced repeated exposure to substantially the same general harmful conditions.

44.    From November 2008 through September 2009, Cardinal 1 experienced four outages, two of which were unscheduled, to repair physical damages resulting from deficiencies by MTI and its subcontractors in the procurement and erection of the JBR's internal components.

The cost of repairs undertaken by the Owners during these outages totaled $4,482,050, of which more than $2 million was incurred to repair resulting damage to otherwise non-defective property.

45.    Cardinal 2 experienced six outages between December 2008 and August 2009, four of which were unscheduled, to repair physical damages resulting from deficiencies by MTI and its subcontractors in the procurement and erection of the JBR's internal components.  The cost of repairs undertaken by the Owners during these six outages totaled $8,162,007, of which more than $5 million was incurred to repair resulting damage to otherwise non-defective property.

46.    Notwithstanding numerous shut downs and extensive repair efforts  at Cardinal 1 and 2, by the summer of 2009, the internal components of the Cardinal 1 and 2 JBRs were so badly damaged that the Owners demanded their complete replacement.

47.    With respect to the other five JBRs (Conesville, Kyger Creek 12, Kyger Creek 35, Clifty Creek 13 and Cardinal 3), damages ensuing from the incorporation of defective internal components have resulted in widespread property damage to otherwise non-defective property.

48.    Among other things, MTI procured Composolite® from Strongwell Corporation, and gas risers from Beetle Plastics that were defective.   A detailed survey of the gas risers provided by Beetle Plastics revealed that they were too thin.

49.    In the fall of 2009, it was discovered that some of the installed gas risers at Conesville, which was completed and put into operation in June 2009, were beginning to oval in the center (they should be cylindrical from top to bottom).   Similar problems were also discovered at the other JBRs.  Representatives of the Owners and Black & Veatch examined the risers and shared information to determine the cause.  This information was also shared with the

Defendant Insurers.  Ultimately, there could be little disagreement that the wall thickness of the risers was significantly less than specified, or that the problem derived from errors by Beetle Plastics in manufacturing gas risers for these JBRs.  Eventually, given the pervasiveness and seriousness of the problem, the Owners demanded that all installed gas risers in each of the JBRs be removed and replaced.

50.     The gas risers are FRP tubes that extend between the upper and lower decks of the JBRs.  The process function of the gas risers is to provide an outlet for the cleaned exhaust gas that bubbles up out of the limestone slurry in the lower plenum to escape to the upper plenum and ultimately into the atmosphere.

51.     The gas risers are also critical to the structural integrity of the JBRs.  As originally constructed, the lower deck, and thus the sparger tubes, are held in place structurally by the gas risers (as opposed to being bottom or side supported).

52.     Given this structure, and the overall configuration of the JBRs, removal of the risers requires them to be lowered to the floor of the vessel, and taken out through a hole cut in the steel tank.  As part of that process, many non-defective components must be removed and are unavoidably damaged.

## BLACK & VEATCH'S LIABILITY

53.     By the summer of 2009, the Owners of the Cardinal plant were demanding the complete replacement of the Cardinal 1 and 2 JBR internal components, by reason of physical damage to the internal components, among other problems.  By late 2009, Owners of the other plants and JBRs (Conseville, Kyger Creek, Clifty Creek and Cardinal 3), were making similar demands, by reason of deficiencies in certain of the internal components, which had been

403455426

incorporated into the JBRs, and could not be removed without causing damage to other components.

54.     The potential liabilities faced by Black & Veatch from the claims brought by the Owners were enormous, and far exceeded the amounts of the settlements ultimately negotiated by Black & Veatch with the owners of the JBRs.

55.     Timely notice was provided to the insurers, including Defendants Aspen/Catlin, Liberty Mutual, FM Global, AEGIS and EIS, of the claims being made by the Owners and the damages incurred.

56.     Black & Veatch retained attorneys and experts to respond to the Owners' claims. There were in-depth investigations of existing conditions at each individual location and of the underlying engineering, as well as considerations of different possible fixes.   Negotiations with the Owners lasted over many months.   Black & Veatch incurred millions of dollars in legal and expert fees defending and responding to the Owners' claims.

57.     To avoid litigation with the Owners, Black & Veatch obtained permission from its general liability insurers, including Defendant Aspen/Catlin, to settle the Owners' claims without prejudicing any of its rights to coverage.   In consenting to Black & Veatch's settling with the Owners, Black & Veatch's general liability insurers reserved all rights to assert coverage defenses, and to deny coverage altogether, except for any defense based upon violation of consent to settle provisions.

58.     During the summer of 2010, Black & Veatch and the Owners of each of the four projects referenced above, entered into settlement agreements resolving their disputes over the damages incurred to the seven JBRs at issue.   These settlements were the culmination of extensive negotiations.

59.    As part of the settlement with the Owners of the Cardinal plant, Black & Veatch agreed to pay $10.03 million for repairs conducted at Cardinal 1 and Cardinal 2 during 2008 through 2009.  In addition, Black & Veatch agreed to replace most internal components of the Cardinal JBRs.

60.    Similarly, as part of the settlements with the Owners of the Kyger Creek, Clifty Creek and Conesville plants, Black & Veatch agreed to replace most internal components of the JBRs at these plants.

61.    In exchange for Black & Veatch's commitments, the Owners released Black & Veatch from claims arising out of the construction of the JBR internals through the date of settlement, and agreed to assist Black & Veatch in pursuing whatever rights existed under their property policies (whether through the assignment of their rights or other means).

62.    Replacement work began immediately thereafter and is scheduled to continue through the summer of 2013, when the replacement work at the last of the plants is scheduled to be completed.

63.    Specifically, replacement work at the Cardinal Plant, the Kyger Creek Plant and the Clifty Creek Plant has been completed.  The repair process at Conesville is scheduled to commence during the fall of 2012, with an anticipated completion date of July 2013.

64.    Black & Veatch's liability for the damages incurred at the seven JBRs arose from the negligence of MTI and its subcontractors in the procurement, fabrication and erection of the JBRs' internal components that resulted in physical injury to tangible property of the Owners, and caused unexpected shut downs to repair and replace otherwise non-defective property of third-parties, among other things.

65.     At each JBR, there has been physical loss or damage to property insured under property policies issued by Defendants FM Global, AEGIS and/or EIS.

66.     The damages at each JBR constituted physical injury to tangible property for which Black & Veatch was legally liable, triggering coverage under Black & Veatch's general liability policies issued by Defendants Aspen/Catlin and Liberty Mutual.

67.     Black & Veatch's legal liability covered by its general liability policies is in excess of the limits of the Aspen/Catlin Policy, and triggers the coverage of the Liberty Mutual Policy.

68.     Zurich, Black & Veatch's primary general liability carrier, has issued payment to Black & Veatch in the amount of $4 million for the damages incurred at the JBRs, thereby exhausting a full products-completed operations aggregate under the Zurich Policy.

69.     The liability for damages incurred by Black & Veatch by reason of, among other things, physical injury to otherwise non-defective property of the Owners, arising from the negligent work of MTI and its subcontractors, includes, but is not limited to:

        A.     Amounts paid to reimburse the Owners of the Cardinal plant for the cost of repairing physical damage to internal components of Cardinal 1 and 2 after those JBRs began operations;

        B.     Liability for physical damage to non-defective property of the Owners of the Cardinal Plant, which required the near complete replacement of the internal components of the Cardinal JBRs;

        C.     Liability for damage to or destruction of non-defective property of the Owners of the other plants (Kyger Creek, Clifty Creek and Conesville), which must be removed to access and replace defective components supplied by lower-tier subcontractors of MTI; and

14

403455426

D.      Costs and expenses incurred to pursue this action, including award of fees under KAN. STAT. ANN. § 40-256.

## DEFENDANT GENERAL LIABILITY INSURERS
## HAVE FAILED TO PROVIDE COVERAGE

70.     On or about July 9, 2009, after receiving a letter from AEP alleging that defective work in the construction of Cardinal 1 and 2 was causing widespread physical damage to the internal components of those units, Black & Veatch informed its general liability carriers, including Defendants Aspen/Catlin and Liberty Mutual, of the Owners' claims and sought coverage.

71.     The Defendants were further informed by Black & Veatch of the Owners' claims regarding damages at the other three plants.

72.     Defendant Aspen/Catlin responded to Black & Veatch's request for coverage by reserving rights under the Aspen/Catlin Policy and requesting additional information.

73.     Black & Veatch provided Aspen/Catlin with extensive documentation and information regarding the nature of the damages at each of the seven JBRs and Black & Veatch's potential liability.  Black & Veatch also provided Aspen/Catlin with detailed costs analyses regarding the damages at issue, as well as access to the project sites themselves.  The same information has been available to Defendant Liberty Mutual.  The insurers were also offered the opportunity to participate in negotiations with the Claimant/Owners.  Black & Veatch has continued to make information available to the insurers subsequent to its settlements with the four ownership groups.

74.     Black & Veatch has made repeated demands for indemnification from Aspen/Catlin for covered damages incurred at all seven JBRs located at the four plants.  Aspen/Catlin has refused to provide any indemnification.

75.     Liberty Mutual provides second layer umbrella coverage above the Aspen/Catlin Policy.  To the extent that Black & Veatch's covered losses exceed Aspen/Catlin's limits of liability, Liberty Mutual's coverage is triggered.

## THE PROPERTY INSURERS HAVE FAILED
## TO PROVIDE COVERAGE

76.     Upon information and belief, Defendants FM Global, AEGIS and EIS were first informed by the Owners of the damages incurred at the JBRs in the fall of 2009.  On or about March 12, 2010, Black & Veatch submitted its own notice to Defendants FM Global, AEGIS and EIS of the damages and sought coverage.

77.     Defendants FM Global, AEGIS and EIS responded to Black & Veatch's requests for coverage by reserving rights under their policies and requesting additional information.

78.     Black & Veatch provided Defendants FM Global, AEGIS and EIS with access to thousands of documents and information regarding the nature and amount of the damages at each of the seven JBRs.  Black & Veatch also provided Defendants FM Global, AEGIS and EIS access to the project sites themselves.

79.     Black & Veatch has made repeated demands for indemnification from Defendants FM Global, AEGIS and EIS for coverage at the seven JBRs located at the four plants.  Defendants FM Global, AEGIS and EIS have refused to provide any indemnification.

80.     Upon information and belief, all applicable conditions of the property policies have been complied with, or they have been waived, released or are the subject of an estoppel.

## COUNT I
## DECLARATORY JUDGMENT
## ASPEN/CATLIN

81.     Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

16

403455426

82.     Upon information and belief, Defendants Aspen/Catlin dispute one or more of the allegations herein, including, without limitation, the assertion of Black & Veatch that the Aspen/Catlin Policy covers the damages outlined above.

83.     By reason of the foregoing, an actual and justiciable controversy exists between Black & Veatch and Aspen/Catlin regarding their respective rights and obligations under the Aspen/Catlin Policy, including, but not limited to Aspen/Catlin's obligation to indemnify Black & Veatch in connection with its liability for property damage incurred at the seven JBRs.

84.     An Order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

85.     Black & Veatch is entitled to a declaratory judgment, inter alia, that:

(i)   Aspen/Catlin are obligated to indemnify Black & Veatch for its liability to the Owners for property damage arising out of the negligence of MTI and its subcontractors at the Cardinal 1, Cardinal 2, Cardinal 3, Conesville, Kyger Creek 12, Kyger Creek 35 and Clifty Creek 13 JBRs;

(ii)   The exclusions cited by Aspen/Catlin do not bar coverage for Black & Veatch's liability for property damages at the JBRs;

(iii)   Black & Veatch is entitled to recover from Aspen/Catlin all fees and costs incurred in pursuing this action.  *See* KAN. STAT. ANN. § 40-256.

## COUNT II
## BREACH OF CONTRACT
## ASPEN/CATLIN

86.     Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

403455426

87.     The Owners made claims against Black & Veatch for property damage, including physical injury to tangible property of the Owners due to defects in the procurement, manufacturing and erection of internal components at the above referenced JBRs by subcontractors.

88.     Black & Veatch incurred liability for, among other things, the costs of repairing damage to otherwise non-defective property of the Owners.

89.     The Aspen/Catlin Policy is a valid and binding agreement.  Pursuant to the terms of the Aspen/Catlin Policy, Aspen/Catlin have an obligation to indemnify Black & Veatch against its liability for, among other things, accidental physical damage to property of the Owners, including all damage to otherwise non-defective components of the JBRs.

90.     Black & Veatch has incurred liability by reason of claims for damages because of "property damage," including claims for damages for the repair and replacement of internal JBR components damaged by the negligence of MTI and its subcontractors.

91.     Aspen/Catlin are obligated to indemnify Black & Veatch, but have breached that obligation.

92.     Black & Veatch has paid all premiums due on the Aspen/Catlin Policy and the Liberty Mutual Policy.

93.     Black & Veatch has complied with all applicable conditions of the Aspen/Catlin Policy and the Liberty Mutual Policy, or they have been waived, released or are the subject of an estoppel.

94.     As a result of Aspen/Catlin's breach, Aspen/Catlin are liable to Black & Veatch for money damages under the Aspen/Catlin Policy, and for attorneys' fees, costs and interest.

403455426

**COUNT III**
**DECLARATORY JUDGMENT**
**LIBERTY MUTUAL**

95.     Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

96.     Upon information and belief, Defendant Liberty Mutual disputes one or more of the allegations herein, including, without limitation, the assertion of Black & Veatch that the Liberty Mutual Policy covers its legal liability for property damages, as outlined above, in excess of underlying limits.

97.     By reason of the foregoing, an actual and justiciable controversy exists between Black & Veatch and Liberty Mutual regarding their respective rights and obligations under the Liberty Mutual Policy, including, but not limited to, Liberty Mutual's obligation to indemnify Black & Veatch for damages incurred at the seven JBRs.

98.     An Order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

99.     Black & Veatch is entitled to a declaratory judgment, inter alia, that:

(i)  Liberty Mutual is obligated to indemnify Black & Veatch for property damages in excess of the Aspen/Catlin Policy limits of liability in connection with the JBRs described above; and

(ii)  The exclusions contained in the Liberty Mutual Policy do not bar coverage for the damages incurred by Black & Veatch.

**COUNT IV**
**DECLARATORY JUDGMENT**
**FM GLOBAL**

100.    Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

403455426

101.   Upon information and belief, Defendant FM Global disputes one or more of the allegations herein, including, without limitation, the assertion of Black & Veatch that the FM Global Policy covers some of the damages outlined above.

102.   By reason of the foregoing, an actual and justiciable controversy exists between Black & Veatch and FM Global regarding their respective rights and obligations under the FM Global Policy, including, but not limited to FM Global's obligation to indemnify Black & Veatch in connection with damages incurred at the Cardinal JBRs.

103.   An Order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

104.   Black & Veatch is entitled to a declaratory judgment, <u>inter alia</u>, that:

(i)   FM Global is obligated to indemnify Black & Veatch for certain of the physical loss and damage to insured property at the Cardinal 1, Cardinal 2 and Cardinal 3 JBRs;

(ii)   The exclusions cited by FM Global do not bar coverage for the damages incurred at the Cardinal 1, Cardinal 2 and Cardinal 3 JBRs;

(iii)   Black & Veatch is entitled to recover from FM Global all fees and costs incurred in pursuing this action.  *See* KAN. STAT. ANN. § 40-256.

**COUNT V**
**BREACH OF CONTRACT**
**<u>FM GLOBAL</u>**

105.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

20

106.    As a result of alleged defects in the procurement, manufacturing and erection of internal components by subcontractors at the Cardinal JBRs, Black & Veatch asserts  that there has been physical loss or damage to insured property.

107.    The FM Global Policy is a valid and binding agreement.

108.    Black & Veatch is an additional insured under the FM Global Policy for ongoing operations at Cardinal 3, and has the right to pursue coverage pursuant to an agreement with the Owners for completed operations damages incurred at Cardinal 1 and Cardinal 2.

109.    To the extent there is coverage under the FM Global Policy for damages incurred at the Cardinal JBRs, FM Global has an obligation to indemnify Black & Veatch against physical loss or damage to insured property.

110.    To the extent there is coverage, FM Global has breached its obligation to Black & Veatch.

111.    Upon information and belief, all obligations under the FM Global Policy have been satisfied, including the payment of premiums and provision of timely notice of claims, or they have been waived, released or are the subject of an estoppel.

112.    As a direct, proximate and foreseeable result of FM Global's refusal to fulfill its coverage obligations to Black & Veatch, and other breaches, Black & Veatch has incurred damages, and will continue to incur substantial fees, costs, and expenses as more fully set forth above.

113.    As a result of the aforementioned breaches, FM Global is liable to Black & Veatch for money damages to the extent covered by the FM Global Policy, and for attorneys' fees, costs and interest.

**COUNT VI**
**EQUITABLE SUBROGATION**
**FM GLOBAL**

114.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

115.   To the extent the FM Global Policy covers the damages at the Cardinal 1 and 2 JBRs, FM Global, not Black & Veatch, is primarily liable for the property damage claimed by Buckeye Power and the other Owners (collectively, the "Owners").

116.   Black & Veatch paid the Owners for property damage at the Cardinal JBRs thereby extinguishing some or all of FM Global's liability to the Owners.

117.   Black & Veatch made the settlement payment to the Owners to protect its own interests and to avoid increased liability, defense costs, and other losses.

118.   Black & Veatch's settlement payment to the Owners was not voluntary.

119.   Black & Veatch's settlement payment served as payment of FM Global's debt, to the extent of coverage.

120.   To the extent that the settlement payment made by Black & Veatch to the Owners for damages at the Cardinal JBRs should have been made by FM Global, subrogation against FM Global would not work any injustice to FM Global.

**COUNT VII**
**UNJUST ENRICHMENT**
**FM GLOBAL**

121.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

122.   FM Global received premium payments from Buckeye Power in exchange for insuring the Cardinal 1 and 2 JBRs through the FM Global Policy.

403455426

123. Black & Veatch asserts that certain property damages incurred at the Cardinal JBRs, which property damages Black & Veatch has repaired, are covered by the FM Global Policy.

124. To the extent of coverage, Black & Veatch conferred a benefit on FM Global through its settlement with the Owners, as the repairs performed by Black & Veatch at the Cardinal JBRs were the primary responsibility of FM Global.

125. FM Global was aware of and enriched by the benefit conferred by Black & Veatch.

126. It would be inequitable under the circumstances to allow FM Global to retain that benefit without paying its value.

## COUNT VIII
## DECLARATORY JUDGMENT
## AEGIS

127. Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

128. Upon information and belief, Defendant AEGIS disputes one or more of the allegations herein, including, without limitation, the assertion of Black & Veatch that the AEGIS Policies cover some of the damages outlined above.

129. By reason of the foregoing, an actual and justiciable controversy exists between Black & Veatch and AEGIS regarding their respective rights and obligations under the AEGIS Policies, including, but not limited to AEGIS's obligation to indemnify Black & Veatch in connection with certain of the damages incurred at the Kyger Creek, Clifty Creek and Conesville JBRs.

130.   An Order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

131.   Black & Veatch is entitled to a declaratory judgment, _inter alia_, that:

(i)   AEGIS is obligated to indemnify Black & Veatch for certain of the physical loss and damage to insured property at the Kyger Creek, Clifty Creek and Conesville JBRs;

(ii)   The exclusions cited by AEGIS do not bar coverage for the damages incurred at the Kyger Creek, Clifty Creek and Conesville JBRs;

(iii)   Black & Veatch is entitled to recover from AEGIS all fees and costs incurred in pursuing this action.  _See_ KAN. STAT. ANN. § 40-256.

## COUNT IX
## BREACH OF CONTRACT
## AEGIS

132.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

133.   As a result of alleged defects in the procurement, manufacturing and erection of internal components by subcontractors at the Kyger Creek, Clifty Creek and Conseville JBRs, there has been physical loss or damage to insured property.

134.   The AEGIS-OVEC Policy and AEGIS-AEP Policy (collective the "AEGIS Policies") are valid and binding agreements.

135.   Black & Veatch is an additional insured under the AEGIS-OVEC Policy for ongoing operations at Kyger Creek and Clifty Creek, and has the right to pursue coverage under the AEGIS-AEP Policy pursuant to an agreement with the Owners for completed operations damages incurred at Conesville.

136.   To the extent there is coverage under the AEGIS Policies, AEGIS has an obligation to indemnify Black & Veatch against physical loss or damage to insured property.

137.   To the extent there is coverage, AEGIS has breached its obligation to Black & Veatch.

138.   Upon information and belief, all obligations under the AEGIS Policies have been satisfied, including the payment of premiums and provision of timely notice of claims, or they have been waived, released or are the subject of an estoppel.

139.   As a direct, proximate and foreseeable result of AEGIS's refusal to fulfill its coverage obligations to Black & Veatch, and other breaches, Black & Veatch has incurred damages, and will continue to incur substantial fees, costs, and expenses as more fully set forth above.

140.   As a result of the aforementioned breaches, AEGIS is liable to Black & Veatch for money damages to the extent covered by the AEGIS Policies, and for attorneys' fees, costs and interest.

**COUNT X**
**EQUITABLE SUBROGATION**
**<ins>AEGIS</ins>**

141.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

142.   To the extent the AEGIS-AEP Policy covers the damages at the Conesville JBR, AEGIS, not Black & Veatch, is primarily liable for the property damage claimed by AEP and the other Owners (collectively, the "Owners").

143.   Black & Veatch paid the Owners for property damage at the Conesville JBR thereby extinguishing some or all of AEGIS's liability to the Owners.

144.   Black & Veatch made the settlement payment to the Owners to protect its own interests and to avoid increased liability, defense costs, and other losses.

145.   Black & Veatch's settlement payment to the Owners was not voluntary.

146.   Black & Veatch's settlement payment served as payment of AEGIS's debt, to the extent of coverage.

147.   To the extent that the settlement payment made by Black & Veatch to the Owners for damages at the Conesville JBR should have been made by AEGIS, subrogation against AEGIS would not work any injustice to AEGIS.

**COUNT XI**
**UNJUST ENRICHMENT**
**AEGIS**

148.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

149.   AEGIS received premium payments from AEP in exchange for insuring the Conesville JBR through the AEGIS-AEP Policy.

150.   Black & Veatch asserts that certain property damages incurred at the Conesville JBR, which property damages Black & Veatch has repaired, are covered by the AEGIS-AEP Policy.

151.   To the extent of coverage, Black & Veatch conferred a benefit on AEGIS through its settlement with the Owners, as the repairs performed by Black & Veatch at the aforementioned JBRs were the primary responsibility of AEGIS.

152.   AEGIS was aware of and enriched by the benefit conferred by Black & Veatch.

153.   It would be inequitable under the circumstances to allow AEGIS to retain that benefit without paying its value.

26

## COUNT XII
## DECLARATORY JUDGMENT
## EIS

154.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

155.   Upon information and belief, Defendant EIS disputes one or more of the allegations herein, including, without limitation, the assertion of Black & Veatch that the EIS Policy covers the damages outlined above.

156.   By reason of the foregoing, an actual and justiciable controversy exists between Black & Veatch and EIS regarding their respective rights and obligations under the EIS Policy, including, but not limited to EIS's obligation to indemnify Black & Veatch in connection with some of the damages incurred at the Conesville JBR.

157.   An Order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

158.   Black & Veatch is entitled to a declaratory judgment, _inter alia_, that:

(i)   EIS is obligated to indemnify Black & Veatch for certain of the direct physical loss and damage to insured property at the Conesville JBR;

(ii)   The exclusions within the EIS Policy do not bar coverage for the damages incurred at the Conesville JBR;

(iii)   Black & Veatch is entitled to recover from EIS all fees and costs incurred in pursuing this action.  _See_ KAN. STAT. ANN. § 40-256.

## COUNT XIII
## BREACH OF CONTRACT
## <u>EIS</u>

159.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

160.   As a result of alleged defects in the procurement, manufacturing and erection of internal components by subcontractors at the Conesville JBR, Black & Veatch asserts that there has been direct physical loss or damage to insured property.

161.   The EIS Policy is a valid and binding agreement.

162.   Black & Veatch has the right to pursue coverage under the EIS Policy pursuant to an agreement with the Owners.

163.   To the extent there is coverage under the EIS Policy for damages incurred at Conesville, EIS has an obligation to indemnify Black & Veatch against physical loss or damage to insured property.

164.   To the extent there is coverage, EIS has breached its obligation to Black & Veatch.

165.   Upon information and belief, all obligations under the EIS Policy have been satisfied, including the payment of premiums and provision of timely notice of claims, or they have been waived, released or are the subject of an estoppel.

166.   As a direct, proximate and foreseeable result of EIS's refusal to fulfill its coverage obligations to Black & Veatch, and other breaches, Black & Veatch has incurred damages, and will continue to incur substantial fees, costs, and expenses as more fully set forth above.

403455426

167.   As a result of the aforementioned breaches, EIS is liable to Black & Veatch for money damages to the extent covered by the EIS Policy, and for attorneys' fees, costs and interest.

## COUNT XIV
## EQUITABLE SUBROGATION
## EIS

168.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

169.   To the extent the EIS Policy covers the damages at the Conesville JBR, EIS, not Black & Veatch, is primarily liable for the property damage claimed by AEP and the other Owners (collectively, the "Owners").

170.   Black & Veatch paid the Owners for property damage at the Conesville JBR thereby extinguishing some or all of EIS's liability to the Owners.

171.   Black & Veatch made the settlement payment to the Owners to protect its own interests and to avoid increased liability, defense costs, and other losses.

172.   Black & Veatch's settlement payment to the Owners was not voluntary.

173.   Black & Veatch's settlement payment served as payment of EIS's debt, to the extent of coverage.

174.   To the extent that the settlement payment made by Black & Veatch to the Owners for damages at the Conesville JBR should have been made by EIS, subrogation against EIS would not work any injustice to EIS.

403455426

## COUNT XV
## UNJUST ENRICHMENT
## EIS

175.   Black & Veatch repeats and realleges each and every preceding allegation as if fully set forth herein.

176.   EIS received premium payments from AEP in exchange for insuring the Conesville JBR through the EIS Policy.

177.   Black & Veatch asserts that certain property damages incurred at the Conesville JBR, which property damages Black & Veatch has repaired, are covered by the EIS Policy.

178.   To the extent of coverage, Black & Veatch conferred a benefit on EIS through its settlement with the Owners, as the repairs performed by Black & Veatch at the Conesville JBR were the primary responsibility of EIS.

179.   EIS was aware of and enriched by the benefit conferred by Black & Veatch.

180.   It would be inequitable under the circumstances to allow EIS to retain that benefit without paying its value.

**WHEREFORE,** Black & Veatch demands judgment against Aspen/Catlin, Liberty Mutual, FM Global, AEGIS and EIS as follows:

(a)      Entering declaratory relief, in accordance with paragraphs 85, 99, 104, 131 and 158 above, and as otherwise appropriate based upon the claims and defenses of the parties;

(b)      Awarding money damages, in an amount to be proven at trial;

(c)      For attorneys' fees and costs incurred pursuing this action;

(d)      For pre-judgment and post-judgment interest; and

(e)      For such other and further relief that this Court deems just and equitable.

403455426

## JURY DEMAND

Black & Veatch demands a trial by jury on all issues so triable.

Dated: November 13, 2012

Respectfully submitted,

*/s/ Christopher P. Sobba*

Roy Bash                           (MO 25769)
Chris Sobba                        (KS 20708)
POLISNELLI SHUGHART PC
Twelve Wyandotte Plaza
120 W. 12th Street
Kansas City, MO 64105
Phone: (816) 421-3355
Fax: (816) 374-0509
rbash@polsinelli.com
csobba@polsinelli.com

David T. Dekker (*pro hac vice*)
David L. Beck (*pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N. Street, N.W.
Washington, DC 20037-1122
Phone (202) 663-8000
Fax: (202) 663-8007
david.dekker@pillsburylaw.com
david.beck@pillsburylaw.com

**ATTORNEYS FOR PLAINTIFF**
**BLACK & VEATCH CORPORATION**

403455426

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have the 13th day of November, 2012, filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send email notification of such filing to the following attorneys of record:

Michael J. Kuckelman
Kathryn A. Lewis
Kuckelman Torline Kirkland & Lewis
10740 Nall Avenue, Suite 250
Overland Park, KS  66211
mkuckelman@ktklattorneys.com
klewis@ktklattorneys.com

Robert J. Franco
Scott O. Reed
Andrew S. Patton
Franco & Moroney LLC
500 West Madison Street, Suite 2440
Chicago, IL  60661
robert.franco@francomoroney.com
scott.reed@francomoroney.com
andrew.patton@francomoroney.com

**ATTORNEYS FOR DEFENDANTS ASPEN INSURANCE (UK) LTD.,
CATLIN LLOYD'S SYNDICATE 2003, and LIBERTY MUTUAL INSURANCE
EUROPE (UK) LTD.**

In addition, service of process will be intended to be made upon the newly added defendants in the following manner:

Factory Mutual Insurance Co.
c/o Kansas Department of Insurance
Commissioner of Insurance
Attn: Legal Division
Kansas Insurance Department
420 SW 9th Street
Topeka, KS 66612

Associated Electric & Gas Insurance Services Limited
c/o Kansas Department of Insurance
Commissioner of Insurance
Attn: Legal Division
Kansas Insurance Department
420 SW 9th Street
Topeka, KS 66612

403455426

Energy Insurance Services, Inc.
c/o USA Risk Intermediaries
Attn: Mr. Gary W. Coulter
501 River Street, 1st Floor
Greenville, South Carolina 29601

*/s/ Christopher P. Sobba*
Attorney for Plaintiff

403455426