IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BLACK & VEATCH CORPORATION,

        Plaintiff,

    v.                                       No. 12-2350-SAC

ASPEN INSURANCE (UK) LTD., *et al.,*

        Defendants.


MEMORANDUM AND ORDER

        The case comes before the court on four pending motions for partial summary judgment, two by the plaintiff Black & Veatch Corporation ("B&V"), (Dk. 283) and (Dk. 298), and two by the defendants, Aspen Insurance (UK) Ltd. ("Aspen") and Lloyd's Syndicate 2003 ("Lloyd's") (collectively as "defendants" or "liability insurers"), which are a motion for partial summary judgment on the coverage issues (Dk. 296) and a motion for partial summary judgment on the attachment and quantum issues (Dk. 309). B&V has filed a motion for leave to file a sur-reply (Dk. 318) in response to the defendants' motion for partial summary. To say that the motions have been thoroughly briefed would be an understatement. They span hundreds of pages with boxes of exhibits. Nonetheless, the court has reviewed all matters submitted and arguments presented, including B&V's requested sur-reply (Dk. 318) and the defendants' response (Dk. 319). And though all arguments and authorities have been considered and weighed at

1

some expense in time and effort, this order will address only those which are directly relevant to the immediate disposition here.

The case involves a relatively straightforward factual setting. The plaintiff B&V is a global engineering, consulting, and construction company. It is suing its first layer excess umbrella liability insurer for claimed coverage under a manuscript commercial general liability ("CGL") policy for its liability for damages to internal components of seven Jet Bubble Reactors (JBRs) which B&V engineered, procured and constructed as wet flue gas desulfurization systems for coal-fired boilers. The litigation of this case has been contentious and extensive. The parties dispute numerous terms of the manuscript policy and offer widely varying interpretations of these terms. Thus, the issues are numerous and complex. Simply put, the parties' summary judgment filings ask the court to interpret and apply the manuscript policy's different terms in deciding claims amounting to millions of dollars.

*Procedural Matters*

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, ––– U.S. ––––, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014)(quoting Fed. R. Civ. P. 56(a)). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986). A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. *Id.* at 252.

The moving party has the initial burden of showing "the absence of a genuine issue of material fact," and, if carried, the non-moving party then "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [it] carries the burden of proof." *National American Ins. Co. v. American Re-Insurance Co.*, 358 F.3d 736, 739 (10th Cir. 2004) (internal quotation marks and citation omitted). At the summary judgment stage, the court is not to be weighing evidence, crediting some over other, or determining the truth of disputed matters, but only deciding if a genuine issue for trial exists. *Tolan*, 134 S. Ct. at 1866. The court performs this task with a view of the evidence that favors most the party opposing summary judgment. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

A procedural matter deserves some attention. The court's time spent on these summary judgment proceedings was unnecessarily extended by the parties' failure to comply with the letter and the spirit of the district's rules governing summary judgment filings. Specifically, D. Kan. Rule 56.1(a)

and (b) require memoranda filed in summary judgment proceedings to begin with a section that contains a "concise statements of material facts." Unfortunately, what the parties submitted here was neither concise nor just statements of material fact. Instead, the parties argued extensively and repeatedly over what conclusions and inferences should be properly drawn from these facts. The court will not extend this order with the all too many instances of these violations other than to say that both sides were guilty.

Nonetheless, because of the egregious nature of the violations in this case, the court will set out the relevant portions of the governing rule below, make a few general comments, and then summarily enforce these plain provisions without further discussion later:

**(a) Supporting Memorandum**. The memorandum or brief in support of a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies. All material facts set forth in the statement of the movant will be deemed admitted for purpose of the summary judgment unless specifically controverted by the statement of the opposing party.

**(b) Opposing Memorandum.**
        (1) A memorandum in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute must by numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed.
        (2) If the party opposing summary judgment relies on any facts not contained in the movant's memorandum, that party must set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by section (a), above. All material facts set forth in this statement of the non-moving party

will be deemed admitted for the purpose of summary judgment unless specifically controverted by the reply of the moving party.

**(c) Reply Memorandum.** In a reply brief, the moving party must respond to the non-moving party's statement of additional material facts in the manner prescribed in subsection (b)(1).

**(d) Presentation of Factual Material.** All facts on which a motion or opposition is based must be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories, and responses to requests for interrogatories. . . .

**(e) Duty to Fairly Meet the Substance of the Matter Asserted.** If the responding party cannot truthfully admit or deny the factual matter asserted, the response must specifically set forth in detail the reasons why. All responses must fairly meet the substance of the matter asserted.

D. Kan. Rule 56.1.[1]

This rule speaks to "material facts." A party who seeks to controvert a statement of material fact must do so specifically by disputing the asserted fact and then by citing those particular portions of the record on which it relies. A party also has the option of seeking relief under paragraph (e). In addressing only facts and the controverting of them, the rule does not invite a party to expand this section of its memorandum into arguing contentions or issues associated with a fact or arguing inferences to be drawn from a fact. Such a practice undermines one of the rule's promoted purposes of having a "concise" statement of facts and leads to memoranda longer than necessary due to redundant and repetitive presentations in the first instance and in refutation. It cannot be overstated that arguments and

---

[1]In addition, the District's summary judgment guidelines direct that, "Legal arguments should not be set forth in a party's statement of facts." Summary Judgment Guidelines, http://www.ksd.uscourts.gov/summary-judgment/ ¶ 6.

inferences are topics reserved for the parties' arguments and authorities sections of summary judgment memoranda. *See Leathers v. Leathers*, 2012 WL 5936281 at *2 (D. Kan. Nov. 27, 2012); *cf. Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 856 (10th Cir. 1999) (Affirmed district court striking a party's responsive documents on five different grounds, with one of those grounds being, "intermixed their responses and their own statements of 'facts' with legal arguments and asserted inferences to be drawn from the facts."). Finally, paragraph (e) imposes a "duty" to submit responses that "must fairly meet the substance of the matter asserted." The court reads this as saying that a party should not be disputing a fact because it disagrees with the relevance and force of the legal argument for which the fact may be offered. The fact is the substance of the matter asserted, not what a party could argue or infer from it. The court will enforce these rules and treat any properly supported statements of fact as undisputed for purposes of the motions unless the statement of fact is properly addressed and disputed on substantive grounds. *See Kirch v. Embarq Management Co.*, 702 F.3d 1245, 1250 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 2743 (2013).

*Factual Background*

        This background comes from the parties' stipulations in the pretrial order ("PTO") and from some of the general uncontroverted facts stated in the parties' summary judgment pleadings. As for the other facts,

uncontroverted or not, that are relevant to this order, the court will address those specific statements when pertinent to its analysis.

American Electric Power ("AEP"), on its own behalf and as an agent for the power company owners ("Owners"), entered a series of agreements with B&V for it "to engineer, procure and construct ["EPC"] wet flue gas desulfurization systems (aka, jet bubbling reactors ("JBRs")) for eight installations." (Dk. 294, ¶ 1, PTO). B&V "subcontracted the engineering, procurement and construction of the internal JBR components to MTI (Midwest Towers, Inc.)" who, in turn, subcontracted much of the manufacturing and installation of these components to lower-tier subcontractors.  (Dk. 284, ¶ 94). The JBRs were to remove sulfur pollutants from the exhaust gas produced by coal-fired power plants. The parties have stipulated to this description of the process:

> 5. Exhaust gas from the coal-fired power plant enters the JBR through the inlet plenum, where it is cooled and moisturized, to begin the removal of sulfur and other contaminants. The gas is drawn from the inlet plenum to the middle section where it is forced down through PVC pipes known as sparger tubes . . . and into a bath of limestone slurry in the lowest section of the JBR tank. There, a chemical reaction occurs between the exhaust gas and the slurry that removes sulfur dioxide and other constituents from the exhaust gas.
> 6. The cleaned gas that bubbles up out of the slurry is forced upward through fiberglass reinforced plastic ("FRP") tubes (known as gas risers . . .) into the exhaust plenum (the upper level) of the JBR, from which it is forced out of the JBR through the plant exhaust stacks and released into the atmosphere.

(Dk. 294, p. 3-4).

B&V procured commercial general liability insurance to cover its work on these JBRs. (Dk. 294, PTO, ¶ 7). This lawsuit is a coverage dispute over the damage claims arising in connection with seven of these JBRs which have been referred to by the parties as, Cardinal 1, Cardinal 2, Cardinal 3, Conesville, Kyger Creek 1-2, Kyger Creek 3-5, and Clifty Creek 1-3. As to the liability policies, the parties have stipulated only to the following:

> 8.  Zurich provided the primary layer of general liability coverage underlying the Aspen/Catlin Policy, with per occurrence limits of $2,000,000, general aggregate limits of $4,000,000, and products-completed operations aggregate limits of $4,000,000.
> 9.  Defendants Aspen/Catlin provided first layer excess/umbrella liability coverage with per occurrence limits of $25,000,000, general aggregate limits of $25,000,000, and products-completed operations aggregate limits of $25,000,000.
> 10.  The Aspen/Catlin Policy is a negotiated policy.
> . . . .
> 20.  Black & Veatch has paid all premiums due on the Aspen/Catlin policy.

*Id.* at pp. 4-5).

As for the construction of the JBRs and the subsequent claims, the parties did stipulate to the following:

> 11. After Black & Veatch completed construction of the Cardinal 1 and 2 and Conesville JBRs, the Owners alleged deficiencies in the work.
> 12. Cardinal 1 was completed and began operating in March 2008. Deficiencies in the JBR components were discovered as early as August 2008, and Cardinal 1 had to be shut down and repaired.
> 13. Cardinal 2 was completed and began operating in December 2007. Deficiencies in the JBR components were discovered as early as May 2008, and Cardinal 2 had to be shut down and repaired.
> 14. Conesville was completed and began operating in January 2009. In the fall of 2009, it was determined that the gas risers installed at Conesville, as well as the gas risers installed at each of the other six JBRs, were deficient and required removal.

15. Because of defective gas risers and other deficiencies in the JBRs, the Owners demanded that Black & Veatch make repairs.
16. At the time the Owners made their demands on Black & Veatch, the Cardinal 1 and 2 projects, and the Conesville project were completed operations.
17. During the summer of 2010, Black & Veatch and the Owners of the JBRs, entered into settlement agreements resolving their disputes relating to eight JBRs, including the seven at issue here.
18. As part of the settlements, Black & Veatch agreed, among other things, to replace most internal components of the JBRs.
19. In replacing the internal components, Black & Veatch has obtained contribution from various parties responsible for the costs incurred.

(Dk. 294, pp. 4-5).

*Initial Summary of Positions*

B&V contends the Aspen/Catlin Commercial General Liability ("CGL") policy covers its liability, legal and contractual, for property damage claims, unless there is an exclusion that applies. B&V argues the coverage extends to liability both for property damage done to the completed JBRs engaged in operations and for property damage done to the JBRs still undergoing construction. Having incurred costs exceeding $225 million to repair and resolve the Owner's claims, B&V seeks coverage for $72 million from the defendants. B&V recognizes the defendants deny coverage contending that the damages to B&V's work are not covered as "property damage" of a "third party" caused by an "occurrence" as those terms are defined and applied in the policy and under New York law. B&V seeks judgment as a matter of law on having sustained physical damages constituting "property damage" caused by an "occurrence" that is covered by

the policy's basic insuring agreement. More specifically, B&V seeks judgment

on the following propositions:

> (i) The internal components of the JBRs constitute tangible property of a Third Party, as defined in the Policy;
> (ii) For the three projects in commercial operation when the damage was sustained, the Policy provides coverage for physical injury to the JBRs where the damaged work or the work out of which the damage arises was performed on B&V's behalf by subcontractors;
> (iii) For the four projects where work by B&V was ongoing, the Policy provides coverage for physical injury to the JBRs' internal components other than "that particular part" which is defective;
> (iv) Under Endorsement 27, the Policy provides coverage on each project for physical injury to the JBRs' internal components resulting directly from errors in Professional Services provided by B&V or on its behalf; and
> (v) The limits of liability afforded by Endorsement 27 apply separately to the projects insured by the Policy and to each "Large Work" project identified in Endorsements 35 and 36 of the Policy.

(Dk. 284, pp. 30-31).

The defendants argue the policy is unambiguous and defines

"occurrence" and "property damage" as to cover only third party property

damage and to not cover claims for deficient work that kept the system from

working as contracted, which is all that allegedly happened here. The

defendants maintain the owners' claims here were not for damage claims

but in the nature of a performance guaranty and were brought to recover for

frustrated commercial expectations from deficient work.

*Claims*

The parties' contentiousness keeps them from agreeing to the

general nature of the plaintiff's claims. The court will defer to the plaintiff's

characterization of its own claims. In that respect, the court understands the

plaintiff is claiming coverage for property damage resulting directly from:
(1) the work of the subcontractors on behalf of B&V and B&V's failure to
deliver professional services as a contractor that caused the <u>operation of the
completed JBRs</u> (Cardinal 1, Cardinal 2 and Conesville) to damage many of
the JBR's internal components which required repairs to the damaged
components, the cost of which were backcharged to B&V by the owners and
the extensive nature of which caused the owners to demand complete
replacement of the JBR's internal components; (2) the work of the
subcontractors in installing the defective gas risers and the failure of B&V to
deliver professional services as a contractor in connection with the gas risers
that required the removal of the risers from <u>the non-completed JBRs</u> which
resulted in unavoidable "rip and tear" damage to other internal components
that had to be removed to repair the risers.

*Governing Law--New York*

The insurance contract here is a manuscript which means it is
not a standard form regularly issued by the insurer but may differ in
language and terms from the standard liability insurance policies. The
parties' summary judgment filings consistently reflect their somewhat
remarkable agreement over the insurance policy provisions being
unambiguous and capable of judicial interpretation as a matter of law. The
parties are steadfast in holding to this shared position despite their
significant disagreements over what the provisions mean.

In cases of diversity jurisdiction, like this one, the court follows the forum state's choice of law rules. *See BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir.1999). When the parties have incorporated a choice of law provision in the agreement, "Kansas courts generally effectuate the law chosen by the parties to control the agreement." *Brenner v. Oppenheimer & Co. Inc.*, 273 Kan. 525, 539, 44 P.3d 364 (2002). "When sophisticated parties possessed of roughly equivalent bargaining power negotiate a set of understandings covering a commercial transaction, the courts commonly will enforce the arrangement the parties have crafted for themselves. *See Hall v. Sprint Spectrum L.P.*, 376 Ill.App.3d 822, 826, 315 Ill.Dec. 446, 876 N.E.2d 1036 (2007) (discussing freedom to contract in context of choice-of-law clause)," *appeal denied*, 226 Ill.2d 614, *cert. denied*, 555 U.S. 814 (2008); *Enterprise Bank & Trust v. Barney Ashner Homes, Inc.*, 2013 WL 1876293, at *8, 300 P.3d 115 (Table) (Kan. App. May 3, 2013). Only in those rare situations when the parties' self-chosen law runs completely afoul of a prominent Kansas public policy is a court justified in refusing the parties' choice. *See Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1223 (10th Cir. 1991); *Brenner*, 273 Kan. at 540-41. The parties have not directly advocated any such Kansas public policy in their filings. The pretrial order sets out Endorsement 32 of the Aspen/Catlin policy which provides in relevant part that, "Any dispute concerning the interpretation of the terms of this policy is understood and

12

agreed to by both you and us to be subject to New York law." (Dk. 294, p.

2). As the parties' dispute here principally concerns the interpretation of that

policy and its application, the court will look to New York law in resolving

these interpretation issues in the absence of arguments to the contrary.

"Insurance policies are, in essence, creatures of contract, and

accordingly, subject to principles of contract interpretation." *In re Estates of*

*Covert*, 97 N.Y.2d 68, 76, 761 N.E.2d 571 (N.Y. 2001). "The initial

interpretation of a contract is a matter of law for the court to decide." *Parks*

*Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d

33, 42 (2nd Cir. 2006). In New York, the insurance contract is to be

"interpreted according to common speech and consistent with the

reasonable expectation of the average insured." *Dean v. Tower Ins. Co. of*

*New York*, 19 N.Y.3d 704, 708, 979 N.E.2d 1143, 1145 (N.Y. 2012) (internal

quotation marks and citation omitted). "'[C]ontracts of insurance are to be

interpreted so as to give effect to the intention of the parties as expressed in

the unequivocal language employed. The best evidence of what the parties

to an agreement intended is the language of the agreement itself, especially

where, as here, the parties to the insurance policy were sophisticated

entities." *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v.*

*TransCanada Energy USA, Inc.*, 52 Misc. 3d 455, 28 N.Y.S.3d 800, 806 (N.Y.

Sup. Ct. 2016) (quoting *Broad Street, LLC v. Gulf Ins. Co.*, 37 A.D. 3d 126,

130, 832 N.Y.S.2d 1 (1st Dept. 2006)). "It is hornbook law that the terms of

the insurance contract as a whole shall be examined in determining the intent of the parties." *In re Hanover Ins. Co.*, 119 A.D.2d 529, 532, 501 N.Y.S.2d 347, 350 (1st Dept. 1986) (citation omitted), *appeal dismissed*, 68 N.Y.2d 751 (1986).

The critical opening inquiry for interpreting policy language "is whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2nd Cir. 2010) (internal quotation marks and citation omitted). "[T]he threshold determination as to whether an ambiguity exists is a question of law to be resolved by the court." *Agor v. Board of Educ.*, 115 A.D.3d 1047, 981 N.Y.S.2d 485, 487 (3d Dept. 2014) (citations omitted). "Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (internal quotation marks and citation omitted). "It is well settled that a contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *White v. Continental Cas. Co.*, 9 N.Y.3d 264, 265, 848 N.Y.S 603, 605, 878 N.E.2d 1019, 1021 (N.Y. 2007) (internal quotation marks and citations omitted). "Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to

reflect its personal notions of fairness and equity." *Id.* If unambiguous, "interpretation is a matter of law and effect must be given to the intent of the parties as reflected by the express language of the agreement." *National Granite Tit. Ins. Agency v. Cadlerock Prop. Joint Venture*, 5 A.D.3d 361, 362, 773 N.Y.S. 2d 86 (2d Dept. 2004) (internal quotation marks and citation omitted). More fully stated, "[i]t is well settled that resolution of the rights and liabilities of parties to an insurance contract is a question of law for a court to determine based upon the specific provisions of the policy at issue, unless the terms of the policy are ambiguous and require consideration of extrinsic evidence as an aid to construction." *Selective Ins. Company of America v. County of Rensselaer*, 51 Misc. 3d 255, 268, 27 N.Y.S.3d 316, 326 (N.Y. Sup. Ct. 2011) (citation omitted). In such a case, the policy should be construed in a way "that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." *Raymond Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d 157, 162, 833 N.E.2d 232 (N.Y. 2005).

"[I]f 'the language in the insurance contract is ambiguous and susceptible to two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact.'" *City of New York v. Starnet Ins. Co.*, 910 N.Y.S.2d 761, 2010 WL 2425981 at *2 (N.Y. Sup. Ct. 2010) (quoting *State of N.Y. v. Home Indemnity Co.*, 66 N.Y.2d 669, 486 N.E.2d 827, 829 (N.Y.

1985)). "Absent any relevant extrinsic evidence or the anticipation of the availability thereof, the resolution of any ambiguity in the written contract between the parties is to be determined by the court as a matter of law." *Schuler-Haas Elec. Co. v. Aetna Cas. & Sur. Co.*, 40 N.Y.2d 883, 357 N.E.2d 1003, 1003 (N.Y. 1976) (citations omitted). At the same time, "if the tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court." *Home Indemnity Co.*, 486 N.E.2d at 829. "Under those circumstances, the ambiguity must be resolved against the insurer which drafted the contract." *Id.* (citations omitted).

When terms appear separately in a policy, "each term must be deemed to have some meaning." *Spoleta Const., LLC v. Aspen Ins. UK Ltd.*, 119 A.D.3d 1391, 991 N.Y.S.2d 183, 185 (4th Dept. 2014), *appeal granted*, *reargument denied*, 122 A.D.3d 1346 (4th Dept. 2014), and *aff'd*, 27 N.Y.S.3d 933 (N.Y. 2016) (internal quotation marks and citations omitted). "[A] policy's terms should not be assumed to be superfluous or to have been idly inserted." *Wirth v. Liberty Mut. Ins. Co.*, 122 A.D.3d 1364, 997 N.Y.S.2d 552, 554 (4th Dept. 2014) (internal quotation marks and citation omitted). "[P]rinciples generally applicable to contract interpretation apply equally to insurance contracts." *State of New York v. American Mfrs. Mut. Ins. Co.*, 188 A.D.2d 152, 155, 593 N.Y.S.2d 885 (3rd Dept. 1993).

"'Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage.'" *Ment Bros. Iron Works Co., Inc. v. Interstate Fire*, 702 F.3d 118, 121 (2nd Cir. 2012)(quoting *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 218, 774 N.E.2d 687 (N.Y. 2002)). "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Village of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 114-16 (2nd Cir. 1995) (internal quotation marks and citation omitted). "[A]fter an insurer establishes that a policy exclusion applies, the burden shifts to the policyholder to prove that an exception to that exclusion applies." *Ment Bros. Iron Works Co. Inc. v. Interstate Fire*, 702 F.3d at 122 (internal quotation marks and citations omitted).

*Basic Policy Terms*

The coverage issues for a CGL policy on construction projects turn on generally applying three basic questions:  "(1) Were the damages caused by an occurrence? (2) Were the damages the result of property damage resulting from the occurrence? and (3) Are the damages excluded under one or more of the policy exclusions?" William Schwartzkopf, <u>Prac. Guide Construction Cont. Surety Claims</u> § 22.03 (2016). This court finds this order of questions to be workable and consonant with the parties' presentations.

The central policy terms framing these issues are as follow. The contract's "Insuring Agreements," and, in particular, the terms under the heading of "I. Coverage" are:

> (1)  We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" which the "Insured" by reason of liability imposed by law or assumed by the "Insured" under contract prior to the "Occurrence", shall become legally obligated to pay as damages for:
> (a)  . . . "Property Damage" occurring during the Policy Period . . . and caused by an "Occurrence" . . . .

(Dk. 284-1, p. 7). Summarized for relevance here, the insurance covers the insured's liability that is imposed by law or is assumed by the insured under contract and that makes the insured legally obligated to pay property damage as defined by the policy and as caused by an occurrence covered under the policy. The parties do not argue that this insuring agreement is unique for a CGL policy. The plaintiff does highlight the additional liability clause, "assumed by the 'Insured' under contract prior to the 'Occurrence,'" as unusual and significant.

As to what constitutes an "Occurrence," the policy reads:

> H. "Occurrence" means:
> (1) an accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "Bodily Injury" or "Property Damage" that is not expected or not intended by the "Insured."
> All damages that arise from continuous or repeated exposure to substantially the same general conditions are considered to arise from one "Occurrence."

*Id.* at p. 10. The parties do not argue that this definition is unusual or atypical for a CGL policy.

18

The dispute in this case concerns coverage of property damage liability. The policy defines the same as follows:

> K. "Property Damage" means:
> (1) physical injury to tangible property of a "Third Party", including all resulting loss of use of that property of a "Third Party" (all such loss of use shall be deemed to occur at the time of the physical injury that caused it); or
> (2) loss of use of tangible property of a "Third Party" that is not physically injured (all such loss being deemed to occur at the time of the "Occurrence" that caused it).

*Id.* at 11. The parties do not show this definition to be unique to this contract.

Coverage is limited to injury or loss to property "of a 'Third Party." The relevant definition of "Third Party" is:

> N. "Third Party" means any company, entity, or human being other than an "Insured" or other than a subsidiary, owned or controlled company or entity of an "Insured." Notwithstanding paragraph 2(d) of Insuring Agreement III of this Policy, an employee of an "Insured" shall be treated as a "Third Party."

*Id.* The Policy's Declarations list B&V as the "NAMED INSURED." (Dk. 284, p. 2).

**OCCURRENCE ISSUES**

The initial coverage agreement basically provides that the insurer shall pay on behalf of the insured those sums for which the insured is liable by law or by assumption under contract prior to the occurrence and is legally obligated to pay as damages for property damage occurring during the policy period and caused by an occurrence. The policy issues of first importance turn on whether the loss claims here are for property damage

19

caused by an occurrence, that is, by an accident, including continuous or

repeated exposure to substantially the same general harmful conditions, that

results in property damage that is not expected or not intended by the

insured.

From the summary judgment filings, the court understands that

B&V's position as to the occurrence for the completed and operating JBRs is

consistent with the following testimony from its CEO Steven Edwards:

> A. So I believe the occurrence at Cardinal 1 and 2 was the leakages
> through seal plates that disrupted the flows to the right places. I
> believe it was the –some construction defects that allowed parts to
> come loose and clog strainers that then caused other problems or
> plugged nozzles, and then that ended up causing uneven amounts of
> water to flow in various places that caused buildup of both – on the
> decks and in the tubes themselves.
> Q. So the accident as regards Cardinal 1 and 2 is leakage through seal
> plates, plugging –
> A. Components coming loose and plugging up certain areas, and then
> other areas disrupting the water flows, causing further plugging.
> Q. And disruption of water flows?
> A.  Uneven water flows.
> Q. Is there anything else about Cardinal 1 or 2 that, in your mind, is
> an occurrence?
> A. Components that suffered damage and fell and broke other pieces
> and parts, buildup that caused excessive loading on beams and
> columns.
> Q. Anything else?
> A. That's my recollection.

(Dk. 312, pp. 37-38, quoting Dk. 297-13, Edwards Dep. pp. 80-81). The

plaintiff also relies on the testimony of its Senior Vice President/Senior

Project Director in the Energy Division, Sheldon Wood, in describing the

occurrence to encompass the resulting property damage due to the buildup

of deposits, "[d]eflection and cracking of the decks, plugged spargers,

damaged and clogged wash headers, damaged support grid, damaged oxidation air piping, collapse of the module, deck module." (Dk. 312, p. 38, quoting Dk. 297-3 Wood Dep, p. 17). In sum, the occurrence for the completed JBRs was the construction defects consisting of leaks and loose parts that disrupted water flowage and clogged strainers which resulted in the buildup of deposits on other parts causing damage and excessive loading which led to more damages to the components of the JBRs.

Regarding the non-completed JBRs, B&V identifies the occurrence with the fit-up or installation of the defective gas risers and, more specifically, points to the occurrence happening "when the gas risers were incorporated into the JBR such that they could not be removed or replaced without making a hole in the steel tank and/or physically damaging other internal components of the JBRs." (Dk. 312, p. 36 citing Dk. 297-15, B&V's Response to Interrogatory No. 4). In other words, the plaintiff alleges the occurrence for the non-completed JBRs happened when the defective gas risers were installed within the JBRs such that their subsequent removal and replacement meant damaging the JBRs and its internal components. For both the completed and the non-completed JBRs, the alleged occurrences are defective construction work either in the design or installation being defective or in the parts themselves being defective.

In deciding this "occurrence" issue, the court realizes it is not blazing any new territories on CGL policies covering construction activities.

Instead, it is traveling down a path that from a broad perspective has many

forks and conflicting markers but from the narrow perspective of New York

law is uniquely well-marked and well-maintained. Here is how one

commentator described the broader judicial landscape in 2013 on the issue

of what is an occurrence under a CGL policy for construction services:

> Courts have long struggled with the "occurrence" element of the
> CGL policy. The standard form policy's insuring clause obligates the
> insurer to pay those sums that the insured becomes legally obligated
> to pay as damages because of "bodily injury" or "property damage," if
> the injury is caused by an "occurrence" that takes place in the
> "coverage territory" and occurs during the policy period. The concept
> of "occurrence" is key to CGL coverage. If the "bodily injury" or
> "property damage" is not caused by an "occurrence," there is no
> coverage. The standard policy defines "occurrence" as "an accident,
> including continuous and repeated exposure to substantially the same
> general harmful conditions." Just what is accidental in the context of
> construction services? There is no simple answer. Every year,
> numerous courts wrestle with this question. And every year, the
> analysis and conclusions become more disquieting and disparate.
> Judicial reflection on this issue is marked by a number of
> shortcuts intended to truncate the analysis in order to arrive at some
> acceptable conclusion. Some courts choose to focus on policy, often
> adopting the view that insurers are not in the business of guaranteeing
> that contractors perform their contractual obligations properly and
> contractors should bear the responsibility for properly selecting and
> supervising their subcontractors. Other courts find analogizing to other
> frequently misunderstood financial instruments, such as performance
> bonds to be a useful analytical tool. Other courts prefer to "weigh" the
> conflicting authority and adopt what they construe to be the majority
> rule. Still other courts look to the nature of the damages caused by the
> purported "occurrence" in determining whether this policy condition
> had been met. And still other courts analyze this issue in terms of
> fortuity.

Patrick J. O'Connor, Jr., *Recent Developments in Insurance Law*, 7 No. 1

Journal of the American College of Construction Lawyers 121 (Jan. 2013).

While the author did not analyze any New York cases from 2012, he did note

and cite the following 2010 case, "*400 15th Street, LLC v. Promo-Pro, Ltd.*, 28 Misc. 3d 1233, 2010 WL 3529466 (N.Y. Sup 2010) (faulty workmanship is not an occurrence and to hold so is to turn the CGL policy into a performance bond)." Another commentator a couple years later cautioned contractors, "[t]he divergence in views of the occurrence requirement is one reason insureds need to carefully analyze which state's law will apply to a coverage dispute." Lee H. Shidlofsky, *Deconstructing CGL Insurance Coverage Issues in Construction Cases*, 9 No. 2 Journal of the American College of Construction Lawyers n. 37 (Aug. 2015). Mr. Shidlofsky also noted that New York decisions were against the trend of "finding that physical damage resulting from inadvertent construction defects constitutes an occurrence under a CGL policy" and cited, "*National Union Fire Ins. Co. of Pittsburgh, PA v. Turner Const. Co.*, 119 A.D.3d 103, 986 N.Y.S.2d 74 (1st Dep't 2014); *Rosewood Home Builders, LLC v. National Fire & Marine Ins. Co.*, 2013 WL 1336594 (N.D.N.Y. 2013)." *Id.* at n. 62. The court's impression is that there is much debate over the "accidental" character of construction defects and that New York law runs against the growing trend followed in other jurisdictions of expanding coverage. It may be that the court's resolution of this issue will be disquieting to one side, but the court's goal is to reach a conclusion that is not disparate with New York law. Indeed, the court is not writing on a clean slate but is construing and applying the plain law which the parties agreed would govern their dispute. Policy

arguments on either side of this issue are of no moment, for this court's role is simply to construe and apply New York law as it is found to the facts of this case.

Consistent with New York law, the court believes it is important here to presume that the contracting parties, being as knowledgeable and sophisticated as they are, did understand or, at the very least, are held accountable for understanding the consequences in agreeing that "[a]ny dispute concerning the interpretation of the terms of this policy is understood and agreed by both you and us to be subject to New York Law." (Dk. 294, p. 2); *see Quantum Chem. Corp. v. Reliance Group, Inc.*, 180 A.D.2d 548, 580 N.Y.S.2d 275, 276 (1st Dep't) (per curiam) (citations omitted), *leave to appeal denied*, 79 N.Y.2d 760 (1992). With this being a dispute on the meaning and application of the "occurrence" term in a general liability policy, the court's decision is controlled by New York's approach to interpreting and applying an "occurrence" in liability policies:

> Courts have construed an "occurrence" to be an accident that is unexpected and is evaluated irrespective of the acts leading up to the resulting injury so long as the injury or damage is not intended. *See, e.g., Cont'l Cas. Co. v. Rapid-Am. Co.*, 80 N.Y.2d 640, 593 N.Y.S. 2d 966, 609 N.E.2d 506, 649 (N.Y. 1993). The New York Court of Appeals has reasoned that such policy terms are generally construed narrowly, "barring recovery only when the insured intended the damages . . . . A person may be engaged in behavior that involves a calculated risk without expecting that an accident will occur." *Id.* (citing *City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1150 (2d Cir. 1989) (holding that "ordinary negligence does not constitute an intention to cause damage")).

*Rosewood Home Builders v. National Fire & Marine Ins. Co.*, 2013 WL

1336594 at *4 (N.D.N.Y. Mar. 29, 2013); *see Continental Cas. Co. v. Rapid-*

*American Co.*, 80 N.Y.2d at 649 ("Resulting damage can be unintended even

though the act leading to the damage was intentional." (citations omitted)).

In short, the New York Court of Appeals uses the "transaction as whole" test

in determining the accidental character of an occurrence. *See McGroarty v.*

*Great Am. Ins. Co.,* 36 N.Y.2d 358, 364, 329 N.E.2d 172 (1975). The New

York Court of Appeals found an accident when excavation and construction

services which had continued for months caused damage to adjacent

property:

> We agree that this "transaction as a whole" test should be applied by
> the fact finder when determining whether the term accident is
> applicable to a given situation. We agree also that it is not legally
> impossible to find accidental results flowing from intentional causes,
> i.e., that the resulting damage was unintended although the original
> act or acts leading to the damage were intentional.

36 N.Y.2d at 364.

When the occurrence is faulty workmanship in construction, the

New York courts have recognized an additional accidental character in the

meaning of "occurrence" through the following rule. The Second Circuit

interpreting New York law held that an "occurrence" is more than a simple

claim "for faulty workmanship" but must include "consequential property

damage inflicted upon a third party as result of the insured's activity." *J.Z.G.*

*Resources, Inc. v. King*, 987 F.2d 98, 102 (2nd Cir.), *cert. denied*, 510 U.S.

993 (1993); *see Rosewood Home*, 2013 WL 1336594 at *4. The Second

Circuit in *J.Z.G. Resources* quoted from its earlier decision which had "held that a CGL policy did not provide coverage for a claim against an insured for the repair of faulty workmanship that damaged only the resulting work product":

> "Were we to construe the words 'accident' or 'continuous or repeated exposure to conditions' as encompassing damage to a product resulting from the product's failure to perform according to contract specifications, we would expand the agreed-upon coverage. An accident, given its dictionary meaning, is 'an event or condition occurring by chance or arising from unknown or remote causes.' *Webster's Third New International Dictionary* 11 (1981). We might add that in common parlance an external force of some kind is usually involved."
> 961 F.2d at 389. We distinguished our earlier decision in [*Aetna Casualty & Sur. Co. v.*] *General Time* [*Corp.*], 704 F.2d [80] at 83 [(2d Cir.1983)], on the basis that the defective motors sold by the insured in that case had caused damage to other property of the purchaser. (citation omitted).

*Id.* at 102 (quoting *Jakobson Shipyard, Inc. v. Aetna Cas. and Sur. Co.*, 961 F.2d 387, 389 (2nd Cir. 1992)). The Second Circuit also observed that its approach was consistent with the purpose of such policies:

> The *Jakobson* ruling is consistent with the general concept of PCOH insurance, which has been described in these terms:
> > The products hazard and completed operations provisions are not intended to cover damage to the insured's products or work project out of which an accident arises. The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to

> protect against. The coverage is for tort liability for physical
> damages to others and not for contractual liability of the insured
> for economic loss because the product or completed work is not
> that for which the damaged person bargained.
>
> Roger C. Henderson, *Insurance Protection for Products Liability and
> Completed Operations-What Every Lawyer Should Know*, 50
> Neb.L.Rev. 415, 441 (1971) (footnote omitted).

*Id*. a 102-103. Thus, "under New York law, a Commercial General Liability
policy like the one involved here 'does not insure against faulty workmanship
in the work product itself but rather faulty workmanship in the work product
which creates a legal liability by causing bodily injury or property damage to
*something other than work product*.'" *James River Ins. Co. v. Power
Management, Inc.*, 55 F. Supp. 3d 446, 454 (E.D.N.Y. 2014) (quoting
G*eorge A. Fuller Co. v. U.S. Fidelity & Guar. Co.*, 200 A.D.2d 255, 259, 613
N.Y.S.2d 152, 155 (1st Dept.), *leave to appeal dismissed*, 84 N.Y.2d 806
(1994) (emphasis added in *James River*).

New York courts have grounded this approach on several
fundamental concepts. "An insurer of a CGL policy is not a surety for a
construction contractor's defective work." *Transportation Ins. Co. v. AARK
Const. Group, Ltd.*, 526 F. Supp. 2d 350, 356 (E.D.N.Y. 2007) (citing *Bonded
Concrete, Inc. v. Transcon. Ins. Co.*, 12 A.D.3d 761, 762, 784 N.Y.S.2d 212
(3rd Dept. 2004)); *see James River Ins. Co. v. Power Management, Inc.*, 55
F. Supp. 3d at 454. "CGL policies do not insure against faulty workmanship
in the work product itself." *I.J. White Corp. v. Columbia Cas. Co.*, 105
A.D.3d 531, 532, 964 N.Y.S.2d 21 (1st Dept. 2013). "[A]n 'occurrence' of

27

property damages under a commercial general liability policy cannot exist where a general contractor's 'negligent acts only affect[] [the property owner's] economic interest in the building.'" *Continental Ins. Co. v. Huff Enterprises, Inc.*, 2010 WL 2836343, at *4 (E.D.N.Y. Jun. 21, 2010) (quoting *George A. Fuller*, 200 A.D.2d at 259), *adopted report and recommendation*, 2010 WL 2836312 (Jul. 15, 2010); *see James River Ins. Co.*, 55 F. Supp. 3d at 454. While one can find in these decisions, or ones cited by them, some mention that coverage of CGL policies was intended for tort, not contract, liability, *see, e.g., Transportation Ins.*, 526 F. Supp. 2d at 357 n. 3, this court is more persuaded by the analysis of New York law found in *Thruway Produce, Inc. v. Massachusetts Bay Ins. Co.*, 114 F. Supp. 3d 81, 92 (W.D.N.Y. 2015), which includes:

> The Court cannot agree with Defendant's reading of the case law. Defendant has not cited a single case where a New York court or a federal court applying New York law has held that an insured's breach of contract cannot constitute an occurrence where there is actual physical damage to property other than the defective property of the insured. In the cases upon which Defendant relies, the primary of which are discussed below, where the courts held that an insured's breach of contract cannot constitute an occurrence, the only damages claimed were to the defective product supplied by the insured.
> . . . .
> Defendant's position that a breach of contract or warranty can never constitute an "occurrence" was expressly rejected by the Second Circuit in its unpublished opinion affirming the district court's grant of partial summary judgment in *Chubb Ins. Co. of New Jersey v. Hartford Fire Ins. Co.*, No. 97 CIV. 6935 LAP, 1999 WL 760206 (S.D.N.Y. Sept. 27, 1999), *aff'd*, 229 F.3d 1135 (2d Cir. 2000) ("[W]e reject Hartford's argument that a breach of contract or warranty can never constitute an 'occurrence.' "). As stated by the Second Circuit, "a breach of contract or warranty can be an 'occurrence' if, as a result of the breach, property sold by the insured to a third party, which was then

incorporated into other property belonging to the third party, caused damage to this other property." 229 F.3d 1135.

*Id.* at 92-93. In short, New York law recognizes an "occurrence" even if it is only a contractual breach so long as it has caused damage liability for property other than the defective product itself. Another federal district court applying New York law similarly observed, "This is consistent with the 'purpose of a [CGL] policy[,] which is to provide coverage for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not what the damaged person bargained for.'" *Rosewood Home Builders, LLC*, 2013 WL 1336594 at *4 (quoting *Hartford Acc. & Indem. Co. v. A.P. Reale & Sons, Inc.*, 228 A.D.2d 935, 644 N.Y.S.2d 442, 443 (App. Div. 1996)). In sum, New York law generally construes CGL coverage as not extending to the "occurrence" of faulty workmanship, unless the damage liability is for property other than the insured's own defective product/work.

The court has considered B&V's presentation of New York case law in arguing for a different meaning of "occurrence." Without addressing here each of those citations, the court will indicate that it has read and considered them and finds them distinguishable either as not involving the context of a construction defect/faulty workmanship or as involving damages to property other than the insured's own defective work. To the latter distinction, which is the most significant here, there is the plaintiff's citation of *Ohio Cas. Ins. Co. v. Lewis & Clinch, Inc.*, 2014 WL 6078572 (N.D.N.Y.

2014), for the general proposition that, "property damage resulting from defective construction was caused by an 'occurrence.'" (Dk. 312, p. 92). A closer look at that decision reveals the following:

> To be sure, the Policies "do[] not insure against faulty workmanship in the work product itself but rather faulty workmanship in the work product which creates a legal liability by causing bodily injury or property damage to something other than the work product." *George Fuller Co. v. U.S. Fid. & Guar. Co.*, 613 N.Y.S.2d 152, 155, 200 A.D.2d 255, 259 (N.Y.App.Div. 1994). *See also I.J. White Corp. v. Columbia Cas. Co.*, 964 N.Y.S.2d 21, 105 A.D.3d 531 (N.Y.App.Div. 2013); *Transp. Ins. Co. v. AARK Constr. Grp., Ltd.*, 526 F. Supp. 2d 350 (E.D.N.Y. 2007)).
>
> In *Fuller*, the court held that the underlying complaint did not allege an "occurrence" resulting in "property damage" as those terms are defined by the defendant's CGL policy because there, the insured property owner claimed that certain construction work was done improperly, necessitating unnecessary construction costs and resulting in diminished value of the property. *See Fuller*, 613 N.Y.S.2d at 256–259. The court there found that the allegations "do not involve damage caused by a 'continuous or repeated exposure to substantially the same general harmful conditions,' which, in accordance with the policy's terms, would constitute an 'occurrence' but, rather, intentional cost-saving or negligent acts only affecting [the insured property owner's] economic interest in the building." *Id.*, at 259.
>
> Conversely, in *I.J. White*, the court, distinguishing *Fuller*, found that the claimed damages were covered by the CGL policy in that case. *See I.J. White*, 964 N.Y.S.2d 21, 105 A.D.3d at 532 (citing *Fuller*, 613 N.Y.S.2d at 155, 200 A.D.2d at 259). There, the insured, a bakery, claimed damages to its cake products resulting from the improper operation of a freezer system due to the cakes emerging from the freezer at the wrong temperature, resulting in damage during the cutting process. *See I.J. White*, 964 N.Y.S.2d 21, 105 A.D.3d at 531. The insured further claimed damages in the form of its loss of use of the freezer and the facility it constructed to house the freezer during the eight months it took to repair the equipment. *See id.*, at 532, 964 N.Y.S.2d 21. The court noted that there, as here, but unlike in *Fuller*, the insured was seeking coverage for damage caused by faulty workmanship to something other than the work product. *See id.* In other words, the court noted, in *Fuller*, the claimed damage occurred to the work product itself, whereas in I.J., the claimed damage occurred to the cakes, not the freezer. *See id.*

> Similarly, here, Northbrook's claims of damage to the draft tube gate seals is "property damage" resulting from an "occurrence" under the terms of the Policies. Damage to the Ringfeders and wicket gates, resulting from Lewis & Clinch's faulty work product, does not fall under the Policies' definition of "property damage." Consequently, damages to Unit 2's Ringfeders and wicket gates are not covered under the insuring grants of the policies, but damages to the draft tube gate seals are covered.

*Id.* at *9. In short, this decision actually supports the general rule that faulty workmanship or a construction defect is not an "occurrence" under New York law unless it damages something other than the work product.  It is also worth noting that the CGL policy in *Ohio Cas. Co.* included a subcontractor exception to the "Your Work" exclusion. *Id.* at *5. The decision, however, does not reflect any argument or discussion of this exception as having the effect of modifying New York's law on the meaning of "occurrence."

B&V's reliance on the *I.J. White* decision which is discussed in the above quotation similarly fails to show a different meaning of "occurrence" in New York law. The plaintiff also cites *Royal Ins. Co. of America v. Ru-Val Elec. Corp.*, 1996 WL 107512 at *2 (E.D.N.Y. Mar. 8, 1996), which noted that the important distinction for an "occurrence" in a construction setting "is not whether the complaint states a contract or tort theory, but whether the damage to be remedied is the faulty work or product itself or injury to person or other property." As for *Saks v. Nicosia Contr. Corp.*, 215 A.D.2d  832, 625 N.Y.S.2d 758 (1995), this decision also applied the rule from *Fuller* finding coverage for a claim because it was not

for damages to the constructed home itself but for damages to the real property where the home was negligently placed.

B&V believes that New York case law on this issue is inconsistent and that the New York Court of Appeals has never squarely addressed this meaning of "occurrence." B&V follows this with asking the court to follow case law from other jurisdictions and, in particular, decisions from the Second and Tenth Circuits. The court's impression of New York law on an "occurrence" in faulty workmanship cases is that there is an established consistency up through the most recent decisions. *See, e.g., Maxum Indemnity Company v. A One Testing Laboratories, Inc.*, 150 F. Supp. 3d 278, 285 (S.D.N.Y. Dec. 10, 2015) ("The George A. Fuller decision accurately captures New York law."). As shown in the prior citations, this case law is also firmly based on and consistent with the Second Circuit's interpretation and analysis of New York case law. The absence of a direct decision by the New Court of Appeals in itself certainly does not justify this court defying the authority of a well-recognized line of New York precedent consisting of both state and federal courts. When faced with similar pleas to look to other jurisdictions for a different meaning of "occurrence," the courts charged with applying New York law have rejected these pleas. *See National Union Fire Ins. Co. of Pittsburgh, PA v. Turner Constr. Co.,* 119 A.D. 3d 103, 108-09, 986 N.Y.S.2d 74 (1st Dept. 2014) (a claim of faulty workmanship in itself "simply does not involve fortuity" absent damage to third-party

32

property); *Aquatectonics, Inc. v. Hartford Cas. Ins. Co.*, 2012 WL 1020313, at *7-*8 (E.D.N.Y. Mar. 26, 2012) (Rejected request to follow authority outside of New York and cited *Amin Realty, L.L.C. v. Travelers Property Cas. Co.*, 2006 WL 1720401 at *7 (E.D.N.Y. Jun. 20, 2006) (Did not follow other cited jurisdictions as "the case is governed by the law of New York, which has adopted the majority rule:  to wit, that defective workmanship, standing alone, is not an occurrence under a CGL policy." (citation omitted))).

As it has been stated before, these are sophisticated parties who agreed that any disputes over policy interpretations would be subject to New York law. B&V is the EPC contractor and its work product is nothing short of the entire JBRs. Consequently, New York law's governing definition of "occurrence" does not recognize liability coverage for B&V arising from the claimed property damage to the JBRs, completed or in progress, resulting from the defective or faulty construction of the JBRs performed by B&V or one of its subcontractors:

> There is no "occurrence" under a commercial general liability policy where faulty construction only damages the insured's own work (*see Pennsylvania Gen. Ins. Co. v. Menk Corp.*, 2011 WL 5864109, *4–5 [D.N.J. Nov. 21, 2011] ), and faulty workmanship by subcontractors hired by the insured does not constitute covered property damage caused by an "occurrence" for purposes of coverage under commercial liability insurance policies issued to the general contractor, since the entire project is the general contractor's work (*see Firemen's Ins. Co.*, 387 N.J.Super. at 446, 449, 904 A.2d at 760–761, 762–763). In *Baker Residential v. Travelers Ins. Co.*, 10 A.D.3d 586, 587, 782 N.Y.S.2d 249 (1st Dept.2004), where a developer delivered and installed defective structural beams that deteriorated from water penetration due to improper installation, flashing and waterproofing, this Court held that the damages sought by the

developer did not arise from an "occurrence" resulting in damage to third-party property distinct from the developers' own "work product." . . . .

"[T]he requirement of a fortuitous loss is a necessary element of insurance policies based on either an 'accident' or 'occurrence' " (*Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208, 220 [2002]; Insurance Law § 1101 [a] [1]; *see also Victory Peach Group, Inc. v Greater N.Y. Mut. Ins. Co.*, 310 NJ Super 82, 87, 707 A2d 1383, 1385 [1998]). As the motion court recognized, the addition of "event" or "happening" to the definition of "occurrence" did not alter the legal requirement that the "occurrence" triggering the coverage must be fortuitous. "[A] claim for faulty workmanship, in and of itself, is not an occurrence under a commercial general liability policy because a failure of workmanship does not involve the fortuity required to constitute an accident" (9A Steven Plitt et al., *Couch on Insurance* 3d § 129:4 [2008]; *Pennsylvania Natl. Mut. Cas. Ins. Co. v Parkshore Dev. Corp.*, 2008 WL 4276917, *4, 2008 US Dist LEXIS 71318, *9-12 [D NJ 2008], *affd* 403 Fed Appx 770 [3d Cir 2010]).

*National Union Fire Ins. Co. of Pittsburgh, PA. v. Turner Const. Co.*, 119 A.D.

3d at 108; *see Maxum Indemnity Company*, 150 F. Supp. 3d at 285 (The

"'no occurrence, no coverage' rule for commercial liability policies under New

York law" meant no coverage for "the cost of repairing the allegedly

defective work in order to bring it into compliance with the underlying

contracts, industry standards, and legal requirements.").

Of course, this ruling does not address whether the sophisticated

parties here could not have contracted for CGL insurance with an

"occurrence" element that had an agreed meaning different from that

otherwise applicable under New York law. In deciding if this happened here,

the court still looks to New York law to evaluate the evidence and arguments

on the parties' intent. As only a factual background, the court accepts as

undisputed that the Aspen/Catlin CGL policy was the product of negotiations

34

between underwriters in the Lloyd's insurance market in London. Like other American companies seeking access to this insurance market, B&V employed retail brokers who, in turn, relied on wholesale brokers in London. The wholesale brokers negotiated with the underwriters in the brokering of insurance placement for the company. Galen Brislane was the principal broker from Jardine Lloyd Thomas which served as B&V's wholesale broker. For the underwriters Aspen/Catlin, John Henderson with Ian Grimes negotiated with Brislane over the terms of the deal. These negotiations included Brislane submitting to Henderson an insurance policy written by Westchester which was expiring, and the negotiations involved the parties' marking up this policy with suggested changes, comments and endorsements.  Endorsement 37 to the final policy, as noted by the defendants, includes, however, the significant handwritten term that, "This agreed wording supersedes any previous agreed wording for this placement." (Dk. 284-1, p. 61).

Though negotiated, modified and written by their representatives, the Aspen/Catlin CGL policy is also recognized by the parties as generally resembling other standard liability policies both in organization and in terms. This complicates efforts at determining the parties' intent because of the intersection and interaction between provisions common to CGL policies which have been interpreted and applied under New

York law and other provisions which may be distinct in location and wording.

B&V's general position on this interaction is that:

> The unambiguous terms of the Policy resulted from detailed negotiations between the insured and insurers concerning the scope of coverage. The negotiated terms of the Policy provide B&V coverage for liability arising from damages to B&V's completed operations, as well as liability arising from damages to B&V's work in progress.

(Dk. 284, p. 3). The defendants deny that this negotiated contract is intended to be more than a CGL policy offering third-party liability coverage. The policy is intended to offer no coverage for the insured's own defective work unless the resulting property damage liability is attributable to damage done to third parties. The defendants articulate their general position as follows:

> In seeking coverage, B&V ignores clear New York precedent. B&V ignores policy features that the business risk of construction defects is not covered. Due to the clear New York precedent that there is no coverage for claims of this type, B&V seeks to re-negotiate the Policy in a manner which was never intended. But where there is no issue of ambiguity, as here; the Policy is to be enforced as written.

(Dk. 297, p. 78). It cannot be overlooked that both sides argue from the position that the policy is unambiguous.

In addressing the dispute over whether the parties agreed to a definition of "occurrence" different from New York law, the court's analysis must be consistent with New York law insofar as it guides the interpretation and application of contracts. Thus, it is a "basic principle" of New York contract law "that insurance contracts, like other agreements, will ordinarily be enforced as written." *J.P. Morgan Securities Inc. v. Vigilant Ins. Co.*, 21

36

N.Y.3d 324, 334, 992 N.E.2d 1076 (N.Y. 2013) (citation omitted). Consistent with the public policy favoring the freedom of contract, "parties to an insurance arrangement may generally contract as they wish and the courts will enforce their agreements without passing on the substance of them." *Id.* (internal quotation marks and citations omitted).  "The best evidence of what the parties to an agreement intended is the language of the agreement itself, especially where, as here, the parties to the insurance policy were sophisticated entities." *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. TransCanada Energy USA, Inc.*, 28 N.Y.S.3d 800, 806 (N.Y. Sup. Ct. 2016) (quoting *Broad Street, LLC v. Gulf Ins. Co.*, 37 A.D. 3d 126, 130, 832 N.Y.S.2d 1 (1st Dept. 2006)). This echoes the general rule that, "[a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992) (citations omitted). For when a contract is executed by sophisticated, counseled business persons, "a presumption that a deliberately prepared and executed agreement manifests the true intention of the parties . . . appl[ies] with even greater force." *See Quantum Chem. Corp. v. Reliance Group, Inc.*, 180 A.D.2d 548, 580 N.Y.S.2d 275, 276 (1st Dep't 1992) (per curiam) (citations omitted), *leave to appeal denied by*, 79 N.Y.2d 760 (May, 12, 1992). But this also means that, "[i]nsurance policies must be construed

. . . in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect. " *Selective Ins. Co. of America v. County of Rensselaer*, 26 N.Y.3d 649, 655, 47 N.E.3d 458 (2016) (internal quotation marks and citation omitted). "Coverage, however, is not determined merely on the basis of the insuring clause, but must be determined upon the basis of the combination of the insurance clause and exclusions." *General Acc. Ins. Co. v. U.S. Fidelity and Guarantee Ins. Co.*, 193 A.D.2d 135, 137, 602 N.Y.S.2d 948 (1993) (citing *Schiff Assocs. v. Flack*, 51 N.Y.2d 693, 697-98, 417 N.E.2d 84 (1980)). The New York Court of Appeals in *Schiff Assocs.* observed:

> We start our analysis by noting that the coverage under the policies in this case is not merely what is found under the heading "insuring agreement". Just as this clause affirmatively indicates the coverage which is included, so does the "exclusion" clause tell us expressly what is not. In policies so drawn, the protection the insured has purchased is the sum total, or net balance, however one labels it, of a coming together of the two. For it is not either alone, but the combination of both, which defines the scope of the protection afforded no more and no less.

51 N.Y.2d at 697. Simply put, policies are to be interpreted such that all terms are afforded a fair meaning in keeping with the general notions that insuring agreements affirmatively state coverage and exclusions define what are not covered.

Also in keeping with these rules, the court is mindful that sophisticated parties contracting under New York law would recognize that a

CGL policy of insurance is generally distinguishable in purpose from first-

party property insurance:

> The policy under which The Gap is named as an additional
> insured is a standard commercial general liability insurance policy,
> written on a standard Insurance Service Office (ISO) form. Since the
> purpose of general liability insurance is to provide coverage for liability
> to third parties (see Holmes' *Appleman on Insurance* 2d § 129.1[B], at
> 4), the standard CGL policy does not cover damage to property owned
> by the insured (*id.* at 166, Commercial General Liability Coverage
> Form, Exclusion j). A CGL policy pays a third-party claimant according
> to a judgment or settlement against the insured (see *Great N. Ins. Co.
> v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 688, 685 N.Y.S.2d 411,
> 708 N.E.2d 167, citing Holmes, *supra*, § 3.2).
>     In contrast, insurance coverage for damage to property owned
> by the insured, or "first-party coverage," pays the insured the
> proceeds when the damage occurs (*Great N. Ins., supra* at 687, 685
> N.Y.S.2d 411, 708 N.E.2d 167); it protects an interest "wholly
> different" from that protected by third-party coverage (*id.* at 688, 685
> N.Y.S.2d 411, 708 N.E.2d 167). "The principal distinction between
> liability and property insurance is that liability insurance covers one's
> liability to others for bodily injury or property damage, while property
> insurance covers damage to one's own property" (Postner & Rubin,
> *New York Construction Law Manual*, § 10.06, Coverage, at 380
> [emphasis in original] ).

*Gap, Inc. v. Fireman's Fund Ins. Co.*, 11 A.D.3d 108, 111-12, 782 N.Y.S.2d

242, 244 (1st Dept. 2004). It necessarily follows that sophisticated parties

who are wanting to contract for coverage outside the standard and expected

parameters of liability insurance would want to exercise care in expressing

and making evident their unique intentions in the written agreement such

that the parties' agreed understanding is open, meaningful, and

understandable.

        B&V argues that the policy's meaning of "occurrence" here is not

constrained by how New York courts have interpreted this term in other CGL

policies. It claims, instead, that the policy here covers liability for "Property Damage" done to AEP's work and that the "Occurrence" is the "unexpected and not intended Property Damage resulting from either:  work performed on behalf of B&V by a subcontractor, or error in the delivery of 'Professional Services' in connection with work by B&V as an EPC contractor." (Dk. 284, pp. 4-5). B&V attaches significance to the following words in the policy's "coverage" insuring agreement that are italicized here:

> (1)  We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" which the "Insured" by reason of liability imposed by law or *assumed by the "Insured" under contract prior to the "Occurrence"* shall become legally obligated to pay as damages for . . . "Property Damage" occurring during the Policy Period stated in Item 4 of the Declarations . . . and caused by an "Occurrence"; . . . .

(Dk. 284-1, p. 7) (italics added). B&V infers that such assumed contractual liability claims could only be brought by the owners with whom B&V had contracted and that the claims would necessarily involve damages sustained by the project. (Dk. 312, p. 90). Therefore, B&V reads this italicized language as evidencing the parties' intent, "that damages arising from faulty workmanship of subcontractors to otherwise non-defective work constitute an occurrence and are covered." (Dk. 318-1, p. 2).

The defendants believe B&V is isolating this italicized language and then ignoring its context. First, this language does not purport to remove the requirement of an "occurrence" but rather affirms it. Second, the language does not reflect any intent or understanding between the parties to abandon the meaning of "occurrence" otherwise applicable under New York

law. Third, the language appears within a sentence that limits coverage to "property damages" occurring during the policy period which is inconsistent with an argued intent to cover construction defects which are typically latent and would not be manifested until after the policy's expiration.

The court is not persuaded by B&V's arguments for attaching general interpretative significance to this particular clause in the insuring agreement. The clause itself is not unusual for CGL policies. B&V rightly identifies it as an "assumption of liability clause." (Dk. 318-1, p. 2, n.1). Such a clause "provides coverage for liability incurred pursuant to indemnification agreements which are also typically contained in construction contracts." Dwight G. Conger, et al., *Construction Accident Litigation,* § 10.4 (2d ed. 2015). Instead of placing this clause in an endorsement or attachment, the parties here included it in the insuring agreement. *See id*. A CGL policy may even include this clause as an exclusion. *See, e.g., City of New York v. Lexington Ins. Co.*, 735 F. Supp. 2d 99, 109 (S.D.N.Y. 2010); *QBE Ins. Corp. v. Adjo Contracting Corp.*, 32 Misc. 3d 1231, 2011 WL 3505475 (Sup. Ct. Apr. 5, 2011), *aff'd in part and rev'd in part on other grounds*, 121 A.D. 3d 1064, 997 N.Y.S. 2d 425 (2d Dept. 2014). In interpreting this clause, the courts do not gloss over the words, assume or assumption, but read the clause to address coverage in those circumstances when the insured has contractually assumed another's liability, as in an indemnification agreement or hold harmless agreement.

41

*See QBE Ins. Corp.,* 2011 WL 3505475 at *50; *American Family Mut. Ins. Co. v. American Girl*, 268 Wis.2d 16, 673 N.W.2d 65, 81 (Wis.), *reconsideration denied*, 271 Wis.2d 114 (Wis. 2004). Stated another way, "'assumption of liability' means that the insured has assumed a liability for damages that exceeds the liability it would have under general law." *Ewing Const. Co., Inc. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. Sup. Ct. 2014); *see American Girl*, 673 N.W.2d at 80-81 ("The term 'assumption' must be interpreted to add something to the phrase 'assumption of liability' in a contract or agreement. Reading the phrase to apply to all liabilities sounding in contract renders the term 'assumption superfluous.'"). B&V does not cite any authorities for giving the phrase here, "liability . . . assumed by the Insured under contract," a broader and different meaning than what is found in these well-reasoned cases. Nor does this policy afford any reason for reading over "assumed" as superfluous in order to construe this clause as signifying coverage of all liabilities sounding in contract rather than those sounding in indemnification or in the assumption of some extra liability. The court agrees with the defendants that this assumption of liability clause and its location in the insuring agreement does not reasonably express an intent or understanding between the parties to abandon the accepted New York meaning of "occurrence" in CGL policies involving faulty construction work.

The defendants also contend the plaintiff's efforts to broaden the meaning of the assumption of liability clause are thwarted by Endorsement

4. It provides, "With respect to . . . 'property damage', . . . arising out of liability you assume under any contract, this policy is limited to the coverage provided by the 'underlying insurance.'" (Dk. 284-1, p. 23). With the Zurich policy being the undisputed underlying insurance, the defendants note this assumption of liability clause is not part of the Zurich's insuring agreement, and instead, appears as an exclusion. (Dk. 303-16, pp. 57-58). Notwithstanding the plaintiff's creative efforts at reading the Zurich policy, the terms at issue likewise speak only to indemnification and do not yield any reasonable reading of coverage for other direct contractual liability between B&V and AEP. The defendants' arguments (Dk. 319-1) are persuasive on this point.

B&V lifts up other provisions in the policy as showing the parties' intention to have coverage for damages to its own work product caused by faulty workmanship. Of course, these arguments must be framed by whether they show the parties intended "occurrence" to mean something different from what is found in New York law. Before embarking on this analysis, it should be noted that New York law asks courts to construe language as to afford all terms a fair meaning and to not void any provision of force and effect. This does not mean that for purposes of this case the court must conceive of a separate meaning and effect for each term under a given set of circumstances. Parties, even sophisticated ones, should be granted the leeway of being repetitive and overly careful in spelling out and limiting

coverage. In this regard, the defendants say the contract reflects the parties took a "belt and suspenders" approach, and a quick read of the policy shows the defendants have made a valid point. In their arguments over interpreting the policy, both sides emphasize that the negotiated policy was written to address those foreseeable risks which they agreed to be covered. It would seem to follow that if certain risks would be plainly foreseeable from engaging in anticipated activities, then a court should be able to expect that sophisticated and knowledgeable parties contracting for insurance would be deliberate and plain in preparing a contract with language that manifested their true intention on the agreed and plainly foreseeable risks covered or not. *Cf. Raymond Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d 157, 162, 833 N.E.2d 232, 234 (N.Y. 2005) ("We will 'not disregard clear provisions which the insurers inserted in the policies and the insured accepted, and equitable considerations will not allow an extension of coverage beyond its fair intent and meaning in order to obviate objections which might have been foreseen and guarded against.' *Caporino v. Travelers Ins. Co.*, 62 N.Y.2d 234, 239, 465 N.E.2d 26 (1984))

The first of these other provisions, and the one most strongly argued by B&V, is exclusion F, which reads:

> "Property Damage" to "Your Work" arising out of it or any part of it and included in the "Products/Completed Operations Hazard".
> This Exclusion F does not apply if the damages work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(Dk. 284-1, p. 14). B&V offers extended evidence, depositions and declarations, and asks the court to consider the same as showing its intent in seeking coverage for subcontractors' work and in then entering this manuscript which speaks to damage liability arising from work done by subcontractors. B&V denies that their negotiations involved the "occurrence" requirement not including damages to its own work product from defective construction work performed by it or by subcontractors. B&V's negotiators and representatives point to notes on earlier drafts of the contract as some proof of their intent and of their expectation in having this subcontractor coverage incorporated into exclusion F. Specifically, B&V contends the subcontractor exception to exclusion F could not be more clear that there is liability coverage for damages to B&V's completed work when the damaged work or the work out of which the damages arise was performed on B&V's behalf by a subcontractor. B&V further argues that if "occurrence" is defined so as to preclude damage liability to its own work product, then "there was no reason to include exclusion F, much less negotiate the subcontractor exception to the exclusion." (Dk. 284, p. 41). B&V couches this last argument in this way, "while the 'your work' exclusion (Exclusion F) cuts back on the scope of coverage otherwise provided by the basic insuring agreement, the 'subcontractor exception' clause expressly excepts from the exclusion and preserves coverage in circumstances like those here." *Id.*

The defendants counter that the evidence of B&V's intent, the parties' negotiations and their earlier drafts is irrelevant as the final contract is unambiguous and the best evidence. The parties expressly agreed that the contract's final wording supersedes any previous wording. With respect to the subcontractor exception, the defendants point to the general rule followed in New York that an exception to an exclusion does not create coverage and that this exception, by itself or in combination with other provisions, does not show the parties intended to contract for a unique meaning to "occurrence."

B&V does not present any ambiguity in the policy or argue for one which would allow or require the introduction and consideration of extrinsic evidence of the parties' intent. *American Home Products Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2nd Cir. 1984); *Nichols v. Nichols*, 306 N.Y.490, 119 N.E.2d 351, 353 (N.Y. 1954) ("The first and best rule of construction of every contract, and the only rule we need here, is that, when the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein." (citation omitted)). "New York courts interpret integration clauses 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'" *Oquendo v. CCC Terek*, 111 F. Supp. 3d 389, 412 (S.D.N.Y.) (quoting *Matter of Primex Intl Corp. v. Wal-Mart Stores,* 89 N.Y.2d 594, 499, 679 N.E.2d 624 (N.Y. 1997)). By dint of these rules, the

46

court will look to the relevant terms of the negotiated contract to determine the parties' intent on the meaning of "occurrence."

B&V argues for the court to consider the subcontractor exception because it "preserves coverage" otherwise provided but for exclusion F. (Dk. 284, p. 41). It does so apparently recognizing what is regarded as the general rule that an exception does not create coverage but may preserve it. This is the general rule in New York where courts understand that "exclusions or exceptions from policy coverage . . . are not to be extended by interpretation or implication." *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122, 950 N.E.2d 500 (2011) (internal quotation marks and citations omitted). Applying New York law, courts also have held that "exclusions and exceptions in an insurance policy cannot expand the scope of the agreed coverage." *Continental Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 123 (S.D.N.Y. 2013) (quoting *Bryan Bros. Inc. v. Continental Cas. Co.*, 660 F.3d 827, 831 (4th Cir. 2011)); *Raymond Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d at 163 ("The dissent would discover coverage for vendor negligence in negative inferences from the policy's exclusions, but 'an exclusion from insurance coverage cannot create coverage.'" (quoting *Continental Cas. Co. v. Pittsburgh Corning Corp.*, 917 F.2d 297, 300 (7th Cir. 1990)). "[T]he basic principle [is] exclusion clauses *subtract* from coverage rather than grant it" and that an exception is limited by the scope of the specific exclusion. *See Jakobson Shipyard, Inc. v. Aetna*

*Cas. and Sur. Co.*, 775 F. Supp. 606, 613 (S.D.N.Y. 1991) (quotation marks and citation omitted), *aff'd,* 961 F.2d 387 (2d Cir. 1992). New York law precludes B&V from successfully arguing that the subcontractor exception results in a different meaning of "occurrence." As already stated above, there is nothing in the insuring agreement or in the relevant policy definitions to support giving "occurrence" any meaning different from what New York law requires here, and this results in no "occurrence" and no coverage in the first instance. Therefore, B&V is effectively asking the court to use the subcontractor exception to exclusion F to extend coverage rather than preserve it. To construe the manuscript as argued by B&V would be contrary to New York law.

It is this rule of construction which has kept courts applying New York law from looking at any argued exclusions when there has not been a covered "occurrence." *See Aquatectonics, Inc. v. Harford Cas. Ins. Co.*, 2012 WL 1020313 at *7 ("Because the Court has determined that the property damage to the pool did not arise out of an 'occurrence' pursuant to the Policy, it need not determine whether any exclusions from coverage would apply."); *Transportation Ins. Co. v. AARK Constr. Group, Ltd.,* 526 F. Supp. 2d 350, 356 n.2 (E.D.N.Y. 2007) ("This Court need not discuss whether these exclusions would apply because, as explained below, accidents involving damage to a contractor's work product alone does not constitute an occurrence under a CGL policy."). In *Aquatectonics*, the court discussed

48

the authorities for its holding and rejected the coverage argument based on

the subcontractor exception to the "damage to your work exclusion":

> Loebs argues that it would be incorrect for the Court to restrict its
> analysis to the presence or absence of an "occurrence" without also
> considering the effect of any Policy exclusions or exceptions to those
> exclusions.  (*See Pl.'s Mem.* at 13-14.). The case cited by Loebs as
> support for this assertion, however, specifically states that "[t]he
> insured has the *initial burden* of providing that the damage was the
> result of an 'accident' or 'occurrence,' to establish coverage" and that
> "*[o]nce coverage is established*, the insurer bears the burden of
> proving that an exclusion applies." *Consol. Edison Co. of N.Y.*, 98
> N.Y.2d at 220, 746 N.Y.S.2d 622, 774 N.E.2d 687 (emphases added)
> (cited by Pl.'s Mem. at 14).
>
> Loebs urges that, rather than follow the lead of the numerous New
> York and Second Circuit courts outlined above, the Court should rely
> upon decisions made by courts in other jurisdictions. Loebs directs the
> Court to an article published in the Fall 2008 volume of The
> Construction Lawyer "for an overview of how the issue presented here
> has been playing out across the nation." (Pl.'s Mem. at 3 n. 3 .) The
> article provides the following overview of its opinion as to the
> appropriate framework for determining the scope of a CGL policy's
> coverage:
>> Like most insurance policies, [CGL] policies begin with a broad
>> grant of coverage, which is then limited in scope by exclusions.
>> Exceptions to exclusions narrow the scope of the exclusion and,
>> as a consequence, add back coverage. However, it is the initial
>> broad grant of coverage, not the exception to the exclusion, that
>> ultimately creates (or does not create) the coverage sought ....
>> The legal obligation to pay [ ] must arise from an 'occurrence,'
>> ... [thus,] construction defect coverage litigation often boils
>> down to a dispute first over the meaning of the word 'accident'
>> within the definition of 'occurrence' and then the scope and
>> application of the 'your work' exclusion.
> David Dekker, Douglas Green, Stephen Palley, *The Expansion of
> Insurance Coverage for Defective Construction*, The Construction
> Lawyer, Fall 2008, at 20 (emphasis added). Overall, this initial opinion
> seems to be in accord with the principles set forth by this Court here.
>
> The article goes on to discuss court decisions from, inter alia, Florida,
> Texas, and South Carolina that, "[w]hile cautioning that [exceptions
> to] exclusionary clauses cannot be relied upon to create coverage,"

decided to read policy language initially granting coverage together with exclusions and exceptions to exclusions (such as the Subcontractor Exception) in order to determine whether costs to repair property damage resulting from faulty workmanship should be covered. Id. at 21, 746 N.Y.S.2d 622, 774 N.E.2d 687. The article concludes by warning readers to "Check Your Jurisdiction" because "contrary authority" exists in some states and, in those jurisdictions, "practitioners need to take extra care to address risks associated with subcontractor construction defects . . . ." Id. at 23, 746 N.Y.S.2d 622, 774 N.E.2d 687.

Based upon this article and cases from other jurisdictions, Loebs argues that it is entitled to coverage (or there is a reasonable possibility that it is entitled to coverage) because a subcontractor (Top Tile) performed the tile work on the pool and Hartford was on notice that Top Tile had caused the damage at issue. According to Loebs, therefore, even though the "Damage to Your Work" exclusion in the Policy would ordinarily exclude coverage for damage to the pool, the Subcontractor Exception to the "Damage to Your Work" exclusion (pursuant to which coverage for damage arising out of Top Tile's work would not be excluded) comes into play. Loebs argues that the Court should follow the lead of courts in other jurisdictions and consider all of this information together when determining whether there was a "reasonable possibility of coverage" sufficient to trigger Hartford's duty to defend.

Unfortunately for Loebs, however, it has cited no authority within either New York State or the Second Circuit that would support its position. In fact, as set forth at length above, New York and Second Circuit courts addressing this issue have come down squarely on the opposite side. There is, simply put, no authority from within this jurisdiction that would support Loebs's argument, and the Court is not persuaded by the cited outside authority. *See Amin Realty*, 2006 WL 1720401 at *7 (declining to adopt the view of courts in other jurisdictions that "negligent acts of the insured causing unexcepted damage" to the work product "are within the definition of an accident/occurrence in the context of a CGL insurance policy" because "this case is governed by the law of New York, which has adopted the majority rule: to wit, that defective workmanship, standing alone, is not an occurrence under a CGL policy").

2012 WL 1020313 at *7-*8 (footnote omitted). *See Illinois Nat. Ins. CO. v.*

*Tutor Perini Corp.*, 2012 WL 5860478 at *6 (S.D.N.Y. Nov. 15, 2012) (No

"occurrence" resulting from damages to general contractor's work even if the work was performed by subcontractors and even if the policy had a subcontractor exception), *judgment aff'd*, 564 Fed. Appx. 618 (2nd Cir. May 6, 2014). Other courts have observed that, "[r]eliance upon a CGL's 'exclusions' to determine the meaning of 'occurrence' has resulted in 'regrettably overbroad generalizations' concerning CGLs. . . . We decline to base our analysis of the 'occurrence requirement upon the 'exclusions' in a CGL." *Travelers Indem. Co. of America v. Moore & Associates, Inc.*, 216 S.W.3d 302, 307 (Tenn. 2007) (quoting *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis.2d 16, 673 N.W.2d 65, 76 (2004)); *see Sheehan Constr. Co., Inc. v. Continental Cas. Co.*, 935 N.E.2d 160, 167 (Ind. 2010), *opinion adhered to as modified on reh'g*, 938 N.E.2d 685 (2010). From its review of New York law, the court is persuaded that it should not be singling out exclusions as impacting the construction of basic terms of the insuring agreement in order to extend coverage where none would otherwise exist.

It is worthy of repeating that this court's role is not to look past the plain terms of the policy or to redraft them so that New York's law on the meaning of "occurrence" is avoided and thereby some arguable equity on the facts of this case is reached. There is nothing in B&V's many pages of arguments that addresses what kept them from negotiating and expressing in the manuscript their meaning of "occurrence" which is unique and different from New York law. Sophisticated and counseled commercial

entities are presumed to act deliberately in preparing and executing an agreement that manifests their true intentions. Neither on the express terms of their agreement nor on the preponderance of their arguments is B&V able to overcome this presumption on the face of this policy.

B&V repeatedly questions what reason would the parties have had for including the exception to exclusion F if "occurrence" were defined following New York law. The simple answer is that the exception was intended to operate in the hypothetical situation of coverage existing under the insuring agreement and the exclusion then being applied. The plain terms of the exception are that, "Exclusion F does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (Dk. 284-1, p. 14). The exception does not create coverage but only makes exclusion F inapplicable. On its face, the exception's operation is expressly limited to the exclusion, and it does not refer to any other terms of the negotiated contract. Reliance upon this exception to construe "occurrence" would contradict the plain terms of the exception.

B&V appears to contend that unless someone can come up with a workable hypothetical operation of the exception in relevant circumstances then the exception should be read to modify the meaning of "occurrence" here. The plaintiff does not cite New York authority persuasively supporting this approach. Nor does it come forward with New York authority for a court

52

redefining a basic term of the insuring agreement in order to preserve the hypothetical operation of an exception to an exclusion. The reasonableness of such being a rule of construction is not only questionable, but it seems inconsonant with New York's rule that, "[e]xclusions in policies of insurance must be read seriatim, not cumulatively, and if any one exclusion applies there can be no coverage since no one exclusion can be regarded as inconsistent with another." *Zandri Constr. Co. v. Firemen's Ins. Co. of Newark*, 81 A.D.2d 106, 109, 440 N.Y.S.2d 353, 356 (3d Dept. 1981), *aff'd*, 54 N.Y.2d 999 (N.Y. 1981).

As the defendants counter, the plaintiff's approach would undermine the primary purpose of what appears to be a general third-party liability policy. It would transform an exception whose express operation is limited to the exclusion into a primary insuring provision. It would mean that a single exception could change a liability insurance policy covering third party risks into one that essentially gives B&V, who subcontracts nearly all of its work, first party coverage for any damages to its work product because of the subcontractors' defective work or failure to perform. Such a significant change in the policy's function does not seem to be consonant result from the wording of a single exception. If this is what these sophisticated, commercial parties intended by their negotiated agreement, then why is that intent to expand the definition of "occurrence" to include subcontractors' faulty work performance no more than an arguable inference that cannot be

made without contradicting New York's rules of construction governing insurance contracts.

B&V also points to other provisions as evidencing the parties' intent for coverage of property damages to B&V's work caused by an occurrence arising from faulty workmanship. Exclusion H excludes property damage "claimed for any loss" to B&V's work if the work is "withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect . . . ." (Dk. 284-1, p. 14). There is Endorsement 4 that amends exclusion D for property damage to the insured's property as only "that particular part of real property on which 'Insured' or any contractors or subcontractors working directly or indirectly on the 'insured's' behalf are performing 'your work', if the 'property damage' arises out of 'your work'." (Dk. 284-1, p. 23). B&V notes Endorsement 13 that excludes coverage for property damage arising out of the "Exterior Insulation and Finish System," *Id.* at p. 32, as well as Endorsement 20 that excludes residential construction from the definition of the insured's work, *id.* at p. 40. Finally, B&V refers to Endorsements 35 and 36 which establishes particular policy periods and aggregates for certain projects.

None of these provisions, individually or together, persuasively show that the parties to this manuscript intended by its terms for "occurrence" to have a meaning different from that provided by New York law. Upon closer look, most of these provisions address only specific

scenarios or circumstances. Their contexts preclude them from being read as general terms impacting the insuring agreement. Their application does not require in the first instance that there be the kind of expansive first-party coverage sought by B&V. Instead, most of these provisions can be consistently construed as affirming the intended lack of coverage even under these specifically described circumstances. Nor do any of these provisions expressly state or embody the parties' intent to modify the New York meaning of "occurrence." There is nothing in the wording of these provisions that demonstrates the parties' intent to have "occurrence" in their contract mean something different from New York law. Finally, Endorsements 35 and 36 address additional premiums assessed based on contract values for increased liability limits and extended policy periods. These contract values not only reflect B&V's work but also indicate the relative value of the work to and its impact upon adjacent coal-fired power plant property. The court cannot say that these Endorsements make sense only if there is liability coverage for damage done B&V's own work.

The court construes B&V's memoranda as also arguing that the incorporation of the defectively manufactured gas risers into the JBRs caused property damage to other JBR components which would be covered as an occurrence under the policy. New York law does define "occurrence" in incorporation cases as to recognize that, "'where the insured unintentionally sells a product that is allegedly defective and that is incorporated into a

55

third-party's finished product, the resulting impairment to the finished product is an "occurrence."'" *Thruway Produce, Inc.*, 114 F. Supp. 3d at 91 (quoting *Chubb Ins. Co. of New Jersey v. Hartford Fire Ins. Co.*, No. 97 CIV. 6935 LAP, 1999 WL 760206, at *4 (S.D.N.Y. Sept. 27, 1999) (collecting cases), *aff'd*, 229 F.3d 1135 (2d Cir. 2000)). The incorporation doctrine is inapplicable here, because B&V's work is the entire JBR and all the damage claims here are from the remediation of B&V's own work product performed within the scope of the general contractor's responsibility. *See Illinois Nat. Ins. Co. v. Tutor Perini Corp.*, 2012 WL 5860478 at *6. There are no damages here distinct from B&V's work product. *See Ohio Casualty Ins. Co. v. Lewis & Clinch, Inc.*, 2014 WL 6078572 at *9 (N.D.N.Y. 2014). Thus, there is no occurrence here. *See James River Ins. Co. v. Power Management, Inc.*, 55 F. Supp. 2d at 454.

In sum, the court finds that the defendants are entitled to summary judgment based on the following rulings that have been fully explained above. B&V's claims are not covered as "occurrences." New York law's governing definition of "occurrence" does not recognize liability coverage for B&V arising from the claimed property damage to the JBRs, completed or in progress, resulting from the defective or faulty construction of the JBRs performed by B&V or one of its subcontractors. The governing language of the Aspen/Catlin policy is unambiguous and does not show that the parties intended "occurrence" to mean something different from what

New York law provides. Thus, the "no occurrence, no coverage" rule for commercial liability policies under New York law entitles the defendants to summary judgment. The court understands that the parties filed motions for "partial summary judgment" in order to divide the coverage and damage issues. The pretrial order shows the plaintiff's only legal claims for recovery are declaratory relief and breach of contract for failure to pay under the Aspen/Catlin policy. Additionally, the defendants' motion (Dk. 296) recognizes that a favorable ruling on the coverage motion would terminate "all issues in dispute." *Id*. at p. 1. Thus, by determining that there is "no occurrence and no coverage" under the Aspen/Catlin policy, the court concludes the defendants are entitled to summary judgment and orders the clerk to enter judgment for the defendants accordingly.

IT IS THEREFORE ORDERED that B&V's motion for leave to file a sur-reply (Dk. 318) is granted;

IT IS FURTHER ORDERED that on the exclusive basis of the court's ruling on the coverage determination of no "occurrence," the plaintiff B&V's motions for partial summary judgment (Dk. 283) and (Dk. 298) are denied, and the defendants' motions for partial summary judgment (Dk. 296) and (Dk. 309) are granted.

Dated this  17th day of November, 2016, Topeka, Kansas.


s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge

57