IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BLACK & VEATCH CORPORATION,

        Plaintiff,

        v.                              No. 12-2350-SAC

ASPEN INSURANCE (UK) LTD., *et al.,*

        Defendants.

MEMORANDUM AND ORDER

        This insurance dispute over coverage and amount of recovery comes before the court on a second wave of summary judgment motions following the Tenth Circuit's order (ECF# 329) vacating and remanding this court's prior summary judgment order and the United States Supreme Court's denial of the defendants' petition for certiorari (ECF# 349), *Black & Veatch Corp. v. Aspen Insurance (Uk) Ltd*, 882 F.3d 952 (10th Cir.), *cert. denied*, 139 S.Ct. 151 (2018). The plaintiff Black & Veatch Corporation ("B&V") has filed a motion for partial summary judgment (ECF# 337) and a motion to amend the pretrial order (ECF# 339). The defendants Aspen Insurance (UK) Ltd. and Lloyd's Syndicate 2003 (collectively "Aspen" or "Excess Insurers") have filed a motion for summary judgment. ECF# 340. The motions are fully briefed and ripe for decision. For the sake of brevity and convenience, the court will incorporate by reference from its prior order the summary judgment standards (ECF# 230, pp. 2-3) and general New

1

York law governing interpretation of insurance contracts and the respective burdens of establishing coverage, exclusions and exceptions (ECF# 230, pp. 11-17).

**FACTUAL BACKGROUND**

The plaintiff B&V is suing the defendants who are first layer excess umbrella liability insurers under a manuscript commercial general liability ("CGL") policy for coverage of B&V's claimed liability for damages to seven Jet Bubble Reactors ("JBRs"). B&V contracted with American Electric Power ("AEP") "to engineer, procure and construct ["EPC"] wet flue gas desulfurization systems (JBRs) for eight installations." ECF# 294, ¶ 1, PTO). "Under an EPC contract, B&V delivers services under a single contract. It supervises the project and typically subcontracts most—if not all—of the actual procurement and construction work." 882 F.3d at 954.

B&V procured CGL policies to cover its JBR work. Zurich American Insurance Company ("Zurich") provided the primary layer of coverage having the following limits: $2,000,000 per occurrence and $4,000,000 for general and products-completed operations aggregate limits. Aspen provided the first layer of excess/umbrella liability coverage with per occurrence and aggregate limits of $25,000,000.

As for the property damage claim made against B&V, the Tenth Circuit summarizes it in these terms:

> For at least seven of these JBRs, which were located at four different power plants in Ohio and Indiana, B&V subcontracted the engineering

and construction of the internal components to Midwest Towers, Inc. ("MTI"). Deficiencies in the components procured by MTI and constructed by MTI's subcontractors caused internal components of the JBRs to deform, crack, and sometimes collapse.

After work on three of the JBRs was completed, and while construction of four others was ongoing, AEP alerted B&V to the property damage arising from MTI's negligent construction. AEP and B&V entered into settlement agreements resolving their disputes relating to the JBRs at issue here. Under the agreements, B&V was obligated to pay more than $225 million in costs associated with repairing and replacing the internal components of the seven JBRs.

882 F.3d at 954. The parties also stipulate in the pretrial order to the

following facts that are relevant to these motion proceedings:

11. After Black & Veatch completed construction of the Cardinal 1 and 2 and Conesville JBRs, the Owners alleged deficiencies in the work.
12. Cardinal 1 was completed and began operating in March 2008. Deficiencies in the JBR components were discovered as early as August 2008, and Cardinal 1 had to be shut down and repaired.
13. Cardinal 2 was completed and began operating in December 2007. Deficiencies in the JBR components were discovered as early as May 2008, and Cardinal 2 had to be shut down and repaired.
14. Conesville was completed and began operating in January 2009. In the fall of 2009, it was determined that the gas risers installed at Conesville, as well as the gas risers installed at each of the other six JBRs, were deficient and required removal.
15. Because of defective gas risers and other deficiencies in the JBRs, the Owners demanded that Black & Veatch make repairs.
16. At the time the Owners made their demands on Black & Veatch, the Cardinal 1 and 2 projects, and the Conesville project were completed operations.
17. During the summer of 2010, Black & Veatch and the Owners of the JBRs, entered into settlement agreements resolving their disputes relating to eight JBRs, including the seven at issue here.
18. As part of the settlements, Black & Veatch agreed, among other things, to replace most internal components of the JBRs.
19. In replacing the internal components, Black & Veatch has obtained contribution from various parties responsible for the costs incurred.

(Dk. 294, pp. 4-5).

As it did in the prior summary judgment order, the court sets out the general nature of the plaintiff's claims deferring to its characterization. The plaintiff is claiming coverage for property damage resulting directly from the work of the subcontractors on behalf of B&V and from B&V's failure to deliver professional services both of which resulted in the installation of defective risers. For the <u>three completed and operating JBRs</u>, Cardinal 1 and 2 and Conesville, B&V's claim is for the property damage resulting from alleged deficiencies with the installation and errors with the design and supervision of the risers that "resulted in excessive mineral deposits accumulating on the decks and other internal components of the JBRs, the weight of which in turn caused those components to deform, crack, and, in some cases, collapse entirely." ECF# 294, Pretrial Order, p. 7. Cardinal 1 and 2 JBRs were so badly damaged that the owners no longer considered them viable. *Id.* at p. 8. The owners demanded complete replacement of the badly damaged internal components. *Id*. Thus, B&V is making a coverage claim for its liability incurred to repair or replace the property damaged from the occurrence of the continual, ongoing and unforeseen buildup of deposits in the JBRs. ECF #297-3, Wood Dep. pp. 14-17. For the <u>uncompleted JBRs</u>, B&V's claim is for property damage to other non-defective internal components that resulted from work done to access, remove and replace the installed defective gas risers. Thus, B&V is making a coverage claim for its liability for the damage done to non-defective internal components from

being removed based on the occurrence of the defective gas risers being installed and then needing to be torn out. *Id.* at 297-3, pp. 29-30; ECF# 297-8, Miller Dep. p. 157-158.

**ASPEN'S MOTION FOR SUMMARY JUDGMENT (ECF# 340)**

Aspen advances numerous arguments, and the court will follow the order used by Aspen in its original memorandum. At the outset, some of Aspen's arguments trigger deciding whether these matters were resolved by the Tenth Circuit on appeal and are subject to the law of the case doctrine or the mandate rule. The law of the case doctrine recognizes that, "'[w]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir.1991) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)), *cert. denied*, 504 U.S. 910 (1992). "[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995) (citation omitted). The doctrine "applies to all issues previously decided, either explicitly or by necessary implication." *Rohrbaugh*, 53 F.3d at 1183 (internal quotation marks and citation omitted). "The law of the case doctrine is intended to prevent 'continued re-argument of issues already decided,' *Gage v. Gen. Motors Corp.*, 796 F.2d 345, 349 (10th Cir.

1986), and to preserve scarce court resources—to avoid 'in short, Dickens's *Jarndyce v. Jarndyce* syndrome,' *McIlravy v. Kerr–McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000)." *Huffman v. Saul Holdings Ltd. Partn.*, 262 F.3d 1128, 1132 (10th Cir. 2001).

"An 'important corollary' to the law of the case doctrine, 'known as the "mandate rule," provides that a district court must comply strictly with the mandate rendered by the reviewing court.'" *Id.* (quoting *Ute Indian Tribe v. Utah*, 114 F.3d 1513, 1520–21 (10th Cir. 1997)). Put another way, the law of the case doctrine "requires a trial court to follow an appellate court's previous ruling on an issue in the same case . . . . This is the so-called 'mandate rule.'" *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (footnote omitted), *cert. denied*, 539 U.S. 902 (2003). Thus, an issue decided on appeal may not be relitigated in the same case and "there must be compliance with the reviewing court's mandate." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002). In this circuit, "[t]he mandate consists of our instructions to the district court at the conclusion of the opinion, and the entire opinion that preceded those instructions." *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1126 (10th Cir. 2003); *cf. Quintieri*, 306 F.3d at 1225 n.5 ("Technically, the 'mandate' of this Court consists of a 'certified copy of [our] judgment, a copy of the opinion, and any direction as to costs.'" (quoting *United States v. Reyes*, 49 F.3d 63, 66 (2d Cir.1995)).

<u>Tenth Circuit's Holding on the Meaning of the CGL Policy</u>

On pages two and three above, the court has already the Tenth Circuit's summary of B&V's claim for property damages under the CGL policy. *see Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd*, 882 F.3d at 954. As far as the terms of the basic insuring agreement, the panel noted that the CGL policy obligated Aspen to pay on behalf of B&V its legal obligation for "'Property Damage' . . . caused by an 'Occurrence.'" 882 F.3d at 955. The Policy defines "Occurrence" to be an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in . . . 'Property Damage' that is not expected or intended by the 'Insured.'" *Id*. The Policy defines "Property Damage" as "physical injury to tangible property of a 'Third Party.'" *Id*. "Third Party" is defined as "any company, entity, or human being other than an 'Insured.'" *Id*.

On the issue of whether the damage done to the JBRs was an occurrence, the Tenth Circuit analyzed it as follows, in relevant part:

> We start with the Policy terms and definitions, which are materially identical to the ISO's standard-form CGL policy. Under the Policy, an "occurrence" is an "accident … that results in 'Bodily Injury' or 'Property Damage' that is not expected or not intended by the 'Insured.'" An occurrence triggers coverage. We examine each part of this definition.
> a. *Accidental damages*
> The Policy does not define "accident," but the New York Court of Appeals has explained that a CGL policy covers damages only when they were "unexpected and unintentional." *Cont'l Cas. Co.*, 593 N.Y.S.2d 966, 609 N.E.2d at 510 (holding that these terms are to be construed narrowly as barring coverage "only when the insured intended the damages"); *see also Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 746 N.Y.S.2d 622, 774 N.E.2d 687, 692

(2002) ("Insurance policies generally require 'fortuity' and thus implicitly exclude coverage for intended or expected harms."). A policyholder might take a "calculated risk"—such as hiring a subcontractor—without "expecting" damages to occur. *See Cont'l Cas. Co.*, 593 N.Y.S.2d 966, 609 N.E.2d at 510. "[I]n fact, people often seek insurance for just such circumstances." *Id.*

Whether or not B&V took a "calculated risk" by delegating work on the JBRs to a subcontractor, Aspen does not argue—nor does the record support—that B&V "expected or intended" MTI or any other subcontractor to cause damage. Nor is there evidence that B&V increased the likelihood of such damages through reckless cost-saving or other measures. *See Fuller*, 613 N.Y.S.2d at 155 (finding no "occurrence" where damages arose from "intentional cost-saving or negligent acts"). Thus, the damages at issue here satisfy the Policy's accidental requirement.

b. *Property damage to a third party*

The Policy covers costs arising from property damage. "Property Damage" is defined as "physical injury to tangible property of a 'Third Party.'" ROA, Vol. 1 at 72. A "Third Party" is defined as "any company, entity, or human being other than an 'Insured.' " *Id*. The damage to the JBRs was physical injury to tangible property. Aspen argues, however, that the Policy designates AEP—the energy company that hired B&V to construct the JBRs—as an "Additional Insured," and thus AEP cannot be a third party. *See* Aplee. Br. at 45 (citing ROA, Vol. 7 at 1311). This argument fails.

Under the Policy, an "Insured" is defined as any entity listed as a "Named Insured" or designated as an "Additional Insured." The Policy lists B&V as the "Named Insured." ROA, Vol. 1 at 63. Under Endorsement 33, AEP is designated as an "Additional Insured," thereby adding AEP to B&V's existing insurance policy. *See id.* at 114. Granting one party additional insured status on another's CGL policy is a "common risk-shifting technique" used in construction contracts. Samir Mehta, *Additional Insured Status in Construction Contracts and Moral Hazard*, 3 Conn. Ins. L.J. 169, 170 (1997). But it does not mean the Policy precludes coverage of the damages at issue here.

<u>First</u>, AEP is an "Additional Insured" only with respect to liability for property damage "arising out of operations performed *by the Named Insured*." ROA, Vol. 1 at 114 (emphasis added). But here the work performed by a *subcontractor* (MTI), not by the "Named Insured" (B&V), caused the damages.

<u>Second</u>, Endorsement 33 contains a "separation of insureds" condition, which provides that the Policy "applies separately to each Insured against whom claim is made or suit is brought." *Id*. Its purpose is to preserve coverage for damage claims made by one

insured (here, AEP) against another (B&V). *See West Am. Ins. Co. v. AV&S*, 145 F.3d 1224, 1227 (10th Cir. 1998) (providing that under a "separation of insureds" condition, each insured is "entitled to have the [p]olicy construed as to it as if the [p]olicy were issued only as to it alone"); *see also Greaves v. Pub. Serv. Mut. Ins. Co.*, 5 N.Y.2d 120, 181 N.Y.S.2d 489, 155 N.E.2d 390, 392 (1959) (same). In other words, when AEP claimed damages against B&V, the separation of insureds clause rendered AEP a third party with respect to its claims for property damage against B&V. This understanding of the Policy aligns with common sense: The principle risk B&V faced as an EPC contractor, and thus a main reason for obtaining CGL insurance, was the potential for claims alleging damages made by the property owner—AEP.

*Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd*, 882 F.3d at 962–64 (footnotes omitted). The majority plainly intended its analysis and conclusion to be the rule of law on the meaning of "Occurrence" with its composite elements as applied to B&V's claim of property damages. *See id.* at p. 957 n. 6 ("The district court held only that the damages at issue here could not constitute a coverage-triggering 'occurrence' under the Policy, so it did not proceed to the next step of determining the effect of any Policy exclusions or exceptions to the exclusions. It should do so on remand.").[1]

In sum, the Tenth Circuit has held as a matter of law the following. B&V's property damage claims "satisfy the Policy's accidental

---

[1] "The scope of the mandate on remand in the Tenth Circuit is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard." *Dish Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 864 (10th Cir. 2014) (quotation marks and citation omitted). The Tenth Circuit's footnote suggest this court's discretion on remand was cabined on the first two issues, "(1) Were the damages caused by an occurrence? and (2) Were the damages the result of property damage resulting from the occurrence?" (ECF# 320, p. 17), but was allowed in deciding the third issue, "(3) Are the damages excluded under one or more of the policy exclusions?" *id.*

requirement." *Id*. at 963. "[T]he separation of insureds clause rendered AEP a third party with respect to its claims for property damage against B&V." *Id*. at 964. The subcontractor exception and Endorsement 4 would be rendered surplusage under Aspen's proposed meaning of occurrence. *Id.* at 964-65. The majority summarized its holding in this way:

> In sum, the property damages at issue were caused by an "occurrence," as that term is defined in the Policy, because (1) B&V neither intended nor expected that its subcontractor would perform faulty work, so the damages were accidental, (2) the damages involved physical harm to the property of a third party, and (3) a contrary conclusion would render various Policy provisions meaningless in violation of New York's rule against surplusage.

*Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd*, 882 F.3d at 965. The majority concluded its opinion making it unmistakably clear that it considered the following to be the settled law of the case:

> Under the Policy, the damages at issue here were caused by a coverage-triggering "occurrence." First, the damages were accidental and resulted in harm to a third-party's property, thus meeting the Policy's definition of an "occurrence." Second, the district court's interpretation would violate New York's rule against surplusage by rendering the "subcontractor exception" meaningless. Third, the changes ISO has made to standard-form CGL policies demonstrate that the policies can cover the damages at issue here. Fourth, the overwhelming trend among state supreme courts has been to recognize such damages as "occurrences." Fifth, New York intermediate appellate decisions are distinguishable, outdated, or otherwise inapplicable. We predict the New York Court of Appeals would decline to follow these decisions and instead would join the clear trend among state supreme courts holding that damage from faulty subcontractor work constitutes an "occurrence" under the Policy. For the foregoing reasons, we vacate the district court's summary judgment decision and remand for reconsideration in light of this opinion.

*Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd*, 882 F.3d at 971 (footnote omitted).

The court will apply the law of the case doctrine to all issues explicitly ruled upon in the majority's opinion as well as those issues necessarily decided by implication. Pursuant to the mandate rule, the court appreciates that the panel's opinion regards the coverage issues under the basic insuring agreement to be decided and for the district court on remand to move onto the next step of determining the Policy's exclusions and exceptions. *see* 882 F.3d at 957 n. 6; *Procter & Gamble Co.*, 317 F.3d at 1126 (the mandate includes the panel's entire opinion preceding its final instructions).

Physical Harm to Uncompleted Plants

Aspen first argues against coverage under the basic insuring agreement because the components later replaced in the four uncompleted JBRs were not damaged or physically injured. "Removal and replacement of the new components is not physical injury or property damage." ECF# 342, p. 37. Aspen asks this court to find that property damage "occurs" only if the defective work physically injures other parts of the project.

To take up this issue now would first require this court to limit the Tenth Circuit's ruling on appeal that, "The damage to the JBRs was physical injury to tangible property." 882 F.3d at 963. Indeed, the panel in holding that the "damages were caused by a coverage-triggering

'occurrence'" had to conclude that "the damages were accidental and resulted in harm to a third-party's property." *Id.* at 971. The law of case doctrine extends to issues decided explicitly or by necessary implication. *Dobbs v. Anthem Blue Cross and Blue Shield*, 600 F.3d 1275, 1280 (10th Cir. 2010). For a prior appeal to have implicitly resolved an issue, this Circuit looks to three circumstances:

> "(1) resolution of the issue was a necessary step in resolving the earlier appeal; (2) resolution of the issue would abrogate the prior decision and so must have been considered in the prior appeal; and (3) the issue is so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated."

*Id.* (quoting *McIllravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1036 (10th Cir. 2000)). There is no plain statement or any clear indication that the Tenth Circuit was limiting its "occurrence" analysis to the completed JBRs or was excepting or reserving the uncompleted JBRs from its "occurrence" analysis. Without such a statement or indication, the court regards the appellate panel's "occurrence" findings as necessarily incorporating by implication all seven plants, completed and uncompleted.

Aspen asks the court to limit the panel's occurrence finding to the completed plants based on this language in the panel's opinion:

> Deficiencies in the components procured by MTI and constructed by MTI's subcontractors caused internal components of the JBRs to **deform, crack, and sometimes collapse**.
> After work on three of the JBRs was completed, and while construction of four others was ongoing, AEP alerted B&V to the property damage arising from MTI's negligent construction. AEP and B&V entered into settlement agreements resolving their disputes

relating to the JBRs at issue here. Under the agreements, B&V was obligated to pay more than $225 million in costs associated with repairing and replacing the internal components of the seven JBRs.

882 F.3d at 954 (bolding added). The above bolded terms are certainly active verbs that describe the damage done to the three completed plants. But, it is immediately followed by the description of AEP alerting B&V to property damage that involved all seven JBRs and resulted from the subcontractor's negligent construction. The Tenth Circuit concludes its discussion of B&V's property damage claim by noting that in the settlement with AEP, B&V "was obligated to pay more than $225 million in costs associated with repairing and replacing the internal components **of the seven JBRs**." *Id.* (bolding added). As fairly understood on its face, the Tenth Circuit's opinion addresses B&V's claim for property damages to include all seven JBRs without distinguishing between completed and uncompleted plants. Thus, the Tenth Circuit's ruling that property damages occurred here is subject to the law of the case doctrine, and the mandate rule requires this court is follow it.

In the alternative, the court is persuaded that New York follows the incorporation theory in holding that an injury occurs when a defective component is integrated into a larger product. *See, e.g., Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 72-73, 332 N.E.2d 319 (1975) ("When one product is integrated into a larger entity, and the component product proves defective, the harm is considered harm to the entity to the extent

that the market value of the entity is reduced in excess of the value of the defective component." (citation omitted)); *see, e.g., Adler & Neilson Co. v. Insurance Co. of N. Am.*, 56 N.Y.2d 540, 542-543, 434 N.E.2d 1335 (1982) (repair and replacement costs incurred for non-defective components were property damage as they resulted from repairing the defective parts); *Franco Belli Plumbing & Heating and Sons, Inc. v. Liberty Mut. Ins. Co.*, 2012 WL 2830247 at *8 (E.D.N.Y. Apr. 19, 2012) (citing in part, *Chubb Ins. Co. of N.J. v. Hartford Fire Ins. Co.*, No. 97 Civ. 6935, 1999 SL 760206, at *8 (S.D.N.Y. 1999)("Under New York case law, when an insured is unaware, as here, of a defect in its component of a product, which defect diminishes the value of the product into which it is incorporated, resulting in damage, such damage is considered to arise out of an 'occurrence.'"), *aff'd*, 229 F.3d 1135 (2d Cir. 2000).")). The court's interpretation and application of the Tenth Circuit's ruling on property damage is consistent with New York law.

Damage to Third Party Property and "Particular Part" in Endorsement 4

Aspen contends the replaced components were B&V's property, not the property of a third party, by reading the construction contract to say that B&V "owns" the components until completion of the plant. Aspen extends this argument relying on Exclusion D that carves out property damage to property "owned" by the "Insured" and on Endorsement 8 that makes the policy inapplicable to property damage "to real property leased to, rented to, occupied or managed by any Insured except as respects

14

coverage provided by . . . Endorsement 4." ECF# 342, pp. 40-41. Aspen also points to subparagraph (3) of Exclusion D as reaching "that particular part of real property on which the 'insured' or any contractors or subcontractors working directly or indirectly on the 'insured's' behalf are performing 'your work', if the 'property damage' arises out of 'your work.'" ECF# 284-1, p. 23. Aspen reads this subparagraph to exclude coverage not just for the defective work but for the "entire scope of B&V's work." Aspen says New York law supports its reading. ECF# 342, p. 41.

To take up these issues now, the district court again would be forced to limit an express ruling made by the Tenth Circuit on appeal and again would have no grounds in that opinion for doing so. In finding there was an "occurrence" under the policy, the Tenth Circuit also had to find there was "property damage" which the policy defined as "physical injury to tangible property of a third party." 882 F.3d at 962-63. On the third-party question, the Tenth Circuit explicitly addressed one of Aspen's arguments that AEP was an insured under the policy, not a third party. The Circuit panel concluded:

> In other words, when AEP claimed damages against B&V, the separation of insureds clause rendered AEP a third party with respect to its claims for property damage against B&V. This understanding of the Policy aligns with common sense:  The principle risk B&V faced as an EPC contractor, and thus a main reason for obtaining CGL insurance, was the potential for claims alleging damages made by the property owner—AEP.

*Id.* at 964. The Tenth Circuit expressly found above that AEP was the owner and third party with respect to its claims for property damage against B&V.

Aspen does not reply to B&V's arguments that the Tenth Circuit's rulings are the law of the case doctrine on the issue of third-party damages. This court is required to follow the Tenth Circuit's ruling on this issue. And even if this issue had not been decided on appeal, this court would have decided that AEP owned the JBRs at the time of property damage based on the "31.0 Title and Risk of Loss" provision in the AEP contract.

As for the "particular part" in Endorsement 4, the Tenth Circuit discussed it in these terms:

> The second exclusion, known as "Endorsement 4," excludes coverage for property damage to the "particular part of real property" that B&V or its subcontractors were working on when the damage occurred. Id. at 83. This exclusion pertains only to *ongoing*, rather than completed, work.
>
> . . . .
>
> In the context of *ongoing* work, the standard-form CGL policy excludes coverage for property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working … on your behalf are performing operations, if the 'property damage' arises out of those operations." *CGL Coverage Guide*, App. B: 1986 Occurrence Form, at 298; see also ISO 1986 Circular (explaining that the policy covers "damage caused by faulty workmanship to … parts of work in progress" other than what the contractor or subcontractors were working on). In other words, the policy excludes damage to "that particular part" of the project upon which the insured's operations were being performed at the time the damage occurred, but it covers damage to property other than "that particular part." This is the current understanding of the phrase "that particular part" in the insurance industry today. Scott C. Turner, "*That particular part*" *limitation, Insurance Coverage of Construction Disputes* § 29:7 (2d ed. 2017).
>
> . . . .

> Aspen's interpretation of an "occurrence" would also render "Endorsement 4" surplusage. As described above, "Endorsement 4" pertains to ongoing work and excludes coverage for property damage to "*that particular part* of real property" on which B&V or its subcontractors were actively working. See ROA, Vol. 1 at 83 (emphasis added). If faulty workmanship resulting in damage to B&V's own work could never trigger coverage as an "occurrence," this part of "Endorsement 4" would be meaningless. In other words, there would be no reason for "Endorsement 4" to exclude coverage only for damage to a "particular part" of the JBRs if the Policy could never cover damage to the insured's work in the first instance.

*Black & Veatch Corp.*, 882 F.3d 955–56, 960, 965. In discussing Endorsement 4, the Tenth Circuit interpreted it to exclude coverage "for damage to a 'particular part' of the JBRs." *Id.* at 965. This interpretation necessarily precludes Aspen's interpretation that the exclusion covers the "entire scope of B&V's work," that is, the entire plant.

Aspen does reply to B&V's argument that the Tenth Circuit has interpreted the "particular part" language of Endorsement 4. Aspen singles out the Tenth Circuit's opinion at page 960 as no more than a comment on one treatise writer's opinion about this exclusionary language in CGL policies. Aspen also argues the Tenth Circuit's discussion of Endorsement 4 was not a final ruling but was only to show how this provision would be rendered superfluous if the insuring agreement could not "cover damage to the insured's work in the first instance." 882 F.3d at 965. The above quote from the Tenth Circuit's opinion plainly shows the majority did interpret "that particular part" in Endorsement 4 as applying only to ongoing work and only "**to a 'particular part' of the JBRs,**" not the entire JBRs plant. For the

court to rule in favor of Aspen on this argument, the district court would have to interpret "particular part" contrary to the appellate court's opinion. The Tenth Circuit's narrow reading of "particular part" was important in drawing its conclusion on surplusage. A broader reading of "particular part" would have certainly weakened the surplusage rationale behind its ruling. The law of the case doctrine forecloses the court's consideration of Aspen's argument on this issue.

Property Damage to Cardinal 3 Occurring During Policy Period

Under the basic insuring agreement, Aspen is to pay B&V for its legal obligations to pay "'Property Damage' occurring during the Policy Period stated in Item 4 of the Declarations." ECF# 284-1, p. 7. Declaration Item 4 specifies a policy period from November 1, 2007, to November 1, 2008. Citing the testimony of B&V's corporative representative, Sheldon Wood, Aspen argues that the "property damage" for the Cardinal 3 plant was the removal and replacement of JBR internal components and that the rebuilding of Cardinal 3 did not begin until 2010 or after the policy expired. The issue here is whether property damage occurred during the policy period as to trigger coverage.

Applying New York's "injury in fact" test for determining the trigger date of CGL coverage, B&V argues the injury here occurred when the defective gas risers were installed or when B&V was negligent in providing proper professional services related to gas risers. B&V also points to New

York case law finding property damage as occurring when a defective part was installed. B&V believes there are genuine issues of material fact here that preclude summary judgment.

In reply, Aspen comes forward with the following new argument:

> B&V argues that there is a question of fact on when the installation of the defective risers occurred at Cardinal 3: thus this Court should deny Aspen/Catlin's Motion for Summary Judgment as to this plant. . . .
> However, Paragraph 38 of the Consent Decree in the MTI Litigation recited that "Construction at Cardinal 3 did not begin until 2008. There, gas risers were installed without proper inspection by MTI from January 2009 through March 2009, in breach of its duties as construction and project manager." (Dkt. # 311-1, Ex. B). This is outside Defendants' policy period and, therefore, summary judgment for Defendants as to Cardinal 3 is appropriate.

ECF# 348, p. 17. Because these installation dates are outside the policy period, Aspen argues it is entitled to summary judgment on Cardinal 3.

Aspen waited until its reply brief to make this argument and present these additional facts. Generally, issues raised for the first time in a reply brief are not considered with an exception for new issues raised in reply to the respondent's arguments. *In re Gold Resource Corporation Securities* Litigation, 776 F.3d 1103, 1118 (10th Cir. 2015). Aspen's new argument replies to B&V's position on the "injury-in-fact" occurring when defective risers were installed or when B&V negligently performed its professional services. "The Court will not consider arguments raised for the first time in a reply brief, particularly where the arguments could have been made in the first instance." *Swimwear Solution, Inc. v. Orlando Bathing Suit, LLC*, 309 F. Supp. 3d 1022, 1044 (D. Kan. 2018) (internal quotation marks

and citation omitted). As the following discussion of New York's law on triggering events makes clear, Aspen could have made this argument in its opening memorandum. Therefore, the court will not consider Aspen's new factual arguments first made in its reply brief.

"New York law follows the 'injury-in-fact' test which 'rests on when the injury, sickness, disease or disability actually began." *Maxum Indemn. Co. v. A One Testing Laboratories, Inc.*, 150 F. Supp. 3d 278, 285 (S.D.N.Y. 2015) (quoting *Downey v. 10 Realty Co., LLC*, 78 A.D.3d 575, 911 N.Y.S.2d 67, 67 (2010)(internal quotation omitted)). The New York Court of Appeals has held:

> In *Maryland Cas. Co. v Grace & Co.* (23 F3d 617) the Second Circuit, applying New York law, held that, in an asbestos property damage claim, the "trigger date" for insurance coverage purposes is the date of installation, for it is at that point that the building owner sustains an injury in fact. This Court reached a similar conclusion in *Sturges Mfg. Co. v Utica Mut. Ins. Co.* (37 NY2d 69, 72-73), holding that "[w]hen one product is integrated into a larger entity, and the component product proves defective" the larger entity has sustained an injury in fact.

*MRI Broadway Rental, Inc. v. U.S. Mineral Products Co.*, 92 N.Y.2d 421, 427-28, 704 N.E.2d 550 (1998). "When one product is integrated into a larger entity, and the component product proves defective, the harm is considered harm to the entity to the extent that the market value of the entity is reduced in excess of the value of the defective component." *Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 72-73, 332 N.E.2d 319, 322 (1975). "When faulty workmanship in building materials is the gravamen of

an allegation of property damage, 'under an injury-in-fact analysis, the injury may be said to occur at the time of installation.'" *Maxum Indemn. Co.*, 150 F. Supp. 3d at 285 (quoting *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, No. 86 Civ. 9671 (JSM), 1992 WL 123144, at *14 (S.D.N.Y. May 27, 1992), *aff'd in part and rev'd in part on other grounds*, 73 F.3d 1178 (2d Cir. 1995)); *see Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's London*, 673 A.2d 164, 169 (Del. 1996) ("[U]nder New York law, an injury-in-fact or property damage may occur at different points in time along the continuum from initial exposure or installation to actual manifestation. (citations omitted). Accordingly, . . ., property damage sufficient to trigger insurance coverage may occur as early as installation of the plumbing systems into housing units.").

New York law recognizes the triggering event of coverage for property damage from a component part, like the defective risers, can occur as early as the part's installation. Therefore, Aspen is not entitled to summary judgment on its argument that coverage was not timely triggered because the removal and replacement of Cardinal 3's non-defective internal parts occurred after the policy period.

Coverage for Replacing Non-Damaged Parts in Completed Plants

Aspen argues that B&V cannot recover as property damage a claim for physical injury to property caused by its "intentional act of removing perfectly good components to access 'defective' components."

ECF# 342, p. 44. "Under New York law, insurance policies require fortuity and exclude coverage for expected or intended property damage." *Id.* (citing *Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 220, 774 N.E.2d 687 (2002). Aspen argues B&V's intentional demolition of the JBRs is not a fortuitous loss and is not property damage.

The court again believes it must find that this issue has been decided by the Tenth Circuit. The majority concluded that "the damages at issue here satisfy the Policy's accidental requirement." 882 F.3d at 962. To reach that conclusion, the panel squarely addressed the requirements of "unexpected and unintentional" damages and "fortuity," and it even cited *Consolidated Edison*:

> The Policy does not define "accident," but the New York Court of Appeals has explained that a CGL policy covers damages only when they were "unexpected and unintentional." *Cont'l Cas. Co.*, 593 N.Y.S.2d 966, 609 N.E.2d at 510 (holding that these terms are to be construed narrowly as barring coverage "only when the insured intended the damages"); *see also Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 746 N.Y.S.2d 622, 774 N.E.2d 687, 692 (2002) ("Insurance policies generally require 'fortuity' and thus implicitly exclude coverage for intended or expected harms."). A policyholder might take a "calculated risk"—such as hiring a subcontractor—without "expecting" damages to occur. *See Cont'l Cas. Co.*, 593 N.Y.S.2d 966, 609 N.E.2d at 510. "[I]n fact, people often seek insurance for just such circumstances." *Id.*
>
> Whether or not B&V took a "calculated risk" by delegating work on the JBRs to a subcontractor, Aspen does not argue—nor does the record support—that B&V "expected or intended" MTI or any other subcontractor to cause damage. Nor is there evidence that B&V increased the likelihood of such damages through reckless cost-saving or other measures. *See Fuller*, 613 N.Y.S.2d at 155 (finding no "occurrence" where damages arose from "intentional cost-saving or negligent acts"). Thus, the damages at issue here satisfy the Policy's accidental requirement.

882 F.3d at 962-63. The law of the case doctrine forecloses this court from deciding this issue on remand.

Replacing Good Products to "Get to" Damaged Products is not Physical Injury

Aspen denies there is coverage "for costs to remove non-defective products to access defective products and/or the 'property damage' resulting from the replacement of defective product." ECF# 342, p. 45. Aspen notes these are called "get to" or "access" damages but denies that they constitute "physical injury" or "property damage." *Id.* After citing and discussing case law from other jurisdictions, Aspen asks the court to find "that the removal of the conforming components is not covered, and the replacement materials and rebuild costs are not covered either." *Id.* at p. 46-47.

Again, the Tenth Circuit's ruling on "property damage" is the law of the case, and it prevents this court from considering yet another attempt by Aspen to get around the majority's conclusions. The court also refers to its prior discussion of New York law on the incorporation theory which holds that an injury occurs when a defective component is integrated into a larger product and which allows for the recovery of various damages.

Warranty Claims are not Covered "Property Damages"

Aspen argues that B&V is making a claim "for the expense of making warranty repairs" and that this expense is not "any 'physical injury'" to be covered as "property damage" under this policy. ECF# 343, p. 47. B&V

responds that Aspen's labels and characterizations do not change that they were for costs which B&V was legally obligated to pay as repairs for property damage.

The Tenth Circuit's ruling on "property damage" is the law of the case. This court is not at liberty to entertain yet another attempt to argue the case law from lower New York courts which the Tenth Circuit has already distinguished and rejected in predicting what the New York Court of Appeals would hold to be an occurrence under this CGL policy. The Tenth Circuit unquestionably concluded that, "Under the Policy, the damages at issue here were caused by a coverage-triggering 'occurrence.'" 882 F.3d at 971.

Under this heading, Aspen also makes an argument legally unrelated to the issue of "property damage." Specifically, Aspen contends that B&V settled with AEP through a credit of $14.3 million in "backcharges" on Cardinal 1 and 2 before Aspen received notice of B&V's claim from B&V's London broker. According to Aspen, these circumstances make B&V's settlement a voluntary payment under New York law and subject to coverage denial in that the payment was made before the insurer was notified. B&V denies accepting liability without first providing notice to Aspen and further shows there are genuine issues of material fact concerning this issue. While there may be evidence that AEP had charges for work done on Cardinal 1 and 2 as of July 30, 2009, the parties' submissions show a genuine issue of material fact remains over whether B&V voluntarily paid or

assumed those charges without first notifying or obtaining Aspen's consent. Aspen is not entitled to summary judgment on these issues.

*EXCLUSIONS*

Aspen's motion puts forward four exclusions as barring coverage for all or part of the claim presented for the completed and uncompleted plants. Aspen notes the Tenth Circuit remanded the case with instructions for this court to determine "the effect of any Policy exclusions or exceptions to the exclusions." 882 F.3d at 957 n.6.

Intentional Acts

Exclusion A provides that the policy does not apply to "'Property Damage' expected or intended from the standpoint of the 'Insured.'" ECF# 284-1, p. 14. Aspen argues that B&V cannot recover for the costs associated with purposefully demolishing and harming other non-defective internal components to gain access, remove and replace the defective risers. Because B&V acted intentionally to cause these damages, Aspen argues they are excluded in the same way that "get to" damages are excluded.

B&V argues this exclusion is foreclosed by the Tenth Circuit's following finding of accidental damages. Specifically, the appellate panel found:

> Whether or not B&V took a "calculated risk" by delegating work on the JBRs to a subcontractor, Aspen does not argue—nor does the record support—that B&V "expected or intended" MTI or any other subcontractor to cause damage. Nor is there evidence that B&V increased the likelihood of such damages through reckless cost-saving

or other measures. *See Fuller*, 613 N.Y.S.2d at 155 (finding no "occurrence" where damages arose from "intentional cost-saving or negligent acts"). Thus, the damages at issue here satisfy the Policy's accidental requirement.

882 F.3d at 962-963 (footnote omitted). B&V argues the Tenth Circuit's ruling by necessary implication forecloses the possibility of this exclusion. In reply, Aspen argues the Tenth Circuit's ruling does not address B&V's deliberate decisions to "rip out and replace" the non-defective components. Because B&V, as the insured, expected or intended these resulting damages from its deliberate actions, Aspen insists this exclusion bars all recovery of the "get to" damages.

The court has discussed when an appellate court's ruling by necessary implication constitutes a decision of an issue on remand. The Tenth Circuit here did reserve for remand the trial court's consideration of exclusions and exceptions. Still, the question is whether the panel's findings of an occurrence and accidental damages, as not "expected or intended" by B&V, are so closely related to the intentional act exclusion as to involve no additional consideration and as to be a matter that could have been resolved on appeal. *See Dobbs*, 600 F.3d at 1280.

The Policy's definition of "occurrence" is "an accident, . . ., that results in 'Bodily Injury' or 'Property Damage' that is not *expected or not intended by the 'Insured.'*" ECF# 284-1, p. 10 (italics added). The italicized language is indistinguishable from Exclusion A's terms excluding coverage for "'Property Damage' expected or intended from the standpoint of the

'Insured'." ECF# 284-1, p. 14. Both require the same determination: what damages did the insured expect or intend? The Tenth Circuit expressly found that the property damages here "were caused by an 'occurrence,' as that term is defined in the Policy, because (1) B&V neither intended nor expected that its subcontractor would perform faulty work, so the damages were accidental." 882 F.3d at 965. The operation of Exclusion A is indistinguishable from the Policy's definition of occurrence. New York case law applies the same analysis to the accidental character issue and the intentional exclusion issue and considers the ruling on one issue as determinative of the other:

> But courts construing similar policy exclusions have concluded that the analysis applicable to the question whether a loss was accidental is the same as that conducted in analyzing the effect of the exclusion. *See, e.g., O'Connell v. State Farm Fire & Cas. Co.*, No. 03-CV-880, 2005 WL 1576793, at *4 (W.D.N.Y. July 1, 2005) ("Although the first disclaimer denies the existence of coverage in the first instance, while the second relies upon an [intentional act] exclusion [disclaiming coverage for injury expected or intended by the insured], the analysis is the same because the exclusion is 'nothing more than a restatement of the requirement that the harm be the result of an accident for there to be coverage.'" (quoting *Jubin* [*v. St. Paul Fire and Marine Ins. Co.,*] 653 N.Y.S.2d [454] at 455 [(N.Y. App. Div. 1997)]), adopted by 2005 WL 2133600 (W.D.N.Y. Aug. 31, 2005); *see also* 1 M. Jane Goode, *Law & Practice of Insurance Coverage Litigation* § 6:20 (2017) ("Many liability policy forms contain exclusions for bodily injury 'which is expected or intended by the insured.' ... Not surprisingly, the courts tend to use substantially the same approach in interpreting the exclusion as they have in interpreting the same or similar terms contained in the definition of occurrence. Indeed, it is sometimes impossible to determine whether a court has based its decision concerning coverage on the existence or nonexistence of an occurrence or on application of an intentional injury exclusion." (footnotes omitted)).

> Since the Court holds that the Schillaci Complaint alleged an occurrence under the Homeowners Policy, Met P&C cannot rely on the intentional act exclusion to disclaim coverage. *See 670 Apartments Corp.* [*v. Agricultural Ins. Co.*,] 1996 WL 559942, at *5 n.3 [S.D.N.Y. Oct. 2, 1996] (concluding that, because the underlying complaint alleged a covered occurrence even though the insured received warnings about potential harms resulting from its conduct before commencement of the underlying lawsuit, the policy's intentional loss exclusion did not bar coverage).

*Metro. Prop. and Cas. Ins. Co. v. Sarris*, 2017 WL 3252812, at *10–*11 (N.D.N.Y. July 28, 2017), *appeal withdrawn*, 2017 WL 5714502 (2d Cir. Sept. 19, 2017). Thus, the court finds itself again applying the law of the case doctrine, but this time by necessary implication. Aspen's Exclusion A is foreclosed by the Tenth Circuit's finding of an "occurrence."

Your Product

Exclusion E states that the policy does not apply to, "'Property Damage' to 'Your Product', arising out of it or any part of it." ECF# 284-1, p. 14. Aspen argues this exclusion prevents coverage because B&V's claim is seeks damages for having supplied an insufficient product and for having replaced "components at any uncompleted plants." ECF# 342, p. 50. Aspen cites the unpublished and brief decision of *Tradin Organics USA, Inc. v. Maryland Cas. Co.*, 325 Fed. Appx. 10 (2nd Cir. Apr. 16, 2009). In a single paragraph which does not describe the defect or the product, the court applies the "Your product" exclusion summarily concluding that "Tradin's claim was based on damage to Tradin's product—a risk specifically excluded by the "Your Product" provision." 325 Fed. Appx. at 11.

The Second Circuit panel in *Tradin Organics*, however, cited and relied upon *Lowville Producer's Dairy Co-op., Inc. v. American Motorist Ins. Co.*, 198 A.D.2d 851, 604 N.Y.S.2d 421, 422-23 (N.Y. App. Div. 1993). In that decision, the court applied the product exclusion and denied coverage for the loss of contaminated milk that the plaintiff insured, a cooperative association of dairy farmers, had supplied to a cheese manufacturing plant, but it allowed coverage for the cost of removing and disposing the contaminated milk from the purchaser's silo. "The policy was clearly intended to cover the possibility that the insured's product, once sold, would cause bodily injury or damage to property other than the product itself." *Id.* at 423 (citations omitted). *See Hartog Rahal Partnership v. American Motorists Ins. Co.*, 359 F. Supp. 2d 331, 332-22 (S.D.N.Y. 2005); *Federal Ins. Co. v. Marlyn Nutraceuticals, Inc.*, 2013 WL 6796162, at *8 (E.D.N.Y. Dec. 19, 2013)("Where, as here, the damage is to the insured's property, which was not incorporated into any larger entity, courts have found that exclusions such as the 'your product' exclusion in the Policy defeat any duty to defend." (citations omitted)).

B&V denies its claim is based on a defective product but rather is based on its construction project which constitutes real property. B&V refers to the policy's definition of "Your Product" as "any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" insured. ECF# 284-1, p. 11. The JBRs are "massive,

permanent fixtures that constitute 'real property.'" ECF# 345, p. 77 (citing Scott C. Turner, *Insurance Coverage of Construction Disputes*, § 27:8 (2d ed. 2015). B&V contends that if this exclusion covered all property damage arising out of its construction project, then the Policy would be ineffective in meeting what the Tenth Circuit said was B&V's "main reason for obtaining CGL insurance . . . the potential for claims alleging damages made by the property owner—AEP." 882 F.3d at 964. B&V argues a "common sense reading" of the exclusion makes it inapplicable. In reply, Aspen argues for this being a product claim because the risers were insufficient as manufactured. Aspen adds that because the risers' insufficiency did not change with their installation, so B&V's claim should not change in nature either.

"To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Continental Cas. C. v. Rapid-American Corp.*, 80 N.Y.2d 640, 652, 609 N.E.2d 506 (1993). Aspen has not carried its burden. The definition of "Your Product" excludes real property. The general rule for this exclusion is that, "[t]he work performed by contractors on dwellings, buildings, structures, and any other form of realty is therefore not considered to be the product of the insured." 9A Steven Plitt, et al., *Couch on Ins.* § 129:20 (3rd ed. 2018 update). Aspen has not shown that B&V's work in managing and directing

the construction of the JBRs results in a product rather than services related to real property. It seems this exclusion "was always intended by the insurers and brokers to apply to manufacturing that produces 'products' rather than companies like contractors, subcontractors, and construction managers that perform services." Scott C. Turner *Insurance Coverage of Construction Disputes* § 27:8 (2d ed. Nov. 2018 update) (citations and authorities omitted). By excepting "real property" from the definition of "your product," "construction work of a contractor is not 'your product'." *Id.* As for a product that is built into a structure, the general rule is:

> What would otherwise be an insured manufacturer's product, or an insured material supplier's product, may lose that designation once it is incorporated into a building project if it thereby becomes real property under that jurisdiction's law of fixtures. In such cases, if property damage to it occurs after being built into the project, it no longer fits within the definition of "your product," so the exclusion should not apply.

*Id.* at § 27:10. Case law supporting this rule includes, *Travelers Property Casualty Company of America v. Northwest Pipe Company*, 2017 WL 2687652, at *1 (W.D. Wash. Jun. 22, 2017), which involved a claim of damages suffered "in the construction of a large water pipeline" and caused by "the alleged failure of circumferential welds that were being used to attach grout plugs to a large steel pipe liner." The court similarly quoted this treatise and noted:

> The Ninth Circuit has relied upon this rule, albeit in an unpublished decision. *Mid-Continent Cas. Co. v. Titan Const. Corp.*, 281 Fed.Appx. 766, 768–69 (9th Cir. 2008) (quoting *Black's Law Dictionary*, 1254 (8th ed. 2004)) ("Since 'real property' is not defined in the CGL, we

adopt the common meaning of the term, 'land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land.'"). Other courts have likewise reached the same conclusion. *See Scottsdale Ins. Co. v. Tri-State Ins. Co. of MN.*, 302 F. Supp. 2d 1100, 1104–08 (D.N.D. 2004).

*Travelers Prop. Cas. Co. of Am.*, 2017 WL 2687652, at *7. The court then looked to whether the steel liner met the criteria for a fixture under state law:

> Upon installation of the grout plugs, the steel liner was cemented into the underground Twin Tunnels project. Dkt. 30 at 2. This establishes that the steel liner was sufficiently annexed to the realty to satisfy the first prong of the fixture criteria. Additionally, there is no dispute that the steel liner was applied to the purpose of the Twin Tunnels project for which the portion of realty is appropriated. See Dkt. 30; Dkt. 18-12 at 5. Finally, the underlying complaint by the Water District states that the steel liner was "installed at the ends of each of the tunnels as a permanent lining … that prevents water from travelling into or out of the tunnels," thereby establishing the third prong of the fixture criteria. Dkt. 18-12 at 5 (emphasis added). Pursuant to this analysis, the steel liner is real property, or at least it was real property at the time that the alleged defects resulted in the failure of the circumferential welds.

*Travelers Prop. Cas. Co. of Am. v. N.W. Pipe Co.*, 2017 WL 2687652, at *7. This approach certainly seems consonant with the CGL policy at issue here, with the allegation here of injury occurring with the risers' installation, and with New York law.

New York law on the criteria of a fixture matches the law applied in *Travelers Prop.*: "To meet the common-law definition of fixture, the personalty in question must: (1) be actually annexed to real property or something appurtenant thereto; (2) be applied to the use or purpose to which that part of the realty with which it is connected is appropriated; and,

(3) be intended by the parties as a permanent accession to the freehold."

*Matter of Metromedia, Inc. (Foster & Kleiser Div.) v. Tax Commn. of City of N.Y.*, 60 N.Y.2d 85, 90, 455 N.E.2d 1252 (1983) (citations omitted). The parties have not employed this test, identified these fixture criteria, or presented the facts necessary for determining this exclusion. Based on the summary judgment record to date, the risers would appear to meet this fixture definition. Because "real property" is expressly eliminated from the definition of "Your Product," the defendant Aspen is not entitled to summary judgment on this exclusion as argued in its original memorandum, ECF# 342.

Impaired Property

Exclusion G states that the policy does not apply to:

"Property Damage to "Impaired Property" or property that has not been physically injured arising out of:
(1) a defect, deficiency, inadequacy or dangerous condition in "Your Product' or 'Your Work'; or
(2) a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms."
This Exclusion G does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "Your Product" or "Your Work after it has been put to its intended use.

ECF# 284-1, p. 14. The Policy defines "Impaired Property" in this way:

"Impaired Property" means tangible property, other than "Your Product", or "Your Work", that
(1) cannot be used or is less useful because:
        (a) it incorporates "Your Product" or "Your Work" that is known or thought to be defective, deficient, inadequate, or dangerous; or
        (b) you have failed to fulfill the terms of a contract or agreement; and

(2) can be restored to use by:
      (a) the repair, replacement, adjustment, or removal of "Your Product" or "Your Work"; or
      (b) your fulfillment of the terms of such contract or agreement.

ECF# 284-1, p. 9.

Aspen argues that, "[a]ny non-damaged product is either 'Impaired Property' (as defined above) or 'property which has not been physically injured' and is therefore excluded under the 'Impaired Property' exclusion." ECF# 342, p. 52. Aspen also notes that the exclusion's exception for property put to its intended use "does not apply to the four uncompleted plants" because they were not used. *Id*. Aspen wants this exclusion to bar all coverage for replacement damages, "because the removal of *undamaged product* was caused by a defect in the risers." *Id*. Aspen emphasizes that this exclusion operates whether the defective work was done by a subcontractor or not, citing *Pavarini Constr. Co., Inc. v. Continental Ins. Co.,* 304 App. Div. 2d 501, 759 N.Y.S.2d 56 (2003). As authority for this exclusion's applicability, Aspen relies on two unpublished decisions: *Big-D Constr. Midwest, LLC v. Zurich Am. Ins. Co.*, 2018 WL 3025066 (D. Utah Jun. 18, 2018), *corrected and superseded by*, 2018 WL 3849923 (D. Utah Aug. 13, 2018); and *Acceptance Ins. Co. v. Ross Contractors, Inc.*, 2008 WL 2796593 (Minn. App. Jul. 22, 2008), *rev. denied*, (Oct. 1, 2008).

B&V first summarily argues the exclusion does not apply because the property damaged was the JBRs which is B&V's work, and "Impaired Property" is defined above as "tangible property, other than . . . 'Your

Work.'" ECF# 284-1, p. 9. B&V string cites authorities showing the agreement between commentators and courts, "that where non-defective work or property must be damaged to remove defective property, the impaired property exclusion does not apply." ECF# 345, p. 78. B&V distinguishes *Pavarini* as involving a different policy with an unknown definition of "Impaired Property." Finally, B&V points out that the broad application of this exclusion means, "several policy provisions would be rendered superfluous—a prohibited result under the Tenth Circuit's reasoning." *Id.* at p. 79.

In reply, Aspen goes through several of the B&V's citations denying they discussed the "impaired property" exclusion and distinguishing another on the facts. Aspen argues for following *Travelers Cas. & Surety Co. v. Dormitory Authority State of N.Y.*, 732 F. Supp. 2d 347, 366 (S.D.N.Y. 2010); *Island Lathing & Plastering v. Travelers Indem. Co.*, 161 F. Supp. 2d 278 (S.D.N.Y. 2001). Aspen maintains, "New York cases apply the 'impaired property' exclusion to the *non-damaged* parts of all JBRs which were required to be removed and replaced because of the defective components." ECF# 348, p. 23.

Looking first at Aspen's citations, the court agrees that the *Pavarini* lacks sufficient details for it to be applied here correctly. The unpublished decision in *Big-D Construction* involved Utah and Minnesota law, and its analysis does not address how these provisions are typically read and

applied. The Minnesota Court of Appeals in *Acceptance* addresses the

"impaired property" exclusion noting first:

> The reach of exclusion m is difficult to determine. Because it is part of a standard, insurance-industry-wide policy provision, there is caselaw from other jurisdictions and secondary commentary summarizing that caselaw and analyzing the exclusion. See, e g., 4 Philip L. Bruner & Patrick J. O'Connor, *Bruner and O'Connor on Construction Law* § 11.49, at 166-74 (2002); 2 Allan Windt, *Insurance Claims and Disputes: Representation of Insurance Companies and Insureds* § 11.21, at 530-31 (4th ed.2001); 3 Robert J. Franco, *Insurance Coverage for Faulty Workmanship Claims under Commercial General Liability Policies*, 30 Tort & Ins. Law J. 785, 800-02 (1995). Bruner and O'Connor cite other commentators and courts expressing frustration with the complexity of exclusion m, its untoward reach, and its limited actual application. See 4 Bruner & O'Connor, *supra*, § 11.49, at 169-75. We recognize this confusion. We note that "[i]f policy language is ambiguous, it must be interpreted in favor of coverage [and that policy] exclusions are read narrowly against the insurer." . . . .
>
> . . . The potential scope of exclusion m is breathtaking; it could vitiate the insuring clause of the policy and eliminate all coverage. This clash between the possible broad scope of the exclusion and the intended coverage creates an ambiguity in the meaning of the exclusion.
>
> Acceptance does not argue for this broad effect of exclusion m. Instead, Acceptance asserts that because the loss-of-profit damages are tied to contract claims, exclusion m only eliminates loss of profits as an element of damages. However, coverage here was based on the negligence, not the breach of contract.
>
> . . . We adopt the same reasoning to conclude that exclusion m does not preclude coverage and recovery by Nolan for lost profits.

*Acceptance Ins. Co. v. Ross Contractors, Inc.*, 2008 WL 2796593, at *11-12.

(Minn. App. July 22, 2008). Interestingly, *Acceptance* supports reading this

complex and ambiguous exclusion in favor of the insured, in keeping with

the exclusion's narrow purpose, and in furtherance of preserving the policy's

basic coverage terms. Aspen's reply also overstates its position in arguing

that its two "New York cases" show that New York law reads this exclusion

more broadly than argued by B&V. First, *Travelers Cas. and Surety Co.*, applied New Jersey law. Second, *Island Lathing & Plastering,* reads and applies the exclusion summarily as an alternative ground for finding the insurer had no duty to defend, 161 F. Supp. 2d at 288-89.

The "impaired property" exclusion, as the Minnesota Court of Appeals noted above, is complex and vulnerable to expansive readings that "could vitiate the insuring clause." 2008 WL 2796593, at *11. "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Village of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115-16 (2nd Cir. 1995)(internal quotation marks and citation omitted). Not only has Aspen not carried this burden, but it seeks to apply this exclusion against the removal and replacement costs for *non-damaged* parts which is beyond the intended purpose of this exclusion.

The court's application of this exclusion is instructed by the history and purpose of this exclusion and by how most courts have construed and applied it:

The concept of "impaired property" first surfaced in 1986. Before that time, however, the standard CGL policy contained an exclusion intended to address claims that losses were incurred as a result of the insured's failure to perform its obligations. Exclusion m of the 1973 CGL form, known as the "failure to perform" exclusion, precluded coverage for loss of use damages where no physical injury was present resulting from:  (1) a delay in or lack of performance by the insured or (2) the failure of the insured's products or work to meet a level of

performance, quality, fitness or durability warranted or represented by the insured.

The 1973 "failure to perform" exclusion addresses the "loss of use" aspect of "property damage." . . . .

. . . .

Given the interpretation challenges posed by the 1973 form exclusion, many hoped that the revisions to the exclusion would provide a clearer picture. Unfortunately, the exclusion has not become simpler. The introduction of the concept of "impaired property" has created a new set of challenges. Commentators have opined that the new exclusion is "too complex to receive a uniform interpretation." Others have found the new exclusion to be "tricky." One commentator has gone so far as to conclude that the exclusion is subject to attack as "unintelligible or at least ineffective to overcome the insured's reasonable expectations of coverage."

. . . .

The "impaired property" exclusion applies to two classes of property. The first, "impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because your defective work has been incorporated into it where such property can be restored through the repair or replacement of your work. The second class of property is "that [which] has not been physically injured. Therefore, if there is physical injury to tangible property, the second class of property implicated by the impaired property exclusion does not come into play.

"Impaired property" denotes property that is different from the insured's work. In the normal case, the exclusion would have no application where the damage, including the loss of use, occurs to the construction performed by the insured or its subcontractors. In addition to not applying where usefulness may not be restored by the repair of the insured's work, courts have held the exclusion inapplicable where the repair or replacement of the insured's work would cause physical injury to other property.

4 Pt. 2 Philip L. Bruner and Patrick J. O'Connor, Jr., *Bruner and O'Connor on Construction Law* § 11:264 (2018) (footnotes and citations omitted); *see also* 9 No. 2 Lee H. Shidlofsky, *Journal of the American College of Construction Lawyers* (Aug. 2015); *see generally* 9A Steven Plitt, et al., *Couch on Insurance Third Edition* § 129.23 (2018) (footnotes and citations

omitted); *see, e.g.*, *Maryland Casualty Co. v. Mid-Continent Casualty Co.*, 725 Fed. Appx. 699, 711 (10th Cir. Mar. 20, 2016) (exclusion did not reach damage claims other than loss of use of personal property); *Standard Fire Ins. Co. v. Chester O'Donley & Associates, Inc.*, 972 S.W.2d 1, 10 (Tenn. Ct. App. 1998) ("The effect of the 'impaired property' exclusion is to bar coverage for loss of use claims . . . when there has been no physical injury to property other than the insured's work itself. The exclusion does not apply . . . if the insured's work cannot be repaired or replaced without causing physical injury to other property." (citations omitted)), *appeal denied*, (Jul. 6, 1998).

Owing in large part to the complex and ambiguous terms employed in this exclusion, Aspen's application of it here lacks clarity. Aspen takes the general position that, "[a]ny non-damaged product is either 'Impaired Property' (as defined above) or 'property which has not been physically injured' and is therefore excluded under the 'Impaired Property' exclusion (assuming that the replacement of such non-damaged product even involves 'physical harm' to the property of a third party)." ECF# 342, p. 52. Aspen, however, fails to show how any of the JBRs' "non-damaged property" is "tangible property other than . . . [B&V's] 'Your Work' . . . ." ECF# 284-1, p. 9 (Definition of "Impaired Property"). The policy defines "Your Work," to be B&V's "work or operations performed by" B&V or on behalf of B&V. ECF# 284-1, p. 12. Thus, Aspen fails to show that the first

class of property covered by this exclusion, "Impaired Property," meaning tangible property other than "Your Work," is involved here. *See* Scott C. Turner, *Insurance Coverage of Construction Disputes* § 26.7 (2018) ("The work of a general contractor qualifies as its 'your work' such that it cannot be 'impaired property,' so the exclusion cannot apply."); *see, e.g., Archer W. Contractors, LTD v. Liberty Mutual Fire Ins. Co.,* 2015 WL 11004493, at *7 (C.D. Cal. Mar. 31, 2015)*,* ("Because all of the damages alleged were to materials, parts, or equipment built or furnished by AWC, and AWC had expansive responsibility for the Project, the damages are therefore encompassed by the 'Your Product or Your Work' exception to the Impaired Property definition, and do not constitute Impaired Property under the meaning of the National Union Policy."), *aff'd sub nom., Archer W. Contractors, Ltd. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania,* 680 Fed. Appx. 604 (9th Cir. 2017)(unpub.); *Durbrow v. Mike Check Builders, Inc.*, 442 F. Supp. 2d 676, 684 (E.D. Wis. 2006) (Insured's construction of the whole house was its work, so exclusion does not apply).

Aspen also argues the exclusion applies here to the second class of property, that is, "property that has not been physically injured arising out of:  (1) a defect, deficiency, inadequacy or dangerous condition in 'Your Product' or 'Your Work.'" ECF# 284-1, p. 14. Aspen applies the exclusion saying, "the JBR replacement claim is excluded in its entirety because the removal of *undamaged product* was caused by a defect in the risers. That is

exactly the nature of the claim being made here." ECF# 342, p. 52. Again, Aspen's argument runs up against the actual wording and the general meaning of this exclusion. First, the wording of the exclusion actually says there is no coverage for property damage to property "that has **not** been physically injured arising out of" a defect in "Your Work." ECF# 284-1, p. 14. In arguing the removal (the damage) of the undamaged product was caused by a defect in the risers, Aspen appears to be showing the physical injury here did arise out of a defect in B&V's "work or operations by . . . [it] or on [its] . . . behalf." ECF# 284-1, p. 12 (Definition of "Your Work"). Aspen's application does not match the meaning of this exclusion which is to bar "coverage for loss of us of tangible property of others that is not physically damaged by the insured's defective product." *America Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 98 (4th Cir. 2003)("This exclusion places a limitation on the coverage of consequential damages, restricting coverage to loss of use of other persons' properties *that are physically damaged*."). Second, this exclusion does not apply "if the insured's work cannot be repaired or replaced without causing physical injury to the other property." 9A Steven Plitt, *Couch on Insurance Third Edition* § 129.23 (2018). When the fixing of faulty components results in the destruction and replacement of other components, the fix itself "necessitated injury to tangible property, and the injury was unquestionably physical." *U.S. Metal, Inc. v. Liberty Mutual Group, Inc.*, 490 S.W.3d 20, 28 (Tex. 2015), *reh'g denied*, (Jun. 17,

2016). "This exclusion should not apply to eliminate coverage where the incorporation of the defective work or product does no actual physical damage to tangible property but the removal or repair of that work or product has or will physically injury other property." Scott C. Turner, *Insurance Coverage of Construction Disputes* § 26:19 (2019) (citing in part, *DeWitt Constr. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1135 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 4, 2002); *North Star Mut. Ins. Co. v. Rose*, 27 F. Supp. 3d 1250, 1254 (E.D. Okla. 2014)). Aspen has not carried its burden in showing this exclusion bars coverage for B&V's property damages incurred in removing, injuring or destroying other parts to repair or replace the defective components.

Replacement

> Exclusion H reads that the policy is inapplicable for:
>
> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement adjustment, removal or disposal of:
> (1) "Your Product";
> (2) "Your Work"; or
> (3) "Impaired Property";
> if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

ECF# 284-1, p. 14. Aspen reads this exclusion to extinguish coverage for B&V's claim for damages from "'repair, replacement, adjustment, removal or disposal' of the JBR internals due to a 'defect, deficiency, inadequacy, or dangerous condition.'" ECF# 342, p. 53. Aspen contends this exclusion is

intended to deny coverage for the mere discovery of a defective product when the product has yet to fail in use. As examples of this exclusion's application, Aspen cites *Big-D Construction Midwest, LLC v. Zurich American Insurance Co.*, 2018 WL 3849923 (D. Utah Aug. 13, 2018), as barring coverage of a general contractor's costs in removing other building parts so it could replace the non-conforming lumber, and *Nash v. Baumblit Const. Corp.*, 72 App. Div. 3d 1037, 1040, 902 N.Y.S.2d 99, 102 (2010), as barring a general contractor's recovery for restoration and repair work performed due to a defective renovation of a home. *See also Flynn v. Timms*, 199 App. Div. 2d 873, 606 N.Y.S.2d 352 (1993).

In response, B&V reads this Exclusion H to exclude "coverage for costs incurred to recall products from the market or remove work from use where there has been no resulting 'Property Damage,' but the work is recalled or withdrawn from use to repair a known or suspected deficiency." ECF# 345, p. 79. B&V argues the exclusion does not apply when the defect has already caused resulting property damage and cites *Thruway Produce, Inc. v. Mass. Bay Ins. Co.*, 114 F. Supp. 3d 81 (W.D.N.Y. 2015). Aspen's expansive application of this exclusion, according to B&V, would vitiate key coverage and would render meaningless the coverage provided in the subcontractor exception. B&V distinguishes *Nash* as not involving a subcontractor's defective work and damages to other work.

In reply, Aspen counters that the wording of this exclusion is not restricted to product recalls but includes "withdrawals." Aspen argues:

> Parsing the language of the exclusion, the JBRs were 'withdrawn . . . from use' by B&V because of 'a known or suspected defect. . . . Even B&V admits as much. (*See*, Dkt. #345, at 64). B&V contends that the JBRs "were damaged by the incorporation and required replacement of defective gas risers." (*Id*). Even before the phrase "any person or organization" was added to the exclusion by ISO in 1986, broadening the exclusion to limit coverage, New York Courts explained that this exclusion applied to a named insured's withdrawal of its products, but not to a third party claimant's withdrawal of them. *Thomas J. Lipton, Inc. v. Liberty Mut'l. Ins. Co.*, 34 N.Y.2d 356, 314 N.E.2d 37 (1974).

ECF# 348, p. 24. Aspen maintains this exclusion applies to the general contractor's costs in repairing a subcontractor's defective work and cites, *Hathaway Development Co., Inc. v. Illinois Union Ins. Co.*, 274 Fed. Appx. 787 (11th Cir. 2008); *Kay Bee Builders, Inc. v. Merchant's Mut. Ins. Co.*, 10 App. Div. 3d 631, 632, 781 N.Y.S.2d 692 (2004).

This exclusion presents another example where the wording is susceptible to being stretched beyond the exclusion's apparent purpose. The Tenth Circuit has already said in this case, "Allowing CGL policies to cover construction defects caused by a subcontractor comports with the purpose of liability insurance—to protect the contractor not the property owner." 882 F.3d at 968. This finding certainly impacts how this court must read and apply this exclusion. The New York Court of Appeals has interpreted this so-called sistership exclusion mindful of the foreseeable coverage under the policy and against the insurer due to the exclusion's ambiguity:

To say that the categories of damage claimed here by Lipton do not fall within such coverage would appear to exclude what, as a practical matter, would usually be some of the largest foreseeable elements of such damage. Such an interpretation, . . . , would render the coverage nearly illusory.

> It is fundamental that ambiguities in an insurance policy must be construed against the insurer (*Greaves v. Public Serv. Mut. Ins. Co.*, 5 NY2d 120, 125; see 29 N. Y. Jur., Insurance, §§ 617, 619, pp. 607, 609). This is particularly so as to ambiguities found in an exclusionary clause (*Sincoff v. Liberty Mut. Fire Ins. Co.*, 11 NY2d 386, 390-391; see 29 N. Y. Jur., Insurance, § 623, p. 615). We cannot think that, given the economic and factual setting in which these policies were written, an ordinary business man in applying for insurance and reading the language of these policies when submitted, would not have thought himself covered against precisely the damage claims now asserted by Lipton. (Cf. 29 N. Y. Jur., Insurance, § 608, p. 597.)

*Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361, 314 N.E.2d 37 (1974). Thus, the court will follow that precedent which construes this exclusion against the insurer and which reconciles the policy's intended and foreseeable coverage against the exclusion's limited purpose. It should be noted that Aspen's cited case law does not follow this approach in applying the replacement or sistership exclusion.

From its own review of commentaries on insurance law, the court finds the following summary of the exclusion's purpose and function to be meaningful, correct, and consistent with New York law:

> Exclusion n is called the "sistership exclusion" and it applies to any "recall of products, work or impaired property." CGL Policy, Section I.2(n). Exclusion n protects insurance companies against liability for the costs of recalls. *See, e.g., Forest City Dillon, Inc. v. Aetna Cas. & Sur. Co.*, 852 F.2d 168, 173 (6th Cir. 1988). The clause excludes "damages claimed for any loss" if a "product ... is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it." CGL Policy, Section I.2(n); *Travelers*

*Indem. Co. v. Acadia Ins. Co.*, No. 1:08–CV–92, 2009 WL 1320965, at *8 n. 7 (D.Vt. May 8, 2009) ("The 'sistership exclusion' deals with withdrawing or recalling damaged property from the market…."). "Insurance companies … developed the 'sistership' clause to make clear that, while they intended to pay for damages caused by a product that failed, they did not intend to pay for the costs of recalling products containing a similar defect that had not yet failed." *Forest City Dillon*, 852 F.2d at 173.

Harleysville asserts that R.I Pools has effectively "recalled" its shotcrete from the market. But this argument fails, because no "recall" occurred in this case. "[T]he sistership exclusion does not apply to a product that has failed, but only to a 'sister' product withdrawn after failure of the first product." *Am. Home Assurance v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 25 (1st Cir. 1986); *Forest City Dillon*, 852 F.2d at 173; *Gulf Miss. Marine Corp. v. George Engine Co., Inc.*, 697 F.2d 668, 674 (5th Cir. 1983); *Imperial Cas. & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 136 n. 9 (3d Cir. 1988) ("Sistership provisions … do not exclude coverage of damages arising from a defective product when no sister products are involved."); *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 419 (5th Cir. 1982); *Fireman's Fund*, 2008 WL 4066096, at *12 (finding Seventh Circuit's conclusion in *Sokol* that Exclusion n barred coverage inapplicable because that case involved preventative measures, whereas in the case before the court, the product had already caused damage).

Here, no "sister" product was recalled. Paramount seeks coverage for the damage actually caused by its defective product; it does not seek coverage for the removal of its defective shotcrete from the market. Therefore, Exclusion n does not bar coverage in this case.

*Harleysville Worcester Ins. Co. v. Paramount Concrete, Inc.*, 10 F. Supp. 3d 252, 270–71 (D. Conn. 2014); *see, North Star Mut. Ins. Co. v. Rose*, 27 F. Supp. 3d 1250, 1254 (E.D. Okla. 2014); Scott C. Turner, *Insurance Coverage of Construction Disputes* §§ 34:1-3 (2d ed. 2018); 9A Steven Plitt, *et al.*, *Couch on Insurance* § 129:24 (3rd ed. 2018); 3 Allan D. Windt, *Insurance Claims and Disputes* § 11.13 (6th ed. 2018). Turner's commentary observes:

Many cases and commentators, looking to the insurer's original intent, have concluded that "withdrawal" is limited to product recall situation. Insurance companies . . . developed [this exclusion] to make clear that, while they intended to pay for damages caused by a product that failed, they did not intend to pay for the costs of recalling products containing a similar defect that had not yet failed. . . . The exclusion is designed to limit the insurer's exposure in cases where because of the actual failure of the insured's product, similar products are withdrawn from use to prevent the failure of those other products, which have not yet failed but are suspected of containing the same defect. Thus, the exclusion is limited to the costs of withdrawing sister products of work for precautionary purposes and does not apply to claims involving property damage to product or work that has already failed.

This is a terribly significant distinction for construction claims, where very little work has a sister piece of work. Thus, the vast majority of construction claims are unaffected by the exclusion on this ground alone. Thus, one insurance industry commentary concludes, although many insurers cite this exclusion in response to a defective work claim on a construction project, it usually does not apply because a construction product is regarded as unique completed operation and not a mass-produced product subject to a recall.

Scott C. Turner, *Insurance Coverage of Construction Disputes* § 34:3 (2d ed. 2018) (internal quotation marks, footnotes and citations omitted). Windt's commentary adds:

The most significant restriction on the applicability of the sistership exclusion is that although, according to its terms, the exclusion applies whether the insured's product is withdrawn from the "market or from use," the courts have, in general, not applied the exclusion if the insured's product has already been put to use. In fact, there are a few cases that have explained that the exclusion applies only to recalls. The theory behind the incorporation cases is that (a) the sistership exclusion applies only to preventative or curative actions, and (b) once incorporation has taken place, the damage has already taken place, so the withdrawal is not merely a preventative measure.

3 Allan D. Windt, *Insurance Claims and Disputes* § 11.13 (6th ed. 2018).

In light of these authorities and New York case law, the court

finds the sistership exclusion inapplicable as B&V is not seeking preventative damages to sister pieces associated with the withdrawing or removing a product from the market. *See Stonewall Ins. Co. v. Asbestos Claims Mgt. Corp.*, 73 F.3d 1178, 1211 (2d Cir. 1995), *opinion modified on denial of reh'g*, 85 F.3d 49 (2d Cir. 1996) (applying New York law and acknowledging "the case law narrowly construing the sistership exclusion and the ambiguity in the relevant policy language"); *Truax v. Hovey, Ltd. v. Aetna Cas. & Sur. Co.*, 122 A.D.2d 563, 504 N.Y.S.2d 934, 935 (N.Y. App. Div. 1986) ("Since the claim in this case did not involve withdrawal of the insulation from the market," the exclusion as designed does not apply.). And, even if the defective gas risers resulted in the non-use of some of the JBRs, this exclusion does "not preclude coverage for damage" caused by the defective product or work to other property that occurred with its incorporation. *See Stonewall*, 73 F.3d at 1211; *see generally* 3 Allan D. Windt, *Insurance Claims and Disputes* § 11.13 n. 8 (*Truax*, despite its broad holding, "could be explained on the basis that the sistership exclusion was inapplicable because the insured's defective product had already, by virtue of its incorporation, damaged the product into which it had been incorporated."). Consistent with its holdings above and the Tenth Circuit's findings on damages, the court finds that the incorporation of the subcontractors' defective work into the JBRs already damaged them making the sistership exclusion inapplicable.

Finally, the court agrees that applying the sistership exclusion broadly would render subcontractor coverage illusory and would conflict with the Tenth Circuit's reading of this policy. Support for this conclusion comes from *Lipton* and from the following analysis by the West Virginia Supreme Court:

> First, as we previously observed with respect to Exclusion M, applying Exclusion N [sistership exclusion] to preclude coverage for Ms. Cherrington's loss of use of her property would produce an absurd and inconsistent result with the policy's coverage provisions. See Syl. pt. 2, *D'Annunzio*, 186 W.Va. 39, 410 S.E.2d 275. The policy at issue in this case specifically provides coverage for the work of subcontractors. A natural consequence of damages occasioned by defective work would be loss of use of that defective structure or portion thereof. To apply this exclusion to preclude coverage for the damages occasioned by the very same work that the policy expressly covers would render such coverage illusory and would be contrary to the policy's stated intention to provide indemnity for this specific loss. See Syl. pt. 5, in part, McMahon, 177 W.Va. 734, 356 S.E.2d 488 (holding that insurance policy exclusions "will be strictly construed … in order that the purpose of providing indemnity not be defeated"). Thus, we find that Exclusion N does not apply to preclude coverage in this case.

*Cherrington v. Erie Ins. Property and Cas. Co.*, 231 W.Va. 470, 745 S.E.2d 508, 528 (2013). For all these reasons, the court finds that B&V has not carried its burden of showing this exclusion extinguishes coverage for B&V's claim for damages based on the repair, replacement, adjustment, removal or disposal of the JBR internals due to a defect, deficiency, inadequacy, or dangerous condition.

Exhaustion of Underlying Coverage to Trigger Aspen Excess Policy

As an excess insurer, Aspen argues establishing the attachment point of its policy and any attachment credits from B&V's settlements are

critical. It is uncontroverted that "B&V is not seeking coverage from Aspen/Catlin for any design changes or betterments to the JBRs upon rebuilding." ECF# 345, p. 36, ¶ 284. Aspen recognizes the amount of rebuild expenses covered is a question of material fact but argues the issues of attachment could reduce or even moot B&V's claim.

The Policy's insuring agreement provides in pertinent part:

> We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" which the "Insured" by reason of liability imposed by law or assumed by the "Insured" under contract prior to the "Occurrence", shall become legally obligated to pay as damages for:
> (a) "Bodily injury" or "Property Damage" occurring during the Policy Period stated in Item 4 of the Declarations (Policy Period) and caused by an "Occurrence": . . . .

ECF# 284-1, p. 7. The Policy defines "Retained Limit" as follows:

> "Retained Limit" means whichever of the following is applicable:
> (1) with respect to any "Occurrence" that is covered by "Underlying Insurance" or any other insurance, the total of the applicable limits of the "Underlying Insurance" plus the applicable limits of any other insurance; or
> (2) with respect to any "Occurrence" that is not covered by "Underlying Insurance" or any other insurance, the amount of the Self-Insured Retention stated in Item 5(c) of the Declarations (the "Self-Insured Retention").

ECF# 284-1, p. 11. Aspen sweepingly argues the definition of "Retained Limit" makes its policy excess to all underlying insurance and all other insurance, including "property, professional liability, MTI subcontractor/liability policies." ECF# 342, p. 55.

Aspen seeks summary judgment on the following two attachment issues: (1) whether the Aspen policy is triggered if there is

coverage remaining in the underlying policy, and (2) if triggered, what is the Aspen policy's attachment point? ECF# 342, p. 56. B&V also moves for summary judgment that the retained limit requirement under the Aspen policy "has been satisfied by payment or credit for the applicable limits of the Zurich primary policy; and, that the 'other insurance' component of Retained Limit has been met by crediting either the actual net settlement amounts obtained from the MTI general liability policies or, with respect to the Endorsement 35 Named Projects by application of the 'Subcontractors' own limits of USD 5,000,000.'" ECF# 338, pp. 1-2. Because the issues are overlapping, the court addresses both motions at the same time.

Actual Payment and/or Credit for Underlying Coverage

According to Aspen, New York law requires exhaustion by actual payment of underlying coverage when the excess policy requires the same. The court finds that Aspen's cited decisions have policies that clearly conditioned attachment of excess coverage upon the "payment of losses thereunder." *See, e.g., Federal Ins. Co. v. Estate of Gould*, 2011 WL 4552381, at *7 (S.D.N.Y. Sep. 28, 2011), *aff'd*, 719 F.3d 83 (2nd Cir. 2013); *Forest Laboratories, Inc. v. Arch Ins. Co.*, 116 A.D.3d 628, 984 N.Y.S.2d 361, 362 (N.Y. App. Div. 2014) (excess policy required exhaustion through "actual payment" of underlying policy's limit), *appeal den.*, 24 N.Y.3d 901 (2014); *Cooper v. Certain Underwriters at Lloyd's, London*, 716 Fed. Appx. 735, 736 (9th Cir. Mar. 30, 2018)("excess policy unambiguously

required exhaustion of underlying limits through payment by the insurers rather than payment by the insured"). Believing these authorities support the blanket application of this rule here, Aspen argues its excess policy has not been triggered because the underlying Zurich policies were not exhausted by actual payment.

Conceding there is not exhaustion by actual payment here, B&V contends the excess policy here allows it to use "gap filling" between the Zurich settlement and the underlying insurance limits found in Schedule A to calculate the triggering point for coverage. B&V argues this is not contrary to New York law. Unlike the case law cited by Aspen, the excess policy here does not expressly require actual payment by the underlying insurer for exhaustion.

Specifically, the policy provides that Aspen will pay "those sums in excess of the 'Retained Limit,'" ECF# 284-1, p. 7, that is defined, in part, to mean "with respect to any 'Occurrence' that is covered by 'Underlying Insurance' or any other insurance, the total of the applicable limits of the 'Underlying Insurance' plus the applicable limits of any other insurance," ECF# 284-1, p. 11. Noticeably absent from these terms is any language requiring full payment of applicable limits. Instead, the policy refers generally to "applicable limits" and does not expressly require the insurer's payment of those limits. B&V points to a line of relevant New York precedent in this regard:

Plaintiff cites a single case in support of its contention that the policies permit the insured to fill the gap. In *Zeig v. Massachusetts Bonding & Insurance Co.*, 23 F.2d 665 (2d Cir. 1928), the court interpreted an excess policy that required the primary insurance to be "exhausted in the payment of claims to the full amount of the expressed limit." *Id.* at 666. The court found that this language was ambiguous and did not require the underlying insurer to make full payment in cash on its policies, holding that the "claims are paid to the full amount of the policies, if they are settled and discharged, and the primary insurance is thereby exhausted." *Id.* The court noted that the parties could have made full payment in cash a condition precedent for the excess insurance, but that the defendant had "no rational interest in whether the insured collected the full amount of the primary policies, so long as it was only called upon to pay such a portion of the loss as was in excess of the limits of the policies." *Id. Zeig*, which remains a "seminal decision interpreting New York insurance law" in the Second Circuit, *Lexington Ins. Co. v. Tokio Marine & Nichido Fire Ins. Co.*, No. 11 CIV. 391 DAB, 2012 WL 1278005, at *3 (S.D.N.Y. Mar. 28, 2012) (collecting cases relying on *Zeig*), stands for the proposition that New York law permits an insured to fill the gap left by below-limits settlement with an underlying insurer where the policy leaves the terms "payment" or "exhaustion" ambiguous.

*Hopeman Brothers, Inc. v. Contl. Cas. Co.*, 307 F. Supp. 3d 433, 472 (E.D. Va. 2018)(applying New York law). Based on New York precedent referenced here, Aspen's coverage language lacks an express requirement of the underlying insurer's actual payment and can be read as ambiguous over whether B&V can fill the gap. *See Hopeman*, 307 F. Supp. 2d at 476. There is more here. Condition G of Aspen's policy not only confirms there is no triggering requirement of actual payment by the underlying insurer, but it can be read even to allow the insured's gap filling: "(1) We will have liability for any one 'Occurrence' only when the amount of the 'Retained Limit' with respect to such 'Occurrence' has been paid by: (a) the 'Insured'; (b) us on behalf of the "insured' (other than under this policy); or (c) the 'Insured's'

underlying insurer." ECF# 284-1, p. 18. Thus, the court grants partial summary judgment for B&V on the issue of the Aspen policy permitting a below-limits settlement with the underlying insurer and the insured filling the gap for exhaustion.

Amount of Coverage Credited under the Zurich Policies

Aspen argues that should the court rule against the actual payment requirement then the court alternatively should find that Aspen is "entitled to the following" credits under the Zurich policies:

> (1) an attachment credit of $16 million in underlying insurance for the course of construction claims per the Zurich policies; (2) an attachment credit of $4 million in completed operations claims relating to the Zurich policies; (3) a credit equal to the $15 million received from the MTI insurers which is allocated across all covered plants; and (4) a minimum attachment credit of $5 million for the Clifty Creek and Kyger Creek plants.

ECF# 342, p. 62. Besides addressing Aspen's arguments in support of these amounts alleged to be credits, the court also will decide Aspen's other arguments for additional credits.

$16 Million Credit for Course of Construction Claims and $4 Million Completed Operations Credit for both policies

Schedule A of Aspen's policy sets out the schedule of Zurich's underlying commercial general liability ("CGL") coverage as $2 million for each occurrence, $4 million general aggregate per location/project, and $4 million for products-completed operations period aggregate. Aspen observes that Zurich issued two CGL policies, one for 2007/2008 and one for 2008/2009, and each has the same schedule of limits. Aspen summarily

proposes first that the limits for both Zurich policies must be exhausted before coverage under its policy is triggered. Aspen then wants the aggregate limit of $4 million applied to each of the four uncompleted plants resulting in a $16 million credit.

B&V articulates its position both in opposing Aspen's motion and in seeking its own partial summary judgment on this issue. To Aspen's argument that multiple years of Zurich policies are applicable, B&V counters that "its claim is limited to one Policy period for Occurrences at each JBR, which are subject to a single policy period." ECF# 345, p. 84. B&V calls Aspen's argument as being "simply wrong," made "without analysis," and unsupported by "any Policy term that requires (or even suggests) that multiple policy years' of Underlying Insurance should be included in the Retained Limit calculation." *Id.* B&V explains that its settlement with Zurich was "to fully resolve its obligations for the AEP Internals Claims under the 2007-2008 Policy." ECF# 311-4, p. 3. From the Zurich policy, B&V first notes that the insuring agreement fixes Zurich's liability to property damage occurring during the policy period and "includes any continuation, change or resumption of that . . . 'property damage' after the end of the policy period." ECF# 338-2, p. 20. Zurich's policy defines "occurrence" as meaning "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." ECF# 338-2, p. 33. B&V maintains "the triggering events for B&V's general liability are in one policy." ECF# 345, p.

86. Finally, B&V further points to what it calls the "anti-stacking" provision in the Zurich policy:

> If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "occurrence," the maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy.

ECF# 338-2, p. 16, ¶ 14. B&V's position is that Zurich's coverage was limited to the one policy period because B&V's liability was triggered by one occurrence, and while the damages may have continued, Zurich's coverage could not be stacked and cannot "exceed the highest applicable Limit of Insurance under any one Coverage Form or policy." *Id.*

Hoping to evade these plain terms in Zurich's policy, Aspen also argues that B&V's claim really asserts two occurrences. Not only does the record not support this argument but it runs counter to the Tenth Circuit's holding in this case. *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd*, 882 F.3d at 965 ("In sum, the property damages at issue were caused by an "occurrence," as that term is defined in the Policy."); *Id.* at 971 ("Under the Policy, the damages at issue here were caused by a coverage-triggering 'occurrence.'"). 882 F.3d at 965. It is uncontroverted that B&V is contending "that the covered 'occurrence' was the installation of defective gas risers." ECF# 345, p. 23, ¶ 251. The court finds no support for Aspen's argument for multiple occurrences at each plant. As Aspen points out in its reply, ECF# 348, p. 30, there remains an open coverage question because B&V

recognizes a question of material fact as to "the date of the Occurrence at Cardinal 3." ECF# 345, p. 70. This does not impact the court's ruling that Zurich's anti-stacking provisions preclude involving two policies for the same occurrence here.

As for Aspen wanting an aggregate limit credit of $4 million applied to each of the four uncompleted plants, B&V argues this is contrary to the Zurich policy's terms which set an aggregate limit as the most to be paid for damages per location/project while, in contrast, the occurrence limit is the most the insurer will pay for damages arising out of any one occurrence. *See* Zurich policy, Section III-Limits of Insurance, ECF# 338-2, pp. 28-29. New York law certainly recognizes this common understanding as to the difference between the two limits:

> **Aggregate Limit**
> The maximum sum the insurer can be called upon to pay, regardless of the number of occurrences. Insurance policies typically include a "per occurrence" limit, which is the maximum sum the insurer can be called upon pay, regardless of the number of persons injured in a given accident. Absent an 'aggregate limit,' there is no limit on the number of times the insurer can be called upon to pay the 'per occurrence' limit for different accidents.

*See* 33 Sarah B. Biser, *et al.*, *N.Y. Prac., New York Construction Law Manual Appendix 10A (2d ed.)* (Dec. 2017); *see Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 762 F. Supp. 566, 595 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 4 F.3d 1049 (2d Cir. 1993)("The purpose of having an aggregate limit in addition to an occurrence limit is to cap the indemnity payments made in a given policy period regardless of the number of occurrences."). Because

B&V's claim is for one occurrence per plant (location/project), the court agrees with B&V that the occurrence limit credit of $2 million per location/project for the 4 uncompleted JBRs or $8 million fulfills the underlying insurance part of the Retained Limit.

### $15 Million Credit from "Other Insurance" MTI's Insurers and $5 million attachment credit for the Clifty Creek and Kyger Creek plants

MTI was B&V's primary subcontractor for the internal components at each JBR project. B&V was a named additional insured on MTI's general liability policies. The court's holding above that actual exhaustion is not required but that the insured can fill the gap on any retained limits applies with equal force here for "Other Insurance." The parties advance several related arguments as to what is the retained limit, "the applicable limits of any other insurance." ECF# 284-1, p. 11. The parties' briefing reveals that some of the issues are not ripe for summary judgment.

Aspen's motion summarily requests the full $15 million credit for B&V's settlement with MTI's insurers and an additional $5 million credit under Endorsement 35 as underlying insurance for the two plants having a contract value exceeding $50 million. For the "other insurance," B&V asserts it has properly credited Aspen for its $14.5 million settlement with MTI's insurers representing "the exhaustion of two full aggregate limits under both MTI's primary and excess policies for two policy periods, plus an additional $500,000 contribution from MTI's primary insurer." ECF# 338, p. 15; ECF#

307-1. B&V states these settlement amounts "were first allocated to cover legal fees and costs in the amount of $5,278.567 and the remaining amount credited to Retained Limit." ECF# 338, p. 16. B&V moves for summary judgment arguing that the actual amounts recovered from the MTI's insurers constitutes "the full amount of 'other collectible insurances available" as to meet the "Retained Limit" requirement or that Endorsement 35 sets the bar for other insurance to meet the "Retained Limit." ECF# 338, pp. 17-18.

In its summary judgment motion, B&V explains that the subcontractor MTI's primary and excess liability policies gave coverage with limits of $6 million per occurrence and $7 million general aggregate. Because it aggressively pursued coverage under three policy periods with multiple occurrences, B&V made a claim for $22 million coverage against MTI's insurers, asserting coverage under a third policy period (2009-2010) for damages at Cardinal 1. ECF# 338, p. 16. B&V ultimately settled for two full general aggregate limits, plus $500,000, or $14.5 million. B&V also discusses having kept Aspen informed of all settlement efforts, having asked Aspen to participate and assist in these recovery efforts, and having received from Aspen only a reservation of rights and a refusal to participate. B&V explains that its likelihood of recovery under the MTI's third policy was remote and so it accepted the settlement for the two policies. Since Aspen refused to participate in those settlement negotiations, B&V argues Aspen cannot now argue for a different outcome and for benefits from its own

refusal to engage. "Insurers that refuse to participate in settlement should not receive a windfall for their intransigence." ECF# 338, p. 17. B&V's only cited authority is *E.R. Squibbs & Sons, Inc. v. Accident and Cas. Ins. Co.*, 1997 WL 251548 (S.D.N.Y. May 13, 1997).

Aspen responds arguing that B&V's claim for $22 million in coverage against MTI's insurers judicially estops it from now arguing that the actual recovery from MTI's insurers is the recovery of collectible "other insurance" for purposes of its policy. B&V rightly responds this rule of judicial estoppel only applies if the asserting party "succeeds in maintaining that position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The court agrees that Aspen's argument for judicial estoppel cannot prevail here.

Aspen argues that *E.R. Squibbs* applies only when the settlements are reached while the insured is still facing contingent liabilities that could reduce the risk of the insured receiving a double recovery or windfall. While Aspen's reading of *E.R. Squibbs* is too narrow, the court agrees that the decision involves circumstances which are certainly different from the question here of calculating retained limits in the absence of any outstanding contingent liabilities. Aspen also argues the Policy releases it from the obligation to negotiate, settle, or defend when the insured has collectible underlying insurance or other insurance. The decision in *E.R. Squibbs* does not factor in such a policy provision in its rule of equity. The parties have not presented the court with the facts or analysis for evaluating

the possibility of coverage under the third policy or for concluding that the settlement with MTI's insurers was reasonable. The summary judgment record is insufficient to find and apply the rule from *E.R. Squibbs* here. Thus, there are questions of material fact precluding summary judgment on the applicable limits of the "other insurance" involving MTI's insurers.

B&V also looks to Endorsement 35 as providing some guidance for determining the "applicable limits" of "other insurance." On its face, Endorsement 35 provides coverage for certain named projects including, Kyger Creek, Clifty Creek, and Conesville, subject to certain conditions. It expressly provides coverage subject to an additional premium based on the projects' "Full Contract Value." It further states: "The following projects sit in excess of: Sub Contractors' own limits of USD5,000,000 on which Black and Veatch are an additional insured, when Black and Veatch self perform Engineering, Procurement and Construction contracts where Full Contract Values are greater than USD50,000,000." ECF# 338-1, p. 59. B&V argues this Endorsement "requires only one $5 million limit applicable to all Named Projects to meet the defined "other insurance requirement for such projects." ECF# 338, p. 19, n. 7. Aspen responds that it is "entitled to a *minimum* underlying limit of subcontract insurance of $5 million, in addition to the underlying coverage required by the Policy." ECF# 343, p. 25. The court reads Endorsement 35 as separately creating a $5 million limit applicable as one limit for all named projects together. B&V also argues this

Endorsement sets the bar for the "other insurance to be collected in order to meet that component of Retained Limit under the Policy" which was cleared either by MTI's insurers having coverage in excess of $5 million or by B&V's settlement with MTI's insurers exceeding $5 million. ECF# 338 at p. 18. Neither the wording of this endorsement nor any argument offered by B&V would support an interpretation that this endorsement operates as a bar on the applicable "other insurance" limits for JBR units not subject to this Endorsement. The Endorsement expressly recognizes insurance "specifically purchased to apply in excess" of Aspen's policy which under New York law is construed as designating the subcontractors' insurance as "underlying insurance." *See Bovis Lend Lease LMB, Inc. v. Great American Ins. Co.*, 53 A.D.3d 140, 855 N.Y.S.2d 459, 469 (N.Y. App. 2008); *see* Condition H of Aspen Policy, ECF# 284-1, p. 18. As for the subcontractors' liability coverage in excess of $5 million for the named projects and for all other plants, there remains the determination of the applicable limits of this "other insurance" which this court finds, for the reasons already stated above, cannot be decided on this summary judgment record. Consequently, a summary judgment ruling on the retained limit of "other insurance" is not possible.

Invoices Paid by B&V's Professional Liability Insurers

Citing the "one-satisfaction" rule and relying on the deposition testimony of Dennis Frostic, the claims reviewer for B&V's Professional Liability Insurers, Aspen asserts that these liability insurers already

reimbursed B&V on specific subcontractors' invoices for which B&V now seeks payment again from Aspen. Consequently, Aspen wants a summary judgment order that subcontractors' invoices already paid by others cannot be included as part of B&V's claim against Aspen. B&V does not controvert that it periodically submitted invoices to Frostic who reviewed them and advised the insurers on what reimbursements to make. Nor does B&V controvert that its $98 million claim to the Professional Liability Insurers was supported by invoices and was paid to the limit of the professional liability tower. ECF# 345, pp. 39-40. B&V, however, denies that the Professional Liability Insurers "paid on specific invoices submitted by B&V for subcontractor work." *Id.* at p. 40, ¶ 300. B&V understands Frostic to testify that the submitted invoices were paid upon but that the payments were not directed to specific invoices. In support of this reading, B&V submits a declaration from Frostic which is dated after his deposition and states in relevant part:

> 3. . . . On behalf of the Professional Liability Insurers providing coverage to Black & Veatch, I negotiated a settlement of the JBR Internals claim with Black & Veatch.
> 4. Pursuant to the settlement, the Professional Liability Insurers agreed to pay a percentage of all costs incurred in connection with the rebuild of the JBR internals as they were incurred by Black & Veatch.
> 5. Recognizing that a portion of the costs as incurred may not be covered by the professional liability policies, the Professional Liability Insurers agreed to reimburse Black & Veatch 75% of rebuild costs submitted—on an as incurred basis—up to the remaining limits of liability for the professional liability tower of approximately $59 million.
> 6. At my deposition in this matter, Exhibit 116 was identified as documents produced by my law firm pursuant to a subpoena issued by attorneys representing Aspen . . . . That exhibit contains numerous

references to and documents concerning the settlement of the claim made to the Professional Liability Insurers, including invoices Black & Veatch submitted to the Professional Liability Insurers to support its claim for reimbursement as costs were incurred.

7. In issuing reimbursements, the Professional Liability Insurers reviewed a subset of the invoices submitted by Black & Veatch to confirm they related to the rebuild of the JBRs at issue.

8. In issuing reimbursements, the Professional Liability Insurers did not designate or determine specific invoices or portions of invoices for rebuild costs that were being reimbursed, but simply paid 75% of the total submission. The Professional Liability Insurers did pay specific invoices for covered attorney fees and costs of consultants. The attached summary taken from Exhibit 116 reflects the general and not specific invoice by invoice payments made.

ECF# 299-2, pp. 2-3. B&V also looks to the testimony of Stuart Shaw, B&V's vice-president of risk management and dispute resolution, who testified to an agreement with Mr. Frostic whereby the insurers would pay 75% of what was submitted without payments being allocated among specific invoices. ECF# 310-3, pp. 182-185. With this evidence, B&V controverts Aspen's proposed statement of facts over whether the insurers actually reimbursed B&V for specific subcontractors' invoices. *See* ECF# 345, pp, 40-54.

The court agrees with B&V's position that there are genuine issues of material fact here over which, if any, specific invoices were actually paid by the insurers. The evidence certainly indicates invoices were submitted and reviewed, but to say that the record is uncontroverted that B&V's claim for some of those same invoices is necessarily double-dipping assumes facts disputed by those who negotiated and executed the settlement agreement between B&V and its Professional Liability Insurers. The court disagrees with Aspen that Frostic's subsequent declaration plainly

contradicts answers given in his earlier deposition. Aspen is denied summary judgment on this issue. Having found a question of material fact, the court will not take up B&V's alternative arguments for applying the "made whole" doctrine outside of a subrogation context under New York law.

B&V Claim is Moot

Aspen's last issue assumes it has prevailed on all arguments for credits (actual and settlement) from other and underlying insurance and then calculates the total of these to exceed B&V's claim against Aspen, which would moot B&V's claim. Because Aspen has not prevailed on all its positions, including those that follow, and because questions of material fact remain as to some of these issues, the court summarily denies this argument for summary judgment.

**B&V'S MOTION FOR PARTIAL SUMMARY JUDGMENT ECF# 337**

The court has already addressed most of B&V's arguments above in ruling on the issues common to the parties' respective motions. Thus, the court has granted B&V's motion for partial summary judgment that the retained limit for the underlying Zurich insurance has been met by payment or credit for the applicable limits as determined above. Finding there to be genuine issues of material fact and an insufficient record, the court denied summary judgment that the retained limit for the other insurance component has been met by crediting the actual net settlement with MTI's general liability insurers or by application of Endorsement 35. B&V's motion

raises a related issue not decided earlier, that is, what constitutes "other insurance" under the Policy. The court also will take up B&V's remaining summary judgment request that Endorsement 27 requires Aspen to indemnify B&V for property damage arising from professional service errors and exceeding $2 million per occurrence but not more than the $8 million sublimit of each $25 million general aggregate limit.

"Other Insurance"

Noting that the Policy does not define this term of art, B&V argues it is "[i]nsurance that covers the same property against the same risk and in favor of the same party," citing *Western Heritage Ins. Co. v. Century Surety Co.*, 32 F. Supp. 3d 443, 450-51 (S.D.N.Y. 2014). In *Western Heritage,* the court noted the New York Court of Appeals holding, "that the Other Insurance provisions apply only 'where two or more insurance policies cover the same risk in the name of, or for the benefit of, the same person.'" 32 F. Supp. 3d at 451 (citing *Great N. Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 686-87 (1999)); *see Hartford Underwriters Ins. Co. v. Hanover Ins. Co.*, 122 F. Supp. 3d 143, 146 n.2 (S.D.N.Y. 2015), *aff'd*, 653 Fed. Appx. 66 (2nd Cir. Jun. 29, 2016). Under this rule, B&V argues the only "other insurance" applicable here is MTI's general liability policies which listed B&V as an additional insured. B&V argues the following insurance is not "other insurance"--its Professional Liability coverage for errors and omissions by its own professions and the first-party property damage

policies issued to the JBR owners on which B&V was an additional insured—because they insure "different risks and provide recovery for a different range of damages." ECF# 338, p. 8. According to B&V, only subcontractor MTI's general liability insurers insured the same risk as Aspen's liability policy. B&V distinguishes its Professional Liability Policy as insuring "against any economic loss arising from negligent acts, errors or omissions in design, supervision or other professional activities, and does not require bodily injury or property damage caused by an occurrence to be triggered." ECF# 338, p. 12. As for the JBR owners' property insurance, it provided "first-party, no fault coverage." *Id.* at 12-13. Thus, neither of these policies qualifies as "other insurance."

B&V clarifies that its argument as to "other insurance" and exhausting the "retained limits" of "collectible other insurance" does not address the allocation of recoveries from different lines of insurance and the rule against "double-dipping." For allocation, B&V stands on its Exhibit 338-6 which shows unrecovered costs of remediation exceeding $53 million, a sum greater than B&V's property damage claim submitted to the defendants. ECF# 338, p. 14.

Aspen responds that if the court accepts B&V's argument that Endorsement 27 provides some form of professional liability coverage then B&V's Professional Liability insurance is "other insurance" under the retained limits provision. Absent that holding, Aspen apparently concedes B&V's

argument on the meaning of "other insurance" under the retained limits. Aspen certainly challenges B&V's Exhibit 338-6 as including unrecoverable costs and double-dipping.

The court agrees, as Aspen apparently concedes, that "other insurance" does not include the property damage policies issued to the JBR owners on which B&V was an additional insured. B&V also asks the court to restrict any determination of "excess" coverage to the express terms of Endorsement 27 and to conclude that it "does not refer to any other insurance or to any underlying insurance or to the definition of Retained Limit." ECF# 346, p. 18. In short, the court is being asked to determine if the scope of the "other insurance" provisions in the main policy necessarily include consideration of that coverage provided in the policy's endorsement. B&V argues for reading only the express terms of Endorsement 27, while Aspen argues for reading Endorsement 27 as part of the whole policy. Neither side cites any authority for their respective positions. The parties' positions beg the question whether the coverage in Endorsement 27 is distinct as to require its own "other insurance" clause. *See Contract Marine Carriers, Inc. v. Abbott Laboratories, Int'l*, 1993 WL 106374, at *6-*7 (S.D.N.Y. Apr. 6, 1993). This endorsement does not require a separate or additional premium but does have its own limits of liability. The endorsement coverage is of a unique and distinct character in covering professional services specific to B&V's capacity as an Engineering/Procurement

/Construction Contractor ("EPC"). The endorsement, however, expresses this coverage in being an exception to an exclusion under the CGL. In effect, the endorsement makes this loss coverable under the main policy. The court cannot find in the policy any justification for reading the coverage provided in Endorsement 27 in isolation of the other coverage provided by the CGL in determining what is "other insurance." The court will follow the general rule of construing the policy as a whole, giving meaning to all related provisions, and thereby reaching a reasonable conclusion that Endorsement 27's coverage is part of the main policy. Thus, the court denies B&V's request for summary judgment that its Professional Liability insurance necessarily covered a different risk as to not qualify as "other insurance." The court will limit its summary judgment decision to the arguments specifically advanced.

Endorsement 27

B&V asserts it acted as an EPC on each JBR project and contends this endorsement affords coverage for property damage resulting from professional services performed by or on behalf of B&V subject to a sublimit of $8 million per occurrence in excess of $2 million. This endorsement reads:

> **PROFESSIONAL LIABILITY EXCLUSION**
> This policy does not apply to any act, negligence, error or omission, malpractice or mistake arising out of "Professional Services", committed or alleged to have been committed by or on your behalf in the conduct of any of your business activities.
> This exclusion shall not apply to "Bodily Injury" or "Property Damage" that results from such "Professional Services" in connection with your capacity as an Engineering/Procurement/Contractor (EPC).
> A sub limit of USD 8,000,000 will apply in excess of USD 2,000,000 each and every "Occurrence" in respect of such "Bodily Injury" or

> "Property Damage" except where coverage is provided under policy number LB0710358. The sub limit of USD 8,000,000 will form part of the USD 25,000,000 General Aggregate referred to in Item 6b) of the Declarations.
>
> "Professional Services" wherever used in this endorsement means the preparation or approval of audits, accounts, maps plans, opinions, reports, surveys, designs or specifications and supervisory, inspection, engineering or data processing services.

ECF# 338-1, p. 48. B&V also submits AEP's 2009 letters to B&V alleging B&V's errors in design and material selection resulted in defective internal JBR components. ECF## 338-8 and 338-9. B&V contends these allegations trigger the basic insuring agreement for a claim under Endorsement 27 for EPC projects. In its reply, B&V recognizes that "aspects of its Endorsement 27 claim present fact issues about which the parties disagree" and clarifies that its motion is not seeking a judgment on coverage of its professional services claim. ECF# 346, p. 17. Instead, B&V wants the court only to determine now, "based on the undisputed Policy language, that the Endorsement 27 sublimit of coverage is not limited to one general aggregate (as argued by Aspen) but that the sublimit applies to each 'separate and distinct' aggregate for each Named Project in accordance with Endorsement 36." *Id.* at p. 17. Based on this "clarification" in B&V's reply, the court will address only this issue over interpreting the policy language on the applicability of the sublimit to one general aggregate or also to each general aggregate for the named projects in Endorsement 36.

B&V asks the court to read Endorsement 27's provision of the sublimit "form[ing] part of the USD 25,000,000 General Aggregate referred

to in Item 6b) of the Declarations" as subject to Endorsement 36 which amends item 6 of the Declarations. Specifically, Endorsement 36 provides for "a separate and distinct aggregate for each project" named in Endorsement 35. ECF# 284-1, p. 60. It also expressly amends "Items (4) and (6) of the Declaration Page." *Id.* The Declarations Page accordingly reflects a "General Aggregate Limit" of $25 million and a "Per Project Aggregate, in respect of the 13 Named Projects Only, for the project period (see endorsements no. 35 and 36)" of $25 million. ECF# 284-1, p. 2. B&V further points to Section V of the Policy discussing Limits which includes the following:

> If there is a limit stated in Item 6(b) of the Declarations for the General Aggregate Limit (other than the per Project Aggregate in respect of the 13 named Projects and the Products/Completed Operations) that amount is the most we will pay for all damages under INSURING AGREEMENT 1 except for: . . . (2) injury or damage included in the "Products/Completed Operations Hazard" (3) injury or damage in respect of the 13 named Projects and (4) coverages included in the "underlying Insurance" to which no underlying aggregate limit applies.

ECF# 338-1, p. 12. So that each of these provisions have meaning, B&V argues that, "a separate $8 million sublimit for damages in excess of $2 million is available for each Occurrence at each Named Project as well as for each Occurrence at each remaining project." ECF# 338, p. 22. In effect, this interpretation would mean "$8 million of coverage (in excess of $2million) per occurrence but not to exceed the $25 million General Aggregate at each JBR listed in Endorsement 36, and separate sub limited coverage for the

Cardinal projects (under the base Policy as such projects are not listed in Endorsement 36)." *Id.*

Aspen argues that the "Per Project Aggregate Limit" specified in Item 6(c) of the Policy as amended by Endorsement 36 is distinct from the "General Aggregate Limit" specified in Item 6(b) and that Endorsement 27 says it is only a "sublimit" or "part of" the "General Aggregate Limit" in Item 6(b) and is not stacked. Aspen argues that Endorsement 27 does not use or refer to "Project" but only the "General" aggregate limit. Aspen concludes the $8 million is a sublimit per occurrence and is subject to the policy's General Aggregate Limit. Aspen reads, "[t]he effect of Endorsement 27 is to cap the professional liability exposure to the General Aggregate limit of $25 million, depending on the number of occurrences." ECF# 343, p. 35. Aspen does not address the Section V provision that explicitly addresses the limits in Item 6(b).

Section V is significant here, because this provision essentially makes the "General Aggregate Limits" in Item 6(b) subject to "Per Project Aggregate Limit" in 6(c). For the projects named in Endorsement 36, there is stated a separate and distinct aggregate limit along with an exemption from the general aggregate limits in Item 6(b). The court agrees with B&V that the reasonable conclusion giving effect to all relevant provisions is that the professional services sublimit applies to each "separate and distinct

aggregate for each project" named in Endorsement 36. B&V is entitled to partial summary judgment on this issue.

**MOTION TO AMEND PRETRIAL ORDER (ECF# 339)**

In its order of May 1, 2018, the district court stated, "Should a party believe administration of this case would be enhanced by amendment of the pretrial order based on the Tenth Circuit's ruling, any motions to amend should follow the same briefing schedule above." ECF# 335, pp. 5-6. The court's suggestion was intended to assist the parties in framing their motions consistent with what they had already outlined as the issues in this case. The court did so because of its familiarity with the parties' tendency in prior motion proceedings.

At this juncture, the court's partial summary judgment ruling has mooted much of the parties' briefing on this motion. The court will not ask for the parties to brief this motion again, as the case will be transferred for trial. Whether a new pretrial order has administrative value is a determination to be made after transfer.

IT IS THEREFORE ORDERED that Aspen or Excess Insurers' motion for summary judgment (ECF# 340) is denied;

IT IS FURTHER ORDERED that B&V's motion for partial summary judgment (ECF# 337) is granted in part, that the retained limit for the underlying Zurich insurance has been met by payment or credit for the applicable limits as determined herein, that "other insurance" as used in

"Retained Limit" does not include the property damage policies issued to the JBR owners on which B&V was an additional insured, and that Endorsement 27's $8 million sublimit for damages in excess of $2 million applies to each separate and distinct $25 million aggregate for each Named Project in Endorsement 36, but B&V's motion is denied in all other respects as stated above;

IT IS FURTHER ORDERED that B&V's motion to amend the pretrial order (ECF# 339) is denied without prejudice.

Dated this 29th Day of March, 2019.

s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge