**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| BLACK & VEATCH CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:12-cv-02350-KHV-ADM |
| | ) | |
| ASPEN INSURANCE (UK) LTD. and | ) | |
| LLOYD'S SYNDICATE 2003, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BLACK & VEATCH'S MEMORANDUM IN SUPPORT OF MOTION TO BAR THE
OPINIONS AND TESTIMONY OF BERND G. HEINZE**

**I.     Nature of the Matter before the Court**

Black & Veatch ("B&V") moves under Fed. R. Evid. 702 and related authorities to exclude from evidence the report of and any testimony from Aspen/Catlin's designated expert witness Bernd G. Heinze.

**II.     Statement of Facts**

Aspen/Catlin has proffered the report and proposes to offer testimony from Bernd Heinze concerning his "opinion as to positions of the Liability Insurers in relation to" B&V's "claim for coverage in this matter, and, specifically, the impact of underlying insurance and other recoveries by B&V on the claims being asserted by B&V here, based upon [his] understanding of the customs, usage, practices and customs [sic] of the insurance industry at the relevant and material times in this matter and the insurance policies in issue." *See* Heinze Report, Exhibit 1, pp. 2, 12. Mr. Heinze is an attorney with extensive insurance industry experience. *See id.* at pp. 2-6.

As Mr. Heinze acknowledges—consistent with findings of this Court—the Aspen/Catlin Policy (the "Policy") at issue here is "a non-standard manuscripted policy (not a standard general

liability policy), and is not written on a . . . standard form." *See id.* at p. 9; *see also* Pretrial Order, Doc. 294, p. 4, ¶ 10 Stipulations (the "Policy is a negotiated policy").

Mr. Heinze's report lists the documents he reviewed and outlines his understanding of the background facts, including a fairly lengthy description of his understanding of B&V's claim. *See* Ex. 1, at pp. 6-18. With respect to B&V's claim for JBR internals rebuild costs, Mr. Heinze opines that "once the value of the 'covered' re-build expense is identified, the claim amount is then properly reduced by" recoveries B&V "received from AEP, . . . the MTI litigation, . . . the professional liability tower," and "the *Strongwell* litigation (if any)." *Id.* at pp. 18-19.

Although Mr. Heinze admits that legal issues such as whether an "Occurrence" resulting in Third Party "Property Damage" occurred and whether any "applicable exclusions" would "otherwise operate to preclude coverage" are "issues for Court and the trier of fact to resolve," his report nevertheless renders opinions about certain purposes of insurance, "guiding principles" about liability policies, and whether under New York law certain damages constitute an "occurrence." *See id.* at pp 19, 22; Mr. Heinze's report also describes his view of certain "recoveries" B&V has made, as well as his characterization of B&V's position with respect to those recoveries' appropriate allocations. *See id.* at pp. 20-21.

Then, in a section titled "Findings and Opinions," Mr. Heinze's report:

- opines that "New York takes the position that damage to an insured's work product due to faulty workmanship or construction does not constitute an occurrence under a general liability policy;"

- opines that if "the Court finds that there is coverage for B&V's claim, the *claim value* must take into account the recoveries from AEP, MTI (and its insurers), the Professional Liability carriers, and, finally, the Zurich primary underlying limits of liability;"

- states that as "shown by Endorsement 35 of the Policy, the Liability Insurers [sic] attachment point is not only above the Zurich $4 million per 'Designated Construction Project Aggregate' aggregate, but 'sit in excess of: Sub Contractors' own limits of USD5,000,000' for Kyger Creek and Clifty Creek;"

- identifies certain "attachment points for the various plants" including, *inter alia*, three separate "Warranty of Limits" values, for $5 million *each* for the Clifty 13, Kyger 12 and Kyger 35 claims;

- concludes that taking "the Benes Report numbers as correct, the Cardinal 3, Kyger Creek 12 and 35, Clifty 13 claims are moot as the claim does not reach the Liability Insurers [sic] attachment point;"

- states that "the backcharge/warranty claim" is "subject to the Zurich general aggregate," for a net of $3,497,327; and

- states that the "total amount of damages being sought are $28,095,76 [sic]" and that because "B&V has recovered in excess of this amount already," "B&V has already been compensated for the portion of the claim for which B&V would potentially be entitled to recover from the Liability Insurers."

*Id.* at pp. 22-23 (emphasis added).

## III. Question Presented

Should this Court exclude Mr. Heinze's report and intended testimony under Fed. R. Evid. 702 because that content will not help the trier of fact to understand the evidence or to determine a fact in issue in that Mr. Heinze's opinions are legal conclusions that invade the Court's province to instruct the jury and, in several instances, are contrary to the Tenth Circuit's law of this case as well as to this Court's summary judgment rulings?

## IV. Argument

### A. Legal Standards

As previously summarized by the Court:

The court has a "gatekeeping obligation" to determine the admissibility of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). When performing this gatekeeping role, the court has broad discretion when deciding whether to admit expert testimony. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (quoting *Orth v. Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992)). The admissibility of expert testimony is governed by Federal Rule of Evidence 702. It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This court must apply a two-part test to determine admissibility. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). First, the court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, the court " 'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.' " *Id.* (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)) (further citations omitted).

. . . .

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy*, 707 F.3d at 1168 (citing *Nacchio*, 555 F.3d at 1241).

*Radiologix, Inc. v. Radiology & Nuclear Med., LLC*, Case No. 15-4927-DDC-KGS, 2018 WL 1070876, at *4-6 (D. Kan. Feb. 26, 2018).

Further, an expert's testimony is improper under Rule 702 if the expert "attempt[s] to define the legal parameters within which the jury must exercise its fact-finding function." *Id.* at *8 (citing *Specht v. Jensen*, 853 F.2d 805, 809-10 (10th Cir. 1988)). The Court must therefore exclude testimony when its purpose "is to direct the jury's understanding of the legal standards upon which their verdict must be based" because testimony that "articulates and applies the relevant law ... circumvents the jury's decision-making function by telling it how to decide the case." *Id.* (citing *Specht*, 853 F.2d at 808, 810).

As explained in *Specht*, courts must consider whether a proposed expert's testimony will "encroach" on "the trial court's authority to instruct the jury on the applicable law, for it is axiomatic that the judge is the sole arbiter of the law and its applicability." 853 F.2d at 807. The *Specht* court further noted that the rules committee's advisory notes to Fed. R. Evid. 704 emphasized that "an expert should not be allowed to instruct the jury" and that, following those comments, a number of federal circuit courts held "that an expert witness may not give an opinion on ultimate issues of law." *Id.* at 807-08 (citing, *inter alia*, *In Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977), for holding that trial court erred in allowing lawyer to render his opinions on legal obligations arising from a contract and the legal significance of various facts in evidence because it "is not for witnesses to instruct the jury as to the applicable principles of law, but for the judge").

**B.      Mr. Heinze's Report and Testimony Should Be Excluded.**

Mr. Heinze's report and proposed testimony in this case should be excluded because they will not help the trier of fact to understand the evidence or to determine a fact in issue, will confuse and confound the jury, and invade the province of the Court, including because Mr. Heinze opines on ultimate issues of law and does so contrary both to the law of the case according to the Tenth Circuit and to this Court's summary judgment rulings.

**1.      Mr. Heinze's opinions are contrary to the Tenth Circuit's and this Court's conclusions of law.**

Several of Mr. Heinze's opinions should be excluded simply because they have already been held legally incorrect by prior opinions and rulings of the Tenth Circuit and this Court. In his report's "Findings and Opinions" section, for example, Mr. Heinze opined that under New York law, "damage to an insured's work product due to faulty workmanship or construction does not constitute an occurrence under a general liability policy." *See* Ex. 1, p. 22. But the Tenth

Circuit ruled that the Policy's definition of "Occurrence" encompasses damage to B&V's own work arising from faulty subcontractor workmanship. *See Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 882 F.3d 952, 964-65 (10th Cir. 2018).

The Tenth Circuit's holding was based in part on a "subcontractor exception" that restores coverage otherwise excluded by the Policy and was also based in part on Endorsement 4, which the Tenth Circuit recognized would be rendered mere surplusage were the view espoused by Mr. Heinze applied. *See id.* To permit Mr. Heinze to offer this opinion, then, would invade the province of the Court to accurately instruct the jury, and run afoul of the law of the case.[1]

This example also highlights that, although Mr. Heinze's extensive background in the insurance industry may render him an appropriate expert witness in particular contexts, that general expertise and knowledge is of lesser utility here where, as Mr. Heinze acknowledges, the Policy is not standard form but was instead negotiated.

As another example, in claiming to identify the Policy's "attachment points for the various plants," Mr. Heinze opined that separate "Warranty of Limits" applied, to the Clifty 13, Kyger 12 and Kyger 35 claims. *See* Ex. 1, p. 23. But as this Court held, the "Warranty of Limits" in Endorsement 35 "creates <u>one limit</u> for all Named Projects together," (Clifty 13, Kyger 12 and Kyger 35 are Named Projects). *See Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 378 F. Supp. 3d 975, 1010 (D. Kan. Mar. 29, 2019). Mr. Heinze's "Warranty of Limits" opinion is contrary to this Court's summary judgment ruling, cannot help the jury and is irrelevant at this point, and must be excluded. *See Radiologix, Inc.*, 2018 WL 1070876, at *6 (holding that expert witness's

---

[1] *See Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995), (when "a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal").

opinion concerning legal issue already decided by district court's summary judgment ruling was irrelevant and had to be excluded).

And even where Mr. Heinze *says* his Report does not address "legal issues" such as whether any covered "Occurrence" occurred here, and whether any Third Party "Property Damage" has been incurred, because he acknowledges that those "are issues for the Court and the trier of fact to resolve," the Report in fact specifically opines on those issues. *See* Ex. 1, p. 19. In that very same section, titled "Coverage under the Policy for the B&V Claim," Mr. Heinze says that in "order for there to be an 'Occurrence' under the Policy, there must be an 'accident' that 'was not expected or intended' that results in Third Party 'Property Damage.'" *Id.*

Despite giving lip service to the Court's and jury's respective provinces, Mr. Heinze opines that the claim for which B&V seeks to recover in this case is "for contract non-conformance – for B&V's failure to meet the requirement of the contract(s) entered into with AEP" and that "[t]ypically, coverage does not exist under general liability policies for costs to repair defective work or a defective product itself" because the "purpose of the coverage grant in the Policy is to protect the insured against liability resulting from accidental acts ('occurrences')." *Id.* Mr. Heinze then states that where "an insured's liability is based on a foreseeable risk, e.g., the risk that defective products may cause the work to be faulty, damages for breach of contract are a predictable result," (*id.*), more than implying B&V's alleged contract non-conformance does not meet this test.

Not only does Mr. Heinze's Report thus contain opinion content he acknowledges improperly invades the province of this Court and the jury, such content has been rejected by the Tenth Circuit. The Tenth Circuit has already decided that "the damages at issue here were caused by a coverage-triggering 'occurrence' because, among other things, they were accidental and

harmed a third party's property" and the "JBR damage constitutes 'Property Damage' because it involved physical injury to tangible property of a Third Party." *Black & Veatch Corp.*, 882 F.3d at 956, 963-65, 971. Mr. Heinze's contrary opinions and commentary are irrelevant and inappropriate, and should be excluded.

Similarly, in his opinions about the "attachment point" for Aspen/Catlin's liability, Mr. Heinze applies a $4 million "Designated Construction Project Aggregate" to each project. *See* Ex. 1, p. 23. But here, too, this Court has already held to the contrary, concluding that the attachment credit is the per-occurrence limit of $2 million per location/project for each of the 4 uncompleted JBRs. *See Black & Veatch Corp.*, 378 F. Supp. 3d at 1008-09. And the completed operations aggregate of $4 million applies to the completed JBRs for an aggregate of $4 million *total* for Cardinal 1, Cardinal 2 and Conesville – not the $12 million suggested by Heinze. *See id.* at 1007-09.

Aspen/Catlin should be precluded from offering any of Mr. Heinze's opinions and related testimony, and any other opinions and testimony contrary to this Court's and the Tenth Circuit's prior holdings.

> **2.    Mr. Heinze's other opinions should also be excluded as impermissible legal opinions that invade the Court's province of instructing the jury or the jury's province to decide ultimate issues.**

In addition to the above examples of Mr. Heinze's opinions that are directly contrary to the law of the case, his other opinions and proposed testimony concerning allocation of B&V's prior recoveries, credits, underlying and other insurance, and related topics should be excluded because they are nothing but opinions of legal standards he thinks should be applied here: *i.e.*, substitute jury instructions that "encroach" on "the trial court's authority to instruct the jury on the applicable law" under *Specht* (853 F.2d at 807), or conclusions on ultimate issues that invade the jury's province.

With respect to the former, the parties espouse diametrically opposed approaches for determining the quantum of damages and the final amount B&V may be awarded in this lawsuit. As set forth in the draft Pretrial Order dated July 19, 2019, B&V contends:

> The Policy provides a defined path to determine Aspen's indemnity obligation under either of B&V's concurrent claims. The starting point for each claim begins with determining "Property Damage." The General Liability indemnity obligation is Property Damage sustained in excess of the Retained Limit. The Endorsement 27 Professional Liability indemnity obligation is Property Damage sustained, per Occurrence, in excess of $2 million but not more than $8 million (and the Retained Limit does not apply). Under either claim path, any recovery is subject to the Policy's applicable aggregates (specifically, Endorsements 35 and 36). . . .

> Once Aspen's indemnity obligation is determined . . . , any judgment is also limited to preclude "double recovery." B&V contends that this means any judgment plus B&V's other recoveries for damages resulting from the JBR occurrences cannot exceed B&V's total damages sustained as a result of the JBR occurrences. Such other recoveries include all recoveries other than the Retained Limit components. The avoidance of a double recovery is measured *not* against Property Damage recoverable under the Policy but rather against B&V's total damages sustained. After deducting all of B&V's other recoveries from its total damages sustained, B&V's unrecovered damages are still greater than its claim against Aspen.

Draft Pretrial Order, p. 23, at (7)(a)(2)-(5) (emphasis in original).[2]

By contrast, Aspen "disputes B&V's damage computation" and without reference to provisions of the Policy.  Aspen contends "the amount of covered 'property damage' is less than the amounts claimed and/or has already been paid in whole or in part by recoveries from other insurers and other parties." *Id.* at (7)(b)(1)-(5). Aspen contends that "the amount of the claim should be calculated by first determining the amount of 'property damage' for the JBR rebuild, and then reducing that amount by what B&V agrees is not covered to arrive at a net rebuild claim value," that the "net rebuild claim value is then reduced by 'other insurance' and/or B&V's

---

[2] Judge Mitchell issued this draft PTO subject to her direction for the parties to file motions to amend. The referenced statements are the most succinct contrast of the parties' positions.

recoveries, and that amount is then subject to the Policy aggregates and limits." *Id*. Aspen's contention seeks to rewrite the Policy by inappropriately increasing the Retained Limit and adding sums to the Endorsement 27 threshold of "in excess of $2 million." Resolution of this difference for calculation of indemnity under the contract language of the Policy is a legal question for the Court, and Mr. Heinze's opinions on the issue are not allowed under Rule 702.

The "Findings and Opinion" section of Mr. Heinze's report essentially "finds" and "opines" that the correct order of computing damages is as outlined by Aspen, above. *See* Ex. 1, pp. 22-23. But those findings and opinions generally do not explain why, in reference to the Policy or other controlling contracts (for example, by reference to the MTI settlement agreements) or Mr. Heinze's experience, Aspen's proposed damage-computation methodology is correct. *See id.* Mr. Heinze's Report merely says it is. *See id.*

This is problematic under *Daubert* for several reasons. First, the determination of how the various Policy provisions work together to permit an ultimate damages computation, including in coordination with any controlling terms of settlement agreements with other insurers or parties, are matters of contract interpretation for the Court to determine or instruct the jury; matters that are the Court's exclusive province. *See generally Specht*, 853 F.2d at 807-10. Second, to the extent Mr. Heinze's Report purports to answer those questions, he has opined on the ultimate issues in the case without offering opinions explaining why—either in his experience or under the Policy—his opinions are correct. *See id.* Indeed, with respect to certain Policy-referencing conclusions, Mr. Heinze's "Findings and Opinion" *does* include—for example, the "Warranty of Limits" conclusions and Mr. Heinze's view that three separate $4 million aggregates apply to Cardinal 1, Cardinal 2 and Conesville— but those opinions have been rejected by this Court (like others rejected by this Court and the Tenth Circuit). *See* Part B.1., *supra*.

Mr. Heinze's opinions should thus be excluded not only to the extent that they have been rejected by this Court and the Tenth Circuit, but in their entirety because they constitute *de facto* jury instructions that invade the province of the Court and must be excluded under *Specht* and like authorities. As the *Specht* court explained:

> There is a significant difference between an attorney who states his belief of what law should govern the case and any other expert witness. While other experts may aid a jury by rendering opinions on ultimate issues, our system reserves to the trial judge the role of adjudicating the law for the benefit of the jury. When an attorney is allowed to usurp that function, harm is manifest in at least two ways.
>
> First, as articulated in *Marx & Co. v. Diners' Club, Inc.*, the jury may believe the attorney-witness, who is presented to them imbued with all the mystique inherent in the title "expert," is more knowledgeable than the judge in a given area of the law. *Marx*, 550 F.2d at 512. Indeed, in this case, the expert's knowledge and experience was made known to the jury by both the court and counsel in a manner which gave his testimony an aura of trustworthiness and reliability. Thus, there is a substantial danger the jury simply adopted the expert's conclusions rather than making its own decision. Notwithstanding any subsequent disclaimers by the witness that the court's instructions would govern, a practical and experienced view of the trial world strongly suggests the jury's deliberation was unduly prejudiced by the expert's testimony.
>
> Second, testimony on ultimate issues of law by the legal expert is inadmissible because it is detrimental to the trial process. If one side is allowed the right to call an attorney to define and apply the law, one can reasonably expect the other side to do the same. Given the proclivity of our brothers and sisters at the bar, it can be expected that both legal experts will differ over the principles applicable to the case. The potential is great that jurors will be confused by these differing opinions, and that confusion may be compounded by different instructions given by the court . . . .
>
> The line we draw here is narrow. We do not exclude all testimony regarding legal issues. . . . [A]n expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function. However, when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case.

853 F.2d at 808-10; *see also Radiologix, Inc.*, 2018 WL 1070876, at *8 (applying *Specht* and excluding expert's opinions interpreting various provisions of an agreement as "improper legal conclusions").

And because legal opinion testimony that purports to articulate "the ultimate principles of law governing the deliberations of the jury" has the effect of "directing a verdict" (*Specht*, 853 F.2d at 808), Mr. Heinze's opinions would also invade the province of the jury, confuse them as to the governing principles that must define their deliberations, and thus not be helpful to the trier of fact.

## CONCLUSION

For the foregoing reasons, B&V respectfully requests that the Court exclude from evidence at trial the report of and any testimony from Aspen/Catlin's designated expert witness Bernd Heinze.

Respectfully submitted,

POLSINELLI PC

By  /s/ Roy Bash
   Roy Bash  (MO 25769) (KSD 70303)
   900 W. 48th Place, Suite 900
   Kansas City, MO 64112
   Phone:  816-753-1000
   Fax:  816-753-1536
   rbash@polsinelli.com

David T. Dekker (*pro hac vice*)
David L. Beck (*pro hac vice*)
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Phone:  202-663-8000
Fax:  202-663-8007
david.dekker@pillsburylaw.com
david.beck@pillsburylaw.com

George A. Hanson              (KS 16805)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone:  816-714-7115
Fax:  816-714-7101
hanson@stuevesiegel.com

**ATTORNEYS FOR PLAINTIFF**
**BLACK & VEATCH CORPORATION**

## CERTIFICATE OF SERVICE

This is to certify that I have on the 22nd day of July, 2019, filed the foregoing pleading, its Exhibit Index, and accompanying Exhibit, with the Clerk of the Court using the CM/ECF system, which will send email notification of such filing to the following attorneys of record:

Michael J. Kuckelman
Michael T. Crabb
KUCKELMAN TORLINE KIRKLAND
10740 Nall Avenue, Suite 250
Overland Park, KS 66211
mkuckelman@ktk-law.com
mcrabb@ktk-law.com

Robert J. Franco (*pro hac vice*)
Andrew C. Patton (*pro hac vice*)
FRANCO MORONEY BUENIK LLC
500 West Madison St., Suite 2440
Chicago, IL 60661
Robert.franco@francomoroney.com
Andrew.patton@francomoroney.com

**ATTORNEYS FOR DEFENDANTS
ASPEN INSURANCE (UK) LTD. and
LLOYD'S SYNDICATE 2003**

 /s/ Roy Bash
Attorney for Plaintiff